SCHEDULED FOR ORAL ARGUMENT ON _____

NO. 11-1271

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

In Re:  AIKEN COUNTY, SOUTH CAROLINA; ROBERT L.
FERGUSON; WILLIAM LAMPSON; GARY PETERSEN; STATE
OF SOUTH CAROLINA; STATE OF WASHINGTON;
NATIONAL ASSOCIATION OF REGULATORY UTILITY
COMMISSIONERS; NYE COUNTY, NEVADA, Petitioners.

UNITED STATES NUCLEAR REGULATORY COMMISSION,
and GREGORY B. JACZKO, Chairman of the United States Nuclear
Regulatory Commission, Respondents.

On Petition For Writ Of Mandamus (Agency Action Unreasonably Withheld)

**BRIEF OF PETITIONERS**

THOMAS R. GOTTSHALL
S. ROSS SHEALY
Haynsworth Sinkler Boyd, P.A.
Post Office Box 11889
Columbia, SC 29211-1889

*Attorneys for Aiken County*

BARRY M. HARTMAN
CHRISTOPHER R. NESTOR
JOHN ENGLERT*
K&L Gates LLP
1601 K Street, N.W.
Washington, DC 20005-1600
*not admitted*

*Attorneys for Robert L. Ferguson,
William Lampson, and Gary Petersen*

ALAN WILSON*
Attorney General for the State of
    South Carolina
JOHN W. MCINTOSH*
ROBERT D. COOK*
Post Office Box 11549
Columbia, SC 29211
*not admitted*

WILLIAM HENRY DAVIDSON, II
KENNETH PAUL WOODINGTON
Davidson & Lindemann, P.A.
1611 Devonshire Dr., 2nd Floor
Post Office Box 8568
Columbia, SC 29202-8568

*Attorneys for the State of
South Carolina*

ROBERT M. MCKENNA*
Attorney General
ANDREW A. FITZ
TODD R. BOWERS
State of Washington
Office of the Attorney General
Post Office Box 40117
Olympia, WA 98504-0117
*not admitted*

*Attorneys for State of Washington*

JAMES BRADFORD RAMSAY
ROBIN J. LUNT
National Association of Regulatory
    Utility Commissioners
1101 Vermont Ave. N.W., Suite 200
Washington, DC 20005

*Attorneys for NARUC*

ROBERT M. ANDERSEN
Akerman Senterfitt LLP
750 9th Street, N. W.
Suite 750
Washington DC 20001

*Attorney for Nye County*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A.    Parties, Intervenors, and Amici Curiae

The following is a list of all parties, intervenors, and amici in this action.

### 1.    Parties

The Petitioners in this action are:  Aiken County, South Carolina; Robert L. Ferguson, William Lampson, and Gary Petersen (the "Ferguson Petitioners"); the State of South Carolina; the State of Washington; the National Association of Regulatory Utility Commissioners (NARUC); and Nye County, Nevada.

The Respondents are the United States Nuclear Regulatory Commission (NRC) and NRC Chairman, Gregory B. Jaczko.

### 2.    Intervenors

The State of Nevada is an intervenor in this action.

### 3.    Amici Curiae

The Nuclear Energy Institute is an amicus curiae in this action.

## B.    Ruling Under Review

This is an original action filed pursuant to 42 U.S.C. § 10139(a)(1)(B).

## C.    Related Cases

*In re Aiken County*, No. 10-1050, *consolidated with* 10-1052, 10-1069, and 10-1082.

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, NARUC respectfully submits this disclosure statement. NARUC is a quasi-governmental non-profit association incorporated in the District of Columbia. NARUC has no parent corporation nor is there any publicly held corporation that owns stock or other interest in NARUC. NARUC is supported predominantly by dues paid by its State public utility commissioner members and through revenues generated by meetings of those members held three times each year.

Respectfully submitted,

s/ *James Bradford Ramsay*
JAMES BRADFORD RAMSAY
General Counsel
National Association of Regulatory
   Utility Commissioners
1101 Vermont Avenue, N.W., Suite 200
Washington, DC  20005
DATED: December 5, 2011     (202) 898-2207

**TABLE OF CONTENTS**

I.  STATEMENT OF JURISDICTION ................................................................. 1

II.  PERTINENT STATUTES AND REGULATIONS ....................................... 1

III.  STATEMENT OF ISSUES ......................................................................... 2

IV.  STATEMENT OF THE CASE .................................................................... 2

V.  STATEMENT OF FACTS............................................................................ 4

    A.  NRC Process for Reviewing Yucca Mountain License Application......... 4

        1.  DOE Required to Submit License Application for Construction
           Authorization ................................................................................ 4

        2.  NRC Review of Application Included Both Technical Review
           by Staff and Formal Adjudication by ASLB...................................... 6

        3.  Three-Year Schedule for NRC to Issue Final Decision on
           Construction Authorization ............................................................ 7

    B.  DOE Moved to Withdraw Application and ASLB Denied that
       Motion............................................................................................. 8

    C.  The NRC Delayed Action on Review of the ASLB's Order,
       Yielding a 14-Month Hiatus ............................................................ 10

    D.  The NRC Chairman Ordered Closure of the Agency's Technical
       Review Process ............................................................................... 13

        1.  October 2010 Budget Execution Memorandum Directed
           Closeout Despite Continuing Resolution that Maintained
           Spending Authority ...................................................................... 14

        2.  Staff Directed to Proceed as if License Application had been
           Withdrawn ................................................................................... 14

        3.  NRC Chairman's Actions Challenged by Other Commissioners ..... 15

4. The NRC Chairman Blocked Release of Staff SER ......................... 17

5. Shutdown Terminates Licensing Support Network .......................... 18

6. The NRC Chairman Claims DOE, and Not the NRC,
   Effectively Terminated License Review Process............................. 19

E. The Commission's September 9 Memorandum and Order Leaves
   ASLB Order Denying License Withdrawal Intact and Undisturbed....... 20

F. The NRC Has Nevertheless Completed Shut Down of Its Review
   Process ................................................................................. 21

G. Following the NRC Order, the ASLB has Suspended Adjudication
   of the Yucca Mountain License Application ........................................... 22

VI. SUMMARY OF ARGUMENT .................................................... 23

VII. ARGUMENT ................................................................................. 26

A. Preliminary Issues.................................................................... 26

1. Standing: Each Petitioner has Standing to Challenge the
   Inactions at Issue ................................................................. 26

   a. Nye County, Nevada................................................... 28

   b. Aiken County, South Carolina.................................... 30

   c. South Carolina............................................................ 31

   d. Washington ................................................................ 32

   e. Robert Ferguson, Gary Petersen, and William Lampson .......... 33

   f. NARUC........................................................................ 34

2. Respondents' Challenged Actions are Expressly Reviewable
   Under the NWPA ................................................................. 34

B. Standard of Review................................................................... 35

C.  The NRC has Unreasonably Withheld Consideration of, and a Final Decision On, the Yucca Mountain License Application Contrary to the Mandates of the NWPA ..................................................................... 37

1.  The NRC has Unreasonably Withheld Review of the Yucca Mountain License Application Contrary to the Statutory Mandate that NRC "Shall Consider" the License ............................ 37

    a.  The NRC has a duty to "consider" the Yucca Mountain license application ......................................................................... 37

    b.  The NRC's failure to consider DOE's application is unreasonable under the *TRAC* factors ......................................... 38

        (1)  The NRC's failure to consider DOE's application is unreasonable in light of the statutory time frame for reaching a final decision and the circumstances of delay ..................................................................................... 39

            (a)  The NRC undertook no action on DOE's application for approximately half of its three-year timeline under the NWPA .................................. 39

            (b)  The circumstances under which the NRC terminated license application review are unreasonable ................................................................ 41

                1)  It was unreasonable for the NRC Chairman to terminate NRC review of DOE's license application while DOE's motion to withdraw stood denied ......................................... 42

                2)  Budget excuses do not render the NRC's failure to consider DOE's application reasonable ........................................................... 44

                    a)  The NRC had sufficient money to consider DOE's application .......................... 44

                    b)  As a matter of law, lack of appropriation does not relieve a mandatory duty ............... 47

(2)    The NRC's failure to consider DOE's application
        directly prejudices interests addressed by the NWPA....... 49

(3)    Issuing a writ will not impact the NRC's other duties
        or competing priorities........................................................ 50

2.    The NRC has Violated its Duty to Issue a Final Decision
      Approving or Disapproving the Yucca Mountain License
      Application ........................................................................................ 52

VIII. CONCLUSION AND PRAYER FOR RELIEF ............................................ 54

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Abbott Lab. v. Gardner*,
387 U.S. 136 (1967)............................................................................28

*Albuquerque Indian Rights v. Lujan*,
930 F.2d 49 (D.C. Cir. 1991)..............................................................26

\* *Ass'n of Am. Railroads v. Costle*,
562 F.2d 1310 (D.C. Cir. 1977)..........................................................53

\* *Cherokee Nation v. Leavitt*,
543 U.S. 631 (2005)............................................................................48

\* *City of Dania Beach, Fla. v. FAA*,
485 F.3d 1181 (D.C. Cir. 2007)..........................................................27

*Ctr. For Law & Educ. v. Dep't of Educ.*,
396 F.3d 1152 (D.C. Cir. 2005)..........................................................27

*Devia v. NRC*,
492 F.3d 421 (D.C. Cir. 2007)............................................................28

*Esch v. Yeutter*,
876 F.2d 976 (D.C. Cir. 1989)............................................................41

\* *Firebaugh Canal Co. v. United States*,
203 F.3d 568 (9th Cir. 2000) .............................................................48

*Hodges v. Abraham*,
300 F.3d 432 (4th Cir. 2002) .............................................................31

*Houston Lighting & Power Co.*, (South Texas Project, Units 1 & 2),
14 N.R.C. 933, CLI-81-28 (1981) ......................................................21

\* *In re Aiken Cnty.*,
645 F.3d 428 (D.C. Cir. 2011)............................19, 20, 23, 24, 35, 36, 37, 43, 52

v

\* *In re Am. Rivers & Idaho Rivers United,*
    372 F.3d 413 (D.C. Cir. 2004)........................................................36

  *In re Bluewater Network,*
    234 F.3d 1305 (D.C. Cir. 2000)....................................................51

  *In re Int'l Chem. Workers Union,*
    958 F.2d 1144 (D.C. Cir. 1992)....................................................36

\* *Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992).................................................................26, 28

\* *N. States Power Co. v. Dep't of Energy,*
    128 F.3d 754 (D.C. Cir. 1997)......................................................53

  *NARUC v. Dep't of Energy,*
    851 F.2d 1424 (D.C. Cir. 1988)....................................................34

\* *Nuclear Energy Inst., Inc. v. EPA,*
    373 F.3d 1251 (D.C. Cir. 2004)...............................................27, 49

  *Panhandle E. Pipe Line Co. v. FERC,*
    613 F.2d 1120 (D.C. Cir. 1979)....................................................41

\* *Pub. Citizen Health Research Grp. v. FDA,*
    740 F.2d 21 (D.C. Cir. 1984)...................................................35, 51

  *Sierra Club v. Thomas,*
    828 F.2d 783 (D.C. Cir. 1987)......................................................35

\* *Telecomm. Research & Action Ctr. v. Fed. Commc'ns Ctr.,*
    750 F.2d 70 (D.C. Cir. 1984) (*TRAC*) ..................................36, 39, 49, 50, 51, 53

\* *Tennessee Valley Auth. v. Hill,*
    437 U.S. 153 (1978)....................................................................47

  *Zivotofsky v. Sec'y of State,*
    571 F.3d 1227 (D.C. Cir. 2009)....................................................38

## Statutes

5 U.S.C. § 555(b) ...................................................................... 35

5 U.S.C. § 706(1) ................................................................... 1, 35

28 U.S.C. § 1651(a) .................................................................... 1

28 U.S.C. § 2412 ...................................................................... 54

42 U.S.C. § 5841(a)(1) ............................................................... 42

Nuclear Waste Policy Act,
  42 U.S.C. §§ 10101-10270 ...................................................... 2

  42 U.S.C. §§ 10131-10145 .................................................. 1, 34

  42 U.S.C. §§ 10132-10145 ...................................................... 27

  42 U.S.C. § 10101(31) ........................................................... 28

  42 U.S.C. § 10131(a)(1) .................................................... 27, 50

  42 U.S.C. § 10131(a)(2) .................................................... 27, 50

  42 U.S.C. § 10131(a)(3) .................................................... 27, 50

  42 U.S.C. § 10131(a)(7) .................................................... 27, 50

  42 U.S.C. § 10131(b) ............................................................ 27

  42 U.S.C. § 10131(b)(1) .......................................................... 4

  42 U.S.C. § 10131(b)(2) .......................................................... 4

  42 U.S.C. § 10134(b) ............................................................. 5

  42 U.S.C. § 10134(c) ............................................................ 40

  42 U.S.C. § 10134(d) ....................... 2, 7, 23, 24, 28, 37, 39, 52, 53

  42 U.S.C. § 10134(e)(1) ......................................................... 40

42 U.S.C. § 10134(e)(2) ..................................................40

42 U.S.C. § 10136(c) ................................................28, 29

42 U.S.C. § 10137(d) ...............................................28, 29

42 U.S.C. § 10139(a)(1)(B) .......................................1, 34

42 U.S.C. § 10139(a)(2) ..................................................1

Pub. L. No. 107-200, 116 Stat. 735 (2002)
 (codified at 42 U.S.C. § 10135, note) ........................5

Pub. L. No. 111-85, 123 Stat. 2845 (2009) ...................44

Pub. L. No. 111-242, 124 Stat. 2607 (2010) .................45

Pub. L. No. 111-290, 124 Stat. 3063 (2010) .................45

Pub. L. No. 111-317, 124 Stat. 3454 (2010) .................45

Pub. L. No. 111-322, 124 Stat. 3518 (2010) .................45

Pub. L. No. 112-10, 125 Stat. 38 (2011) ...................23, 45

Pub. L. No. 112-4, 125 Stat. 6 (2011) ...........................45

Pub. L. No. 112-6, 125 Stat. 23 (2011) .........................45

Pub. L. No. 112-8, 125 Stat. 34 (2011) .........................45

## **Regulations**

10 C.F.R. § 2.1007(a)(2) .................................................18

10 C.F.R. § 2.309(d)(2)(iii) ............................................28

10 C.F.R. Part 2, Appendix D .....................................8, 40

## Other Authorities

69 Fed. Reg. 32,836-37 (June 14, 2004) ................................................. 18

73 Fed. Reg. 34,348 (June 17, 2008) ...................................................... 5

73 Fed. Reg. 40,883 (July 16, 2008 ......................................................... 5

73 Fed. Reg. 53,284 (Sept. 15, 2008) ....................................................... 8

## Legislative History

H.R. Rep. No. 97-491(I) .................................................................. 35, 40

# GLOSSARY OF ABBREVIATIONS

ASLB          Atomic Safety and Licensing Board

AULG          Affected Unit of Local Government

CR            Continuing Resolution

DOE           United States Department of Energy

LSN           Licensing Support Network

NARUC         National Association of Regulatory Utility Commissioners

NEPA          National Environmental Policy Act

NRC           Nuclear Regulatory Commission

NWPA          Nuclear Waste Policy Act

OCAA          Office of Commission Appellate Adjudication

OIG           Office of Inspector General

SER           Safety Evaluation Report

SRS           Savannah River Site

# I.  STATEMENT OF JURISDICTION

This Court has jurisdiction over the subject matter of this action pursuant to the Nuclear Waste Policy Act (NWPA) Section 119(a)(2), 42 U.S.C. § 10139(a)(1)(B), which provides the United States courts of appeals shall have original and exclusive jurisdiction over any civil action: "alleging the failure of the Secretary, the President, or the Commission to make any decision, or take any action, required under this part [42 U.S.C. §§ 10131-10145]. . . ." This Court has jurisdiction to issue a writ of mandamus to compel an agency action that has been unlawfully withheld or unreasonably delayed pursuant to 28 U.S.C. § 1651(a) and 5 U.S.C. § 706(1). Venue is proper in this Court pursuant to the NWPA Section 119(a)(2), 42 U.S.C. § 10139(a)(2), which provides: "[t]he venue of any proceeding under this section shall be in the judicial circuit in which the petitioner involved resides or has its principal office, or in the United States Court of Appeals for the District of Columbia."

# II.  PERTINENT STATUTES AND REGULATIONS

Copies of the pertinent statutes and regulations are included in the attached addendum to this brief (Addendum).

### III.   STATEMENT OF ISSUES

A.     Has the NRC unreasonably withheld its consideration of the Yucca Mountain license application by terminating its mandatory consideration of that application?

B.     Has the NRC unreasonably delayed its final decision to approve or disapprove issuance of a construction authorization for the Yucca Mountain repository by failing to render a decision within the three years provided by statute?

### IV.   STATEMENT OF THE CASE

On July 29, 2011, Petitioners filed for a writ of mandamus to compel the Nuclear Regulatory Commission (NRC) to perform two mandatory obligations under the NWPA, 42 U.S.C. §§ 10101-10270.  First, the NRC "shall consider" an application for authorization to construct the Yucca Mountain geologic repository for high-level radioactive waste.  42 U.S.C. § 10134(d).  Second, the NRC "shall issue a final decision approving or disapproving the issuance" of such authorization within three years of the application's submission.  42 U.S.C. § 10134(d).

The Yucca Mountain license application was submitted to the NRC by the Department of Energy (DOE) on June 3, 2008.  The NRC initiated consideration of the application by undertaking two related activities: (1) a technical review of

the license application by NRC staff; and (2) an adjudication of contested issues by the NRC's Atomic Safety and Licensing Board (ASLB). In March 2010, however, DOE moved to withdraw its license application after the President announced his decision to abandon the Yucca Mountain project. In June 2010, the ASLB denied the withdrawal request as contrary to the NWPA. Over the next 14 months, the NRC (i.e., the Commission itself) issued no decision in response to its own *sua sponte* review of the ASLB decision. In the meantime, the ASLB adjudication remained at an effective standstill. Further, in October 2010, at the direction of NRC Chairman Gregory B. Jaczko, the NRC initiated an "orderly closure" (i.e., termination) of its own staff's technical review of the license application.

On September 9, 2011, after the instant petition was filed, the NRC issued a "Memorandum and Order" announcing the Commission was evenly divided on whether to overturn or uphold the ASLB's decision. This result means that DOE's motion to withdraw its application with prejudice is denied. Rather than re-initiating NRC activity on the application, however, the Memorandum and Order directed the ASLB to, "by the close of the current fiscal year [i.e., September 30, 2011], complete all necessary and appropriate case management activities, including disposal of all matters pending before it . . . ."

The ASLB adjudication is now indefinitely suspended and the "orderly closure" of NRC staff review is now complete.

Although the NWPA mandates that the NRC "shall consider" DOE's license application, the NRC has unreasonably and unlawfully withheld its consideration by terminating its staff's technical review of the license application and indefinitely suspending the adjudication before the ASLB. Although the NWPA mandates that the NRC "shall issue a final decision approving or disapproving" the construction authorization within three years of submission, the NRC failed to issue a decision by June 3, 2011, and it is taking no action to reach such a decision. A writ of mandamus should thus issue.

## V.    STATEMENT OF FACTS

### A.    NRC Process for Reviewing Yucca Mountain License Application

#### 1.    DOE Required to Submit License Application for Construction Authorization

Congress enacted the NWPA in 1982 to establish a "definite Federal policy" for the disposal of high-level radioactive waste and spent nuclear fuel. 42 U.S.C. § 10131(b)(2). The NWPA outlines a detailed, prescriptive, and stepwise process for the "siting, construction, and operation of repositories" to provide a "reasonable assurance that the public and the environment will be adequately protected from the hazards posed by high-level radioactive waste . . . ." 42 U.S.C. § 10131(b)(1).

On July 23, 2002, Congress designated Yucca Mountain, Nevada as the site of the nation's geologic repository. *See* Pub. L. No. 107-200, 116 Stat. 735 (2002) (codified at 42 U.S.C. § 10135, note) (Draft Appendix (Draft App.) at 979). By the terms of the NWPA, this designation required DOE to submit to the NRC an application for authorization to construct a high-level waste geologic repository at Yucca Mountain. *See* 42 U.S.C. § 10134(b) ("the Secretary shall submit to the Commission an application for a construction authorization for a repository at such site").

On June 3, 2008, DOE submitted to the NRC its license application for construction authorization for the Yucca Mountain repository. 73 Fed. Reg. 34,348 (June 17, 2008) (corrected in 73 Fed. Reg. 40,883 (July 16, 2008)) (Draft App. at 141, 143). DOE's application is a "17-volume, 8600-page construction authorization . . . over two decades in the making and undergirded by millions of pages of studies, reports, and related materials at a reported cost of over 10 billion dollars." Draft App. at 314-15 (Order of ASLB, *In re U.S. Dep't of Energy*, NRC No. 63-001, ASLBP No. 09-892-HLW-CAB04 (June 29, 2010)).

### 2. NRC Review of Application Included Both Technical Review by Staff and Formal Adjudication by ASLB

As outlined in more detail below, the NRC has terminated its review of DOE's application. As structured at the time DOE's application was submitted, however, the NRC's review was to be completed through two concurrent processes.[1] First, the technical staff of the NRC was to complete review of DOE's application to determine whether the application complied with applicable NRC regulations.[2] More than 100 staff and contractors with expertise in disciplines including geochemistry, hydrology, climatology, structural geology, volcanology, seismology, health physics, and engineering were involved in this review, which included testing DOE's scientific and engineering analyses.[3] The product of the staff's review was to be a safety evaluation report (SER), issued by the NRC staff in volumes. The SER was to contain the staff's findings on the repository design, determine whether the proposed facility will meet NRC regulations to protect public health and safety, and determine whether construction of the facility may be authorized.[4]

---

[1] *See* Draft App. at 699 ("Fact Sheet on Licensing Yucca Mountain," available at http://www.nrc.gov/reading-rm/doc-collections/fact-sheets/fs-yucca-license -review.html (last visited Dec. 3, 2011)).

[2] *Id.*

[3] *Id.*; *see also* Draft App. at 689 ("Acceptance and Safety Review of the Yucca Mountain Geologic Repository," available at http://www.nrc.gov/waste/hlw -disposal/licensing/acceptance-safety.html (last visited Nov. 30, 2011)).

[4] *See id.*

Second, the ASLB was to complete an adjudicatory hearing in which parties with standing could challenge technical and legal aspects of DOE's application.[5] This adjudicatory process was to involve only admitted contentions (i.e., issues related to the license application) put forth by those petitioners accepted as parties.[6] The NRC staff was to participate in the adjudication, with its position based on the SER.[7]

After the NRC staff completed review of DOE's application and the ASLB completed its hearing and issued a decision, the NRC (i.e., the Commission itself) was to issue a final decision approving or disapproving authorization for DOE to construct a high-level waste repository at Yucca Mountain.[8]

### 3. Three-Year Schedule for NRC to Issue Final Decision on Construction Authorization

In order to accomplish all the above tasks within the three-year timeline of 42 U.S.C. § 10134(d), the NRC promulgated a detailed Schedule for the

---

[5] *See* Draft App. at 699 ("Fact Sheet on Licensing Yucca Mountain," available at http://www.nrc.gov/reading-rm/doc-collections/fact-sheets/fs-yucca-license-review.html (last visited on Dec. 3, 2011)).

[6] *See id.*

[7] *Id.*

[8] *See* Draft App. at 717 ("Licensing Process for the Yucca Mountain Geologic Repository," available at http://www.nrc.gov/waste/hlw-disposal/licensing/licensing-process.html (last visited Nov. 30, 2011)); *see also* Draft App. at 868 ("NRC's Process for Deciding Whether or Not to Authorize Construction of a Repository at Yucca Mountain, Nevada," available at http://www.nrc.gov/waste/hlw-disposal/licensing/acceptance-safety/timeline.html (last visited Dec. 3, 2011)).

Proceeding on Consideration of Construction Authorization for a High-Level Waste Geologic Repository. *See* 10 C.F.R. Part 2, Appendix D. This schedule calls for the NRC staff to issue the SER by Day 548; for discovery to be completed by Day 608; for summary judgment motions to be filed and resolved between Days 628 and 698; for an evidentiary hearing to be heard between Days 720 and 810, and for a final Commission decision to be issued by Day 1125. *Id*.

In September 2008, the NRC staff found that DOE's application contained sufficient information to begin its detailed technical review. Accordingly, the application was docketed for staff review and a notice of hearing was issued for the ASLB adjudication. 73 Fed. Reg. 53,284 (Sept. 15, 2008) (Draft App. at 145). By early 2010, the ASLB had begun its review and adjudication of the Yucca Mountain application, having admitted approximately 300 contentions for hearing and initiated a discovery phase. *See* Draft App. at 375 (Order of ASLB (Identifying Participants and Admitted Contentions), *In re U.S. Dep't of Energy*, NRC No. 63-001, LBP No. 09-06 (May 11, 2009)).

**B.    DOE Moved to Withdraw Application and ASLB Denied that Motion**

On March 3, 2010, at the direction of the President, DOE filed with the ASLB a motion to withdraw its license application with prejudice. *See* Draft App. at 299 (Department of Energy Motion to Withdraw, *In re U.S. Dep't of Energy*, NRC No. 63-001, ASLBP No. 09-892-HLW-CAB04 (Mar. 3, 2010)). Petitioners

Aiken County, NARUC, South Carolina, and Washington intervened in the licensing proceeding expressly for the purpose of opposing DOE's withdrawal motion as contrary to the NWPA. Petitioner Nye County, an original party to the license proceeding, also opposed DOE's motion on the same grounds.

On April 23, 2010, the NRC directed the ASLB to resolve DOE's motion within 45 days, stating that "the prudent course of action is to resolve the matters pending before our agency as expeditiously and responsibly as possible." Draft App. at 768 (Memorandum and Order, *In re U.S. Dep't of Energy*, NRC No. 63-001 (Apr. 23, 2010)).[9]

On June 29, 2010, following expedited briefing and oral argument, the ASLB issued a 47-page decision denying DOE's motion to withdraw the Yucca Mountain license application. Order of ASLB, *In re U.S. Dep't of Energy*, NRC No. 63-001, ASLBP No. 09-892-HLW-CAB04 (June 29, 2010) (Draft App. at 314). The decision held that DOE's motion was contrary to the requirements of the NWPA. *Id*. (Draft App. at 316-33). Among other matters, the ASLB declared that "submission of [DOE's] Application triggered a duty on the NRC's part to

---

[9] During this time, several of the instant petitioners also filed petitions for review, petitions for mandamus, and a preliminary injunction motion with this Court challenging the decision and authority of the President and the Secretary of Energy to abandon the Yucca Mountain project and withdraw the license application. *In re Aiken County*, No. 10-1050, *consolidated with* 10-1052, 10-1069, and 10-1082.

consider and to render a decision on the Application pursuant to section 114(d) of the NWPA." *Id*. (Draft App. at 320).[10]

## C.    The NRC Delayed Action on Review of the ASLB's Order, Yielding a 14-Month Hiatus

One day after the ASLB denied DOE's motion to withdraw, the NRC *sua sponte* issued an order requesting that within a two-week period, the parties file concurrent opening and responsive briefing on whether the NRC should review the ASLB's decision, and if so, whether to reverse or affirm it.  Draft App. at 874 (Order, *In re U.S. Dep't of Energy*, NRC No. 63-001 (June 30, 2010)).  On July 2, 2010, the NRC asked this Court to suspend a related proceeding challenging the President's and DOE's decision to abandon Yucca Mountain, stating that the NRC had established an "expedited briefing schedule" for review of the ASLB order and asserting that "[h]olding the cases in abeyance until the Commission renders a final decision in response to that briefing would likely crystallize, narrow, or even wholly eliminate the issues . . . conserving both judicial and the parties' resources." *See* Draft App. at 3 (Federal Respondents' Motion to Vacate Briefing and Oral Argument Schedule and Hold Cases in Abeyance, *In re Aiken Cnty.*, Case No. 10-1050 (July 2, 2010)).

Briefing to the Commission on the NRC's *sua sponte* review was completed on July 19, 2010.[11]  Twenty-two days later, on or about August 10,

_____

[10] *See also*, *id*. (Draft App. at 327, 329).

2010, the NRC's Office of Commission Appellate Adjudication (OCAA) had "prepared alternative draft decisions addressing appeals of the [ASLB's] decision on the issue of the Department of Energy's (DOE's) motion to withdraw its application to construct a geologic repository at Yucca Mountain, Nevada."[12]

Four NRC Commissioners voted on the license withdrawal issue[13] between August 25 and September 15, with the Chairman withdrawing his vote and voting again on October 29. Draft App. at 852 (Office of Inspector General, Nuclear Regulatory Commission, "NRC Chairman's Unilateral Decision to Terminate NRC's Review of DOE Yucca Mountain Repository License Application," OIG Case No. 11-05 ("OIG Report")). Notwithstanding the votes, no decision was issued by the NRC.

Two days after NRC Chairman Jaczko voted for the second time, the OCAA provided the Commission with a draft affirmation order detailing the NRC commissioners' vote. Draft App. at 852 (OIG Report). The draft affirmation order sat in abeyance for months and no order was issued. Draft App. at 854 (OIG

---

[11] Draft App. at 892 (2010 Annual Report on Commission Adjudication, SECY-11-0008 ("OCAA Report") at Attachment: "Commission Adjudicatory Decisions, January–December 2010" (Jan. 13, 2011), available at http://www. nrc.gov/reading-rm/doc-collections/commission/secys/2011/2011-0008scy.pdf (last visited Dec. 3, 2011)).

[12] Draft App. at 888.

[13] NRC Commissioner Apostolakis recused himself from voting in this proceeding. *See* Draft App. at 790 (Notice of Recusal (July 15, 2010)).

Report).  According to the NRC's Office of Inspector General, the NRC failed to follow its own internal policies and procedures regarding the scheduling of an affirmation session and formal decision.  Draft App. at 850-56 (OIG Report).

On May 4, 2011, NRC Commissioners Svinicki, Magwood, and Ostendorff told a Congressional committee that their votes had not changed and they viewed their votes as final.[14]  According to one Congressional report, the NRC Chairman continued to block a meeting (affirmation session) that would formally register the Commission's votes.  Draft App. at 1201 (SST Committee Report).  During an investigation by the NRC's Office of Inspector General, one Commissioner informed the investigator that NRC Chairman Jaczko stated "that he would not take action until a majority of the Commission agreed to suspend the ASLB's adjudicatory proceedings."  Draft App. at 855 (OIG Report).  According to the NRC's General Counsel, a draft affirmation order announcing the results of the NRC's review could remain in limbo until the NRC was presented with a forcing function, such as litigation.  Draft App. at 854 (OIG Report).

The prolonged lack of resolution by the NRC resulted in an effective standstill of the Yucca Mountain license adjudication over a 14-plus month period

---

[14] Draft App. at 1200-01 (House Committee on Science, Space, and Technology Majority Staff, Yucca Mountain: The Administration's Impact on U.S. Nuclear Waste Management Policy, June 2011 ("SST Committee Report") available at http://science.house.gov/letter/staff-report-yucca-mountain-safety (last visited July 28, 2011)).

after the ASLB denied DOE's motion to withdraw, including a cessation of all deposition discovery during that period. *See* Draft App. at 601 (Order of ASLB, *In re U.S. Dep't of Energy*, NRC No. 63-001, ASLBP No. 09-892-HLW-CAB04 (June 10, 2011)) ("if and when the adjudicatory process actively resumes"). Several Petitioners attempted without success to break the logjam by reminding the NRC of its duty to consider the application and render a decision on the merits within three years.[15]

## D. The NRC Chairman Ordered Closure of the Agency's Technical Review Process

Notwithstanding that the ASLB had denied DOE's motion to withdraw and that Commission review of the ASLB decision was pending, in October 2010 the NRC Chairman unilaterally directed the NRC staff to begin an "orderly closure" of technical review of the Yucca Mountain license application. Draft App. at 863 (OIG Report). This order came in the form of an October 4, 2010, memorandum issued at the direction of the Chairman.

---

[15] *See, e.g.,* Draft App. at 778 (Motion for a Commission Order Restoring the Technical Review of the Yucca Mountain License Application, *In re U.S. Dep't of Energy*, NRC No. 63-001 (Oct. 7, 2010); Draft App. at 799 (Nye County, Nevada's Response in Opposition to NRC Staff's June 20, 2011 Petition for Review of Board Orders, *In re U.S. Dep't of Energy*, NRC No. 63-001, ASLBP No. 09-892-HLW-CAB04 (June 30, 2011)).

1.    **October 2010 Budget Execution Memorandum Directed Closeout Despite Continuing Resolution that Maintained Spending Authority**

The October 4 memorandum related to budget execution under a Congressional continuing resolution (CR) then in effect.  As a general matter, the memorandum provided that under the CR, "[f]unding availability is based on the previous [FY 2010] fiscal year appropriated level augmented by unobligated carryover. . ."   Draft App. at 695 (NRC Dyer and Borchardt FY 2011 CR Memorandum).  In FY 2010, the NRC had received $23 million and 83.6 full-time positions for its High-Level Waste program, which constituted its ongoing Yucca Mountain licensing activities.    Draft App. at 693 (Congressional Budget Justification).  With specific respect to the NRC's High-Level Waste program, the memorandum further indicated that "the [CR] legislation does not include specific restrictions on spending funds."  Draft App. at 696 (NRC Dyer and Borchardt FY 2011 CR Memorandum).

2.    **Staff Directed to Proceed as if License Application had been Withdrawn**

Despite the NRC having the budgetary authority to continue with license review, the October 4 memorandum nevertheless directed the NRC staff to proceed "in accordance with the Commission's decisions on the [proposed] FY 2011 budget."   Draft App. at 696 (NRC Dyer and Borchardt FY 2011 CR Memorandum).  The NRC's proposed FY 2011 budget reflected drastic cuts to its

Yucca Mountain work. The NRC requested only $10 million (a decrease of $13.7 million) and 32 full-time positions (a decrease of more than 55 positions), with these resource levels proposed to "support work related to the orderly closure of the agency's Yucca Mountain licensing support activities." Draft App. at 694 (Congressional Budget Justification). These proposals, however, were based on the possibility that DOE's license application would be withdrawn in FY 2011. Further, under the terms of the budget request, "orderly closure" activities would only be keyed upon the actual withdrawal (or suspension) of DOE's license application adjudication:

> The Administration has indicated that it does not support developing a repository at Yucca Mountain, Nevada. Consistent with that position, DOE may submit to the NRC a motion to withdraw or suspend its Yucca Mountain license application during FY 2010. The NRC Budget reflects that possibility. *Upon the withdrawal or suspension of the licensing review,* the NRC would begin an orderly closure of the technical review and adjudicatory activities and would document the work and insights gained from the review.

Draft App. at 963 (Congressional Budget Justification) (emphasis added).

### 3.    NRC Chairman's Actions Challenged by Other Commissioners

The October 4 memorandum was challenged by Commissioner Ostendorff, joined by Commissioner Svinicki. They pointed out that the question of whether DOE's application could be withdrawn was still before the Commission. They further objected that under the language of both the CR and the NRC's proposed FY 2011 budget, nothing justified the termination of the NRC's Yucca Mountain

work.  *See* Draft App. at 866 (Ostendorff FY 2011 CR Memorandum); Draft App. at 883 (Svinicki FY 2011 CR Comments).

No Commission deliberation occurred on the effort to reverse the October 4 memorandum.  On October 14, 2010, the NRC Secretary issued an order stating that Commissioner Ostendorff's proposal was "not approved" because "[a] majority of the Commission declined to participate in this matter."  Draft App. at 873 (NRC Secretary Memorandum to Commissioner Ostendorff).  A later investigation by the NRC Inspector General determined that the Chairman "strategically provided three of the four other Commissioners with varying amounts of information about his intention to proceed to closure," and that Chairman Jaczko terminated NRC's review of the license application although "a majority of the Commissioners did not think the conditions to proceed to closure (i.e., withdrawal or suspension) had been met."  Draft App. 863-64 (OIG Report).

On October 27, 2010, Chairman Jaczko indicated without reference to the NWPA that the "orderly closure" was within the NRC's discretion to implement, in the absence of an express budgetary directive from Congress:

> Question 1:  On what legal authority are you grounding your decision to terminate review of the license application based on a budget request, rather than existing law?
>
> Answer:  Neither the text of the Fiscal Year (FY) 2010 Energy and Water Development and Related Agencies Appropriations Act and its underlying committee reports, nor the Fiscal Year 2011 Continuing

Resolution *provide the Commission with express direction on how it is to expend the appropriations from the Nuclear Waste Fund for Yucca Mountain activities.  In the absence of an express direction*, the approach the NRC is following is consistent with the terms of the Continuing Resolution, the Commission's Fiscal Year 2011 budget request, the general principles of appropriations law, and past U.S. Nuclear Regulatory Commission (NRC) practice.  The Commission declined to revisit this decision in voting earlier this month.

Draft App. at 1248.

### 4. The NRC Chairman Blocked Release of Staff SER

As part of the NRC's "orderly closure," the Chairman blocked the release of the NRC staff's SER Volume 3, "Review of Repository Safety After Permanent Closure" (SER-3), although a majority of NRC Commissioners disagreed with the Chairman's direction to stop work on SER-3.  Draft App. at 863-64 (OIG Report).  The publication of SER-3 was (and is) essential to consideration of the license application, and thus fulfillment of NRC's statutory obligation to issue a final decision approving or disapproving issuance of a construction authorization.  *See* Draft App. at 864 (OIG Report) (stating that decision to stop work on the SER is a factor preventing the agency from meeting its statutory obligation); Draft App. at 589 (Order of ASLB, *In re U.S. Dep't of Energy*, NRC No. 63-001, ASLBP No. 09-892-HLW-CAB04 (July 21, 2009) ("Few non-NEPA contentions can be adjudicated before relevant portions of the SER are issued.")); Draft App. at 541 (Order of ASLB, *In re U.S. Dep't of Energy*, NRC No. 63-001, ASLBP No. 09-892-HLW-CAB04 (Feb. 25, 2011) ("when the Staff's SER becomes available,

the Board intends to move this proceeding forward as expeditiously as circumstances permit")).

### 5. Shutdown Terminates Licensing Support Network

In addition, the "orderly closure" terminated the NRC's Web-based Licensing Support Network (LSN), which served as a database for all documentation regarding the application, including discovery and the hearing process. *See* 69 Fed. Reg. 32,836-37 (June 14, 2004) (Draft App. at 127-28). The LSN was central to the adjudicatory proceeding before the ASLB and was critical to the NRC staff's review of the application's technical merits. This importance is underscored by 10 C.F.R. § 2.1007(a)(2), which states that access to the LSN "shall be provided" by the NRC through its website. Despite this requirement, and opposition from petitioner Nye County and others, the LSN was shutdown on August 5, 2011, as part of the NRC's termination of license review. The ASLB prepared for this shutdown. *See* Draft App. at 571 (Order of the ASLB, *In re U.S. Dep't of Energy*, NRC No. 63-001, ASLBP No. 09-892-HLW-CAB04 (July 18, 2011)), 569 (Memorandum from Daniel J. Graser, *In re U.S. Dep't of Energy*, NRC No. 63-001, ASLBP No. 09-892-HLW-CAB04 (July 26, 2011)), 575 (Order of the ASLB, *In re U.S. Dep't of Energy*, NRC No. 63-001, ASLBP No. 09-892-HLW-CAB04 (July 28, 2011)).

**6.     The NRC Chairman Claims DOE, and Not the NRC, Effectively Terminated License Review Process**

In May 2011, Chairman Jaczko testified that it was DOE's actions that caused shut down of the NRC's application review process:

> I would just remind you there is no program at the Department of Energy anymore for high-level waste. That program and that office were terminated almost two years ago now. There is no longer any Yucca Mountain program.
>
> So, you know, I think of this as the best analogy as a developer: wanting to build a shopping mall, and the fire marshal conducting inspections and reviewing fire safety for that particular shopping mall, and the developer deciding after two years to stop work and stop developing the project. The fire marshal doesn't still go out and tell the developer to keep building so that they can conduct their licensing inspections. That's the scenario we have.
>
> *We are not in charge of the Yucca Mountain program. That is a Department of Energy program. It has been terminated. It ultimately would be a tremendous waste of taxpayer dollars to continue to review an application for which there is no applicant.*

Draft App. at 605 (Congressional Hearing Transcript, May 4, 2011) (emphasis added). He also testified with respect to the status of the Commission's review of the ASLB's withdrawal denial: "We will be done with closeout [of technical review] by the end of this fiscal year. *At that time, if those legal questions are unresolved, they are unresolved.*" Draft App. at 605 (Congressional Hearing Transcript, May 4, 2011) (emphasis added).

On July 1, 2011, this Court issued its opinion in *In re Aiken Cnty.*, 645 F.3d 428 (D.C. Cir. 2011). Among other matters, the Court held that a challenge to

19

DOE's actions in terminating its Yucca Mountain activities was not ripe because the ASLB had denied withdrawal to DOE and NRC review of the ASLB's decision was still pending. *In re Aiken Cnty.*, 645 F.3d at 434-36. In so holding, the Court specifically referenced the NRC's independent authority and duties under the NWPA. *See Id*. at 434-35 ("At this stage in the administrative process . . . the DOE has no say in whether the Yucca Mountain license application will be reviewed and granted. *That power lies exclusively with the Secretary of the Commission and the NRC Licensing Board*, which already denied the DOE's motion to withdraw the license application and *still has the responsibility and authority to review the merits of the Yucca Mountain application*.") (emphasis added).

**E.    The Commission's September 9 Memorandum and Order Leaves ASLB Order Denying License Withdrawal Intact and Undisturbed**

The instant petition was filed on July 29, 2011. On Friday, September 9, 2011, the Commission issued a Memorandum and Order that finally addressed review of the ASLB Order. *See* Draft App. at 118 (Memorandum and Order, *In re U.S. Dep't of Energy*, NRC No. 63-001 (Sept. 9, 2011)). On the merits of whether DOE can withdraw its application, the Memorandum and Order stated that "the Commission finds itself evenly divided on whether to take the affirmative action of overturning or upholding the Board's decision." Under the NRC's internal procedures, the effect of a 2-2 Commission vote is to deny a request for

Commission action.[16]    As the ASLB noted in a September 30, 2011, administrative order, the Commission's Memorandum and Order left the ASLB decision denying DOE's motion to withdraw intact and undisturbed as the final decision of the NRC.

## F.    The NRC Has Nevertheless Completed Shut Down of Its Review Process

However, rather than moving forward to consider DOE's application and issue a decision on its merits, the NRC consummated the shut down of its review process.  The Memorandum and Order directed the ASLB to, "by the close of the current fiscal year [i.e., September 30, 2011], complete all necessary and appropriate case management activities, including disposal of all matters pending before it . . . ."  Draft App. at 118 (Memorandum and Order, *In re U.S. Dep't of Energy*, NRC No. 63-001 (Sept. 9, 2011)).  A September 13, 2011, NRC press release documented that the agency "is nearing the successful completion of its orderly closure of the licensing review process," including transferring or donating project infrastructure to other federal agencies or outside the federal government.  *See* Draft App. at 1408 (NRC News No. 11-172 (Sept. 13, 2011)).

---

[16] *See* Draft App. at 703 (Internal Commission Procedures, Chapter III ("Voting"), available at http://www.nrc.gov/about-nrc/policy-making/internal.html# Meetings (last visited Dec. 3, 2011).  *See also Houston Lighting & Power Co.*, (South Texas Project, Units 1 & 2), 14 N.R.C. 933, 935, CLI-81-28 (1981) ("Commission inaction leaves in place a decision . . .") (separate view of Commissioner Bradford).

**G.    Following the NRC Order, the ASLB has Suspended Adjudication of the Yucca Mountain License Application**

On September 30, 2011, the ASLB issued an order suspending the Yucca Mountain license application.   Draft App. at 550 (Memorandum and Order of ASLBP, *In re U.S. Dep't of Energy*, NRC No. 63-001, ASLBP No. 09-892-HLW-CAB04 (Sept. 30, 2010)).   The September 30 order stated in part:

> Two hundred eighty-eight admitted contentions are pending. *They would be ripe for adjudication at evidentiary hearings after deposition discovery, issuance by the NRC Staff of applicable Safety Evaluation Reports* and (in the case of contentions arising under the National Environmental Policy Act) any necessary supplementation by the NRC Staff of DOE's Environmental Impact Statement.
>
> *Although we have been informed that the agency has current appropriated Fiscal Year 2011 Nuclear Waste Funds (NWFs) that could be carried over into the next fiscal year*, there are no Full-Time Equivalent (FTE) positions (i.e., federal employee positions) requested in the President's Fiscal Year 2012 Budget for Yucca Mountain High-Level Waste activities. Therefore, because both future appropriated NWF dollars and FTEs for this proceeding are uncertain, and consistent with the Commission's Memorandum and Order of September 9, 2011, *this proceeding is suspended*.

*Id*. (Draft App. at 552) (emphasis added).

On November 7, 2011, Chairman Jaczko confirmed that the NRC has completely abandoned all work on the Yucca Mountain license application.[17]   He stated that NRC has "moved on from" the Yucca Mountain license application and

---

[17] Draft App. at 643 (Energy Now Interview of NRC Chairman Jaczko) available at http://www.energynow.com/video/2011/11/07/interview-nrc-chairman-gregory-jaczko (last visited Dec. 2, 2011)).

that it does not anticipate performing any additional work on the application "absent some kind of direction from Congress." Draft App. at 643. Under the CR currently in place, the NRC has been given $10 million in spending authority related to its Yucca Mountain activities, without specific Congressional direction or constraints. *See* Pub. L. No. 112-10 § 1423, 125 Stat. 38 (2011) (Draft App. at 1072).

## VI. SUMMARY OF ARGUMENT

Petitioners bring this petition seeking a writ of mandamus (1) to compel the NRC to meet its mandatory statutory obligation under the NWPA to "consider" the license application for authorization to construct the Yucca Mountain geologic repository for high-level nuclear waste, and (2) to require the NRC to meet its mandatory statutory obligation to approve or disapprove such license application within three years of its submission.

DOE submitted its application to construct the Yucca Mountain repository on June 3, 2008. The application was docketed by the NRC on September 15, 2008. The NRC's mandatory statutory duty to consider the application is clear and undisputed under 42 U.S.C. § 10134(d) ("The Commission shall consider an application for a construction authorization for all or part of a repository . . . ."). *In re Aiken Cnty.*, 645 F.3d at 435. It is equally clear and indisputable that the NRC "shall issue a final decision approving or disapproving the issuance of a

construction authorization not later than the expiration of three years after the date of the submission of such application . . . ." 42 U.S.C. § 10134(d). The NRC's blatant failure to fulfill either duty is unreasonable. The direct result of this failure is that a process guaranteed by the NWPA to work toward development, construction, and operation of a safe repository for high-level radioactive waste and spent nuclear fuel has stopped. As a direct result, Petitioners have been harmed.

On July 1, 2011, this Court held that "[s]hould the Commission fail to act within the deadline specified in the NWPA, Petitioners would have a new cause of action . . . ." *In re Aiken Cnty.,* 645 F.3d at 436. Specifically, the Court identified a petition for mandamus to compel agency action unreasonably delayed. *Id*. There is now no question that notwithstanding its two clear statutory obligations, the NRC (a) stopped consideration of the license application over 14 months ago, and (b) did not render a final decision approving or disapproving the license application by June 3, 2011 (or at the latest September 15, 2011). The NRC has no intent to resume consideration of the license application or to approve or disapprove the license application unless this Court orders it to do so.

For three reasons, mandamus is the appropriate and only available legal remedy in this case. First, there is no reasonable basis for the NRC to have delayed (and stopped) considering the license application, and to have refused to

approve or disapprove it.  The law sets forth a clear and unmistakable duty, along with a three-year deadline, for both of these actions.  It is irrational for the NRC to suggest that it need not fulfill these obligations because it believes the applicant— DOE—does not plan to pursue the application.  The NRC has itself ruled through its ALSB that DOE has no authority to withdraw from that process and is obligated to pursue it.  The NRC is also wrong (both factually and legally) to try to manufacture budgetary excuses for not moving forward.  The NRC had sufficient money to consider the application when it abandoned the process in 2010.  It still has money, and in any event its statutory obligation to consider and act on the license application is not excused by such concerns.  It is unreasonable for the NRC to spend available money to shut down a project the law requires it to complete, and then claim that it may stop complying with the law because it might not get enough money from Congress to pursue the project in the future.

Second, the prejudice to Petitioners and others from this unreasonable delay is profound and serious.  The paramount purpose of the NWPA is to address the health, safety, and environmental concerns presented by the temporary storage of high-level radioactive waste and spent nuclear fuel.  To accomplish this purpose, the NWPA dictates a process to expeditiously site, construct, and operate a permanent repository, presumably at Yucca Mountain.  Congress designed the NWPA to ensure a repository siting process that focuses on the scientific merits

and suitability of a site and avoids the political pitfalls that halted earlier siting attempts. The NRC's unreasonable delay cuts the heart out of this law.

Finally, there is no credible argument that competing duties or priorities excuse the NRC from complying with its mandatory statutory duties. Complying with this law would continue the process dictated by law to address a nationwide threat posed by the continuing indefinite storage of high-level radioactive waste and spent nuclear fuel, and address the most expensive, significant, serious, and ongoing question associated with the regulation of nuclear power in this country.

## VII.  ARGUMENT

### A.    Preliminary Issues

#### 1.    Standing: Each Petitioner has Standing to Challenge the Inactions at Issue

The Petitioners have standing to challenge the inactions of Respondents. To determine whether a Petitioner has alleged facts sufficient to support standing, the Court construes the complaint in favor of the Petitioner. *Albuquerque Indian Rights v. Lujan*, 930 F.2d 49, 55 (D.C. Cir. 1991). The "irreducible constitutional minimum of standing" requires a party to show injury in fact that is caused by the defendants' conduct and is redressable by judicial relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

In this case, the NWPA declares that the risk posed by the indefinite interim storage of high-level radioactive waste and spent nuclear fuel is itself injurious.

Congress has specifically found that "radioactive waste creates potential risks and requires safe and environmentally acceptable methods of disposal," 42 U.S.C. § 10131(a)(1); that "a national problem has been created by the accumulation" of such waste, 42 U.S.C. § 10131(a)(2); that previous federal efforts to devise a permanent solution to the problem "have not been adequate," 42 U.S.C. § 10131(a)(3); and that "appropriate precautions must be taken to ensure that such waste and spent fuel do not adversely affect the public health and safety and the environment for this or future generations." 42 U.S.C. § 10131(a)(7).

In response, the NWPA outlines a repository siting and licensing process that, while not guaranteed to result in a repository, is fully intended to guarantee that a process will be followed to determine if a particular repository site is suitable. *See generally*, 42 U.S.C. § 10131(b); 42 U.S.C. §§ 10132-10145; *Nuclear Energy Inst., Inc. v. EPA,* 373 F.3d 1251, 1259 (D.C. Cir. 2004). " 'Where plaintiffs allege injury resulting from violation of a *procedural* right afforded to them by statute and designed to protect their threatened concrete interest, the courts relax—while not wholly eliminating—the issues of imminence and redressability . . . .' " *City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181, 1187 n.1 (D.C. Cir. 2007) (quoting *Ctr. For Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005) (citation omitted)). Here, the Petitioners need not show that the Yucca Mountain repository would ultimately be opened in order to

have standing.  *See Lujan*, 504 U.S. at 573 n.7.  The Petitioners are all within the zone of interests protected by the NWPA.  Standing exists in this case because the injury and impacts of NRC's failure to perform its obligations under the NWPA are "felt in a concrete way by the challenging parties."  *See Devia v. NRC*, 492 F.3d 421, 424 (D.C. Cir. 2007) (quoting *Abbott Lab. v. Gardner*, 387 U.S. 136, 148-49 (1967)).

Each Petitioner suffers a direct injury caused by NRC's unjustifiable failure to consider the Yucca Mountain license application and render a decision on that application within the time frame established by Congress under 42 U.S.C. § 10134(d).  This Court can provide Petitioners relief for their injuries by requiring NRC to comply with its duties under the NWPA.

### a.    Nye County, Nevada

Nye County, Nevada, is the host county for the proposed Yucca Mountain repository.  As such, it is recognized by the NWPA as the "affected unit of local government with jurisdiction over the site of a repository" (AULG).  *See, e.g.*, 42 U.S.C. §§ 10101(31), 10136(c), 10137(d).  Nye County has standing as a matter of right in the delayed NRC licensing proceeding, 10 C.F.R. § 2.309(d)(2)(iii), and under the NWPA must be allowed by the federal government to participate in oversight of all activities and operations at the repository.  42 U.S.C. § 10137(d).  Nye County's exercise of oversight

responsibilities extends to holding DOE and the NRC to their statutory responsibilities under the NWPA.

As the host county and AULG, Nye County received millions of dollars of federal funding under Sections 116 and 117 of the NWPA, 42 U.S.C. §§ 10136(c), 10137(d). It has used that funding to assist in the characterization of the site and conduct scientific and technical oversight of activities at Yucca Mountain.[18] Nye County has already been injured, and will continue to be injured, by the NRC's delay and failure to act on the merits of the license application. Financial assistance, jobs for Nye County citizens, and support for attendant county infrastructure and other improvements have been reduced or discontinued by virtue of actions by the NRC in suspending the proceedings indefinitely.[19]

Nye County wants the repository built and operated in a safe manner. It has an interest in preserving the economic and other benefits stemming from safe operation of the repository that are provided for the AULG by the NWPA. Only the continuation of the NRC licensing process can determine if building the repository is possible. Nye County has an interest in preventing that process from being abandoned contrary to law and without any justification that is grounded in the ultimate safety merits of the proposed repository. This stake in the licensing

---

[18] *See generally,* Draft App. at 268 (Affidavit of Lewis Darrell Lacy).
[19] *Id.*

29

process exists regardless of the NRC's final decision on the merits of construction authorization.

###### b.     Aiken County, South Carolina

Aiken County is the location of a significant segment of the Savannah River Site (SRS), one of the DOE locations currently acting as a temporary storage facility for spent nuclear fuel and high-level radioactive waste.  Aiken County owns substantial real property in close proximity to SRS.  *See* Draft App. at 266 (Affidavit of J. Clay Killian).  Yucca Mountain is the site selected for the long-term disposal of SRS's radioactive materials.  DOE's environmental analysis demonstrates that failure to go forward with Yucca Mountain could result in "widespread contamination at the 72 commercial and 5 DOE sites across the United States, with resulting human health impacts."[20]  The SRS site is one of the five referenced DOE sites.  Aiken County therefore has a concrete interest that is impaired by the Respondent's withholding of actions required by the NWPA regarding the license application.

---

[20] *See* Draft App. at 607 (Department of Energy, Final Environmental Impact Statement for a Geologic Repository for the Disposal of Spent Nuclear Fuel and High-Level Radioactive Waste at Yucca Mountain, Nye County, Nevada, DOE/EIS-0250 Section S.12, available at http://nepa.energy.gov/nepa _documents/EIS/EIS0250/RGD_SUMM/RGSUM_sum_conclus12.pdf (last visited July 28, 2011)).

### c. South Carolina

South Carolina is also home to SRS. It is an owner of adjacent and nearby property, including at least one road within the site. *See* Draft App. at 254 (Affidavit of Carla Griffin). South Carolina therefore has the same concrete injury as Aiken County as a result of Respondents' withholding of actions required by the NWPA regarding the Yucca Mountain license application. In addition, South Carolina also houses seven commercial nuclear reactors that have been required to store onsite the spent nuclear fuel they generate. Continued delay in the approval of a permanent repository for this material only exacerbates the danger posed by the temporary storage of such toxic material. The Fourth Circuit Court of Appeals has held that the Governor of South Carolina (and by extension the State itself) is essentially a neighboring landowner to the SRS, whose property is at risk of environmental damage from DOE's activities at SRS. South Carolina "therefore has a concrete interest that NEPA was designed to protect; as such, [the State] . . . possesses the requisite standing to enforce [its] procedural rights under NEPA." *Hodges v. Abraham*, 300 F.3d 432, 445 (4th Cir. 2002). These

conclusions apply with equal force to the NWPA. South Carolina also has an interest as an environmental regulator.[21]

###    d.    Washington

Washington has an interest as a property owner, a resource manager, a regulator, and a sovereign in the management and disposition of approximately 56 million gallons of untreated high-level radioactive tank waste currently stored at DOE's Hanford Nuclear Reservation (Hanford) located in Washington. *See generally,* Draft App. at 147 (Affidavit of Suzanne L. Dahl-Crumpler). The clear and present danger posed by this waste to the citizens, environment, and commerce of Washington is demonstrated by the fact that approximately one million gallons of the waste has already leaked from Hanford's tanks. Draft App. at 155-58, ¶¶ 22-23, 25. The Hanford tank waste, as well as other waste in Washington, is presumptively slated for disposal at Yucca Mountain after treatment, and the treatment process for tank waste has been designed with Yucca Mountain in mind. Draft App. at 163, 168-70, ¶¶ 41-48, 51. Washington therefore has a compelling interest in continuation of the NWPA's process for determining whether the only repository site designated under the NWPA can be

---

[21] *See* Draft App. at 688 (Department of Energy, Savannah River Site High-Level Waste Tank Closure Final Environmental Impact Statement, DOE/EIS-0303 (2002), available at http://nepa.energy.gov/nepa_documents/EIS/eis0303/feis/CHAP_7.PDF (last visited Dec. 2, 2011) (collecting state statutes and regulations imposing regulatory oversight)).

licensed. Washington's interest has been, and will continue to be, adversely affected by Respondents' withholding of actions required by the NWPA regarding the Yucca Mountain license application.

### e. Robert Ferguson, Gary Petersen, and William Lampson

Petitioners Robert L. Ferguson, Gary Petersen, and William Lampson are individuals who have lived and worked near Hanford for decades, and who are presently, and will continue to be, harmed by the "temporary" storage of high-level radioactive waste there. *See* Draft App. at 288 (Declaration of Robert Ferguson), 292 (Declaration of William Lampson), 295 (Declaration of Gary Petersen). As with the other Petitioners, each and every intervening day that Respondents withhold actions required by the NWPA regarding the Yucca Mountain license application causes a substantial additional delay in the opening of any permanent repository for high-level radioactive waste, and consequently causes Petitioners to suffer continued and extended exposure to the dangers of such waste stored temporarily at Hanford, dangers that DOE itself admits. *See*, note 20, *supra*. Petitioners' injuries are actual, concrete injuries that are caused by Respondent's withholding of mandatory duties under the NWPA and are redressable by the relief sought. It is exactly this kind of additional, unlimited delay that the NWPA was intended to prevent.

### f.   NARUC

The National Association of Regulatory Utility Commissioners (NARUC) has been consistently recognized by Congress and courts as the proper party to represent the interests of State utility commissioners. *See, e.g.*, *NARUC v. Dep't of Energy*, 851 F.2d 1424 (D.C. Cir. 1988). NARUC members, many located within 10-40 miles of working nuclear reactors, have recognized statutory charges to protect the health, safety, and economic interests of electric ratepayers who have already paid, through rates, more than $17 billion into the Nuclear Waste Fund, in part, to support the process of reviewing a permanent repository.[22] All of these interests are directly impacted by the Respondents' failure to comply with the NWPA. *See generally,* Draft App. 274 (Affidavit of Phyllis Reha).

### 2.   Respondents' Challenged Actions are Expressly Reviewable Under the NWPA

The NWPA provides the United States courts of appeals with original and exclusive jurisdiction over any civil action "alleging the failure of the Secretary, the President, or the Commission to make any decision, or take any action, required under this part [42 U.S.C. §§ 10131-10145]. . . ." 42 U.S.C. § 10139(a)(1)(B). This grant of original jurisdiction is consistent with the

---

[22] *See* Draft App. at 688 (Nuclear Energy Institute, *Nuclear Waste Fund Payment Information by State Through Q1 FY2011*, available at http://www.nei.org/resourcesandstats/documentlibrary/nuclearwastedisposal/graphics andcharts/nuclearwastefundpaymentinformationbystate/ (last visited Dec. 2, 2011)).

NWPA's purpose in providing for expedited review to keep the repository development process on track. H.R. Rep. No. 97-491(I) (Draft App. at 650) (stating purposes of NWPA include "[e]xpedited judicial review of court challenges to the program as it is implemented"). The Petitioners' mandamus petition, which alleges failure by the NRC to take actions expressly required by the NWPA, is therefore expressly reviewable by this Court pursuant to the NWPA.

## B. Standard of Review

Mandamus is an extraordinary remedy, but it is appropriately imposed where an agency has refused to perform a statutory duty or has unreasonably delayed in doing so. *In re Aiken Cnty.*, 645 F.3d at 436; *Sierra Club v. Thomas*, 828 F.2d 783, 793-94 (D.C. Cir. 1987). In this case, both conditions exist. As this Court has explained:

> When agency recalcitrance is in the face of a clear statutory duty or is of such magnitude that it amounts to an abdication of statutory responsibility, the court has the power to order the agency to act to carry out its substantive statutory mandates. And even when agency delay or recalcitrance does not rise to a level that justifies either of the above courses, [the] APA empowers the court to evaluate the pace of the agency decisional process and to order expedition if the pace lags unreasonably.

*Pub. Citizen Health Research Grp. v. FDA*, 740 F.2d 21, 32 (D.C. Cir. 1984) (citing 5 U.S.C. §§ 555(b), 706(1)) (case citations omitted).

In assessing whether to issue the writ, the Court must determine whether the agency has a duty to act and, if so, whether it has unreasonably delayed in complying with that duty. *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004). Whether a delay is reasonable is judged by application of the factors laid out in *Telecommunications Research and Action Center v. Federal Communications Center,* 750 F.2d 70, 80 (D.C. Cir. 1984) (*TRAC*). *In re Aiken Cnty.*, 645 F.3d at 436. These can be summarized as three general inquires: (1) the time agencies take to make decisions, which is subject to any timetables imposed by Congress and a "rule of reason"; (2) the nature and extent of the interests prejudiced by the delay, with any delays impacting human health and welfare considered less tolerable; and (3) the impact, if any, of issuing the writ on the agency's other duties or competing priorities. *TRAC*, 750 F.2d at 80. Finally, although "there is 'no *per se* rule on how long is too long' to wait for agency action . . . a reasonable time for agency action is typically counted in weeks or months, not years." *In re Am. Rivers*, 372 F.3d at 419 (quoting *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1149 (D.C. Cir. 1992)).

**C.** **The NRC has Unreasonably Withheld Consideration of, and a Final Decision On, the Yucca Mountain License Application Contrary to the Mandates of the NWPA**

The NRC has unreasonably delayed—and is now ignoring entirely—its statutory duty to consider the license application. The NRC has further refused to perform its statutory obligation to approve or disapprove the application within the specific three-year time period mandated by Congress. A writ of mandamus should thus issue.

**1.** **The NRC has Unreasonably Withheld Review of the Yucca Mountain License Application Contrary to the Statutory Mandate that NRC "Shall Consider" the License**

**a.** **The NRC has a duty to "consider" the Yucca Mountain license application.**

The NRC has a clear and specific statutory duty to *consider* the Yucca Mountain license application. 42 U.S.C. § 10134(d). "[W]e note that the NWPA requires the Commission to review the application, *see* 42 U.S.C. § 10134(d) ('The Commission *shall consider* an application for a construction authorization for all or part of a repository. . . .') . . . ." *In re Aiken Cnty.*, 645 F.3d at 435 (emphasis added). This consideration consists of a detailed technical review by the NRC staff, an adjudication of contested issues by the ASLB, and a final decision by the Commission. *See supra* at 6-7.

The NRC's duty to consider DOE's license application was recognized in the ASLB's June 29, 2010 Order, which now stands as the agency's final decision

and the law of the case regarding DOE's motion to withdraw.  The Order declares

that "submission of [DOE's] Application triggered a duty on the NRC's part to

consider and to render a decision on the Application pursuant to section 114(d)

[42 U.S.C. § 10134(d)] of the NWPA."   Order of ASLB, *In re U.S. Dep't of*

*Energy*, NRC No. 63-001, ASLBP No. 09-892-HLW-CAB04 (June 29, 2010)

(Draft App. at 320).   The Order further states that Section 114(d) is an "explicit

mandate" to the NRC to consider and decide the merits of the application, *id.*

(Draft App. at 327), and that Section 114(d) is an "unambiguous command of

Congress" that the NRC " 'shall consider' the Application and 'shall issue a final

decision approving or disapproving the issuance of a construction authorization.' "

*Id.* (Draft App. 329).  *Accord Zivotofsky v. Sec'y of State*, 571 F.3d 1227, 1243

(D.C. Cir. 2009) ("'Shall' has long been understood as 'the language of

command' " except for "rare exceptions . . . that apply only where it would make

little sense to interpret 'shall' as 'must.' ").  This duty has been ignored.

> **b.    The NRC's failure to consider DOE's application is unreasonable under the *TRAC* factors.**

In the almost year-and-a-half since the ASLB denied DOE's motion to

withdraw, the NRC has delayed and now entirely terminated its consideration of

the Yucca Mountain license application.   It has disbanded its staff's technical

review.  It has indefinitely suspended the ASLB adjudication.  Meanwhile, DOE's

license application has remained pending before the agency. Under the *TRAC* factors, withholding consideration of DOE's application is unreasonable.

> **(1) The NRC's failure to consider DOE's application is unreasonable in light of the statutory time frame for reaching a final decision and the circumstances of delay.**

The first general inquiry under *TRAC* evaluates the time agencies take to make decisions, which is subject to any timetables imposed by Congress and a "rule of reason." *TRAC*, 750 F.2d at 80.[23]

> **(a) The NRC undertook no action on DOE's application for approximately half of its three-year timeline under the NWPA.**

The NWPA dictates a specific three-year time frame for reaching a final decision approving or disapproving DOE's license application, which triggered when DOE submitted its application in 2008. 42 U.S.C. § 10134(d). Congress accounted for the possibility that the NRC might need more time by including a specific mechanism for extending the timeline by one year, contingent on the NRC notifying Congress of such need no fewer than thirty days before the timeline expired. *See id*.

---

[23] While *TRAC* also calls for consideration of how long it takes to make decisions, in this case the proceeding is *sui generis*. Congress determined how long it would allow for this application to be decided, and even gave the NRC the ability to seek additional time—up to a year—but it chose not to do so. *See* 42 U.S.C. § 10134(d). Accordingly, the NRC cannot be heard to suggest that any time period beyond three years is appropriate.

Other provisions of the NWPA confirm Congress' expectation of timeliness during repository licensing. The NWPA requires the NRC to provide Congress with regular status reports on its consideration of DOE's application "until the date on which such authorization is granted." 42 U.S.C. § 10134(c). The NWPA requires DOE to prepare a project decision schedule that "portrays the optimum way to attain the operation of the repository," including identifying activities that, if delayed, will "cause a delay in beginning repository operation." 42 U.S.C. § 10134(e)(1). Further, any federal agency that cannot comply with the project decision schedule must report to Congress and specify its estimated time for completing the activity, along with any actions it will take to mitigate the delay. 42 U.S.C. § 10134(e)(2). The key piece of legislative history for the NWPA indicates that a "legislated schedule for Federal decisions and actions for repository development" is an "essential element" of the NWPA's program. H.R. Rep. No. 97-491(I) (Draft App. at 649-50).

The NRC promulgated a detailed schedule outlining how it would comply with its three-year deadline. 10 C.F.R. Part 2, Appendix D. In addition to being

bound by its own regulation,[24] this schedule also reflects the NRC's recognition and acknowledgement of the importance and materiality of this time frame.

With the clock running, the NRC has now, for nearly a year-and-a-half since the ASLB denied DOE's motion to withdraw, done *nothing* to further its consideration of DOE's application. Instead, it terminated that consideration.

The three-year clock has now stopped, as measured either by the date DOE submitted its application to the NRC (June 3, 2008) or the date the NRC docketed the application for consideration (September 15, 2008). The NRC made no effort to trigger a one-year extension before the timeline expired. Failing to consider the application for almost half of the three-year period imposed by Congress is patently unreasonable.

> **(b)** **The circumstances under which the NRC terminated license application review are unreasonable.**

Further, the NRC's actions in terminating consideration of DOE's license application are inexplicable under any "rule of reason." As argued below, neither the circumstances of the NRC's termination nor any circumstances of budget render the NRC's actions reasonable.

_____

[24] *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (It is axiomatic that "an agency is legally bound to respect its own regulations, and commits procedural error if it fails to abide them."); *Panhandle E. Pipe Line Co. v. FERC,* 613 F.2d 1120, 1135 (D.C. Cir. 1979) (it is "axiomatic that an agency is bound by its own regulations").

**1)** **It was unreasonable for the NRC Chairman to terminate NRC review of DOE's license application while DOE's motion to withdraw stood denied.**

The NRC Chairman directed the termination of NRC's staff review some three months after the ASLB had rejected DOE's withdrawal motion, in spite of available appropriations to continue NRC's review, in spite of the fact that the Commission had not yet rendered a decision on review of the ASLB's order, and in spite of the fact the Chairman was fully aware that the votes necessary to reverse the ASLB decision did not exist. *See supra* at 13-19. The termination of review came without a vote of the Commissioners and despite the fact that a majority of the Commissioners indicated that the conditions to terminate review had not been met. *See supra* at 15-16.[25] In terminating the agency's consideration of the license application, the Chairman acted as if the ASLB's order, not to mention the clear NWPA mandates upon which it is based, did not even exist.

The Chairman has justified the decision to terminate the NRC's review by pointing to DOE's actions in terminating its own Yucca Mountain program and suggesting it "would be a tremendous waste of taxpayer dollars to continue to review an application for which there is no applicant." *See supra* at 19. Such

---

[25] *Cf.* Energy Reorganization Act, 42 U.S.C. § 5841(a)(1) ("[e]ach member of the Commission, including the Chairman, shall have equal responsibility and authority in all decisions and actions of the Commission . . . and shall have one vote.").

circular finger-pointing is irrational, because the only reason there is "no applicant" is that the NRC shut down the process that, through the ALSB, it ordered the applicant to pursue. The ALSB has decided, and the NRC has left undisturbed, the conclusion that DOE has a duty to proceed and may not withdraw its application. The Chairman's position is also directly contrary to the position taken by this Court in *In re Aiken Cnty.*, 645 F.3d 428. *See, e.g.*, *In re Aiken Cnty.*, 645 F.3d at 437 ("At this point in the process, the DOE has submitted a construction license application for the Yucca Mountain repository *and the Commission maintains a statutory duty to review that application*.") (emphasis added), 448 (Kavanaugh, J. concurring) ("[T]he President does not have the final word in the Executive Branch about whether to terminate the Yucca Mountain project. For now . . . the ball in this case rests in the Executive Branch not with the President, *but rather with the Nuclear Regulatory Commission*.") (emphasis added).[26]

The NRC's September 9 Order and Memorandum and subsequent actions are further evidence of this unreasonable, and indeed, nonsensical, conduct. On

---

[26] Further, it is directly contrary to positions taken by the NRC's counsel in response to questioning from this Court during oral argument in the first *In re Aiken County* case. *See* Draft App. p. 99, line 9 through p. 103, line 11 (Oral argument transcript (Mar. 22, 2011)) (e.g. "The licensing board denied the motion. The license application is pending. *The licensing proceeding is going forward*.") (emphasis added)).

the one hand, the order left intact and undisturbed the ASLB decision that DOE

may not withdraw its application. At the same time, it completed the shut down

of the very process from which DOE may not withdraw. Upon sustaining the

ASLB's order, the only reasonable course was for the NRC to permit the ALSB to

enforce its order, not to sustain the order and then direct the ALSB to ignore it.

2) **Budget excuses do not render the NRC's failure to consider DOE's application reasonable.**

a) **The NRC had sufficient money to consider DOE's application.**

Notwithstanding NRC efforts to cloak the termination of review in

budgetary terms, the record makes clear that budget constraints could not be the

real justification for the NRC's failure to proceed with the license application.

Adequate appropriations were available when the Chairman initiated the

"orderly closure" of NRC review. The Administration requested, and Congress

approved, funding for the 2010 fiscal year that continued the Yucca Mountain

license application process. Draft App. at 650-53 (DOE, *FY 2010 Congressional*

*Budget Request, Vol. 5,* (FY 2010 budget request "is dedicated solely to

supporting . . . the NRC LA process.")); Pub. L. No. 111-85, 123 Stat. 2845, 2864,

2868 (2009) (Draft App. at 980, 982). Because no work was done in the licensing

process during much of FY 2010 by the NRC's failure to act, those funds were not

exhausted. In a series of continuing resolutions, Congress funded DOE and NRC

programs at the same FY 2010 levels through April 15, 2011, without legislating an exception for Yucca Mountain that would withhold funds for those programs.[27] The final FY 2011 CR, passed in April 2011 and still in effect, continued to fund the NRC's Yucca Mountain activities at a reduced, but still significant, level ($10 million).[28]

Both the NRC's October 4, 2010 budget guidance memorandum and the Chairman's testimony confirm that the "orderly closure" decision was made *despite* this funding. The October 4 memorandum confirmed that funding availability continued at the FY 2010 appropriated level and that with specific respect to the NRC's High-Level Waste program, "the CR legislation does not include specific restrictions on spending funds." *See* Draft App. at 696 (NRC Dyer and Borchardt FY 2011 CR Memorandum). Indeed, this *lack* of restriction was cited by Chairman Jaczko as the justification for the NRC to begin orderly closure activities in its own discretion. Draft App. at 1248 ("*In the absence of an express direction*, the approach the NRC is following is consistent with the terms of the

---

[27] *See* Pub. L. No. 111-242, 124 Stat. 2607 (2010) (Draft App. at 1362); Pub. L. No. 111-290, 124 Stat. 3063 (2010) (Draft App. at 1372); Pub. L. No. 111-317, 124 Stat. 3454 (2010) (Draft App. at 1373); Pub. L. No. 111-322, 124 Stat. 3518 (2010) (Draft App. at 1374); Pub. L. No. 112-4, 125 Stat. 6 (2011) (Draft App. at 1389); Pub. L. No. 112-6, 125 Stat. 23 (2011) (Draft App. at 1398); Pub. L. No. 112-8, 125 Stat. 34 (2011) (Draft App. at 1406).

[28] Department of Defense and Full-Year Continuing Appropriations Act, 2011, Pub. L. No. 112-10, 125 Stat. 38 (2011) (Draft App. at 983).

Continuing Resolution, the Commission's Fiscal Year 2011 budget request, the general principles of appropriations law, and past U.S. Nuclear Regulatory Commission (NRC) practice.") (emphasis added). In the midst of NRC's "orderly closure," the ASLB itself recognized that NRC's termination was being done in spite of available appropriations. *See* Draft App. at 577 (Order of ASLB, *In re U.S. Dep't of Energy*, NRC No. 63-001, ASLBP No. 09-892-HLW-CAB04 (Apr. 11, 2011)) ("It should be noted that Congress appropriated substantial funding to both the NRC and DOE for Yucca Mountain in FY 2010 and, to date, each of the FY 2011 continuing resolutions have continued funding for Yucca Mountain.").

The NRC's Chairman cannot separate his budget decisions from the decision on the merits of DOE's motion to withdraw. The matters are clearly related. The NRC had to first decide whether DOE could properly withdraw its application before ordering appropriate staff actions in either continuing or terminating the licensing proceeding, including operation of the LSN. If DOE's motion to withdraw is contrary to law, as the ALSB found and the Commission confirmed by not overturning it, then there were no legal grounds for NRC to make budgetary decisions that undermined the licensing process, thwarted staff release of SERs, and dismantled the LSN, especially in the face of continuing

resolutions that appropriated monies for those purposes. The Chairman, however, single-handedly turned these adjudicatory and budget processes on their heads. Budget excuses did not force the NRC to close down its review.

> **b)** **As a matter of law, lack of appropriation does not relieve a mandatory duty.**

Even if an appropriation constraint existed, it is well established that the mere failure of Congress to appropriate funds, without further words that modify or repeal substantive law either expressly or by clear implication, does not in and of itself defeat a government obligation created by statute.

In *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 189 (1978), the court held that without express action of Congress, appropriations for a multi-million dollar dam did not impliedly repeal a prior statute (the Endangered Species Act) that, if followed, could result in the project being halted. In reaching this decision, the court reiterated the "cardinal rule ... that repeals by implication are not favored." *Id*. Rather, "the intention of the legislature to repeal must be clear and manifest," *id*., and "in the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Id*. at 190. Suggesting that the reduction or even elimination of an appropriation to fund a specific agency

obligation impliedly repeals the legal obligation is equally unfounded. *See also, Firebaugh Canal Co. v. United States*, 203 F.3d 568 (9th Cir. 2000) (Secretary of Interior's obligation to provide drainage under the San Luis Act was not repealed by serial appropriation riders prohibiting Secretary from establishing the terminus of the drain until environmental concerns could be addressed).

As applied here, speculation that there may, in the future, be budget constraints is no defense to the statutory obligation to consider the license application. Were it otherwise, any agency could cease undertaking any statutory obligation imposed by Congress on the premise that it might not in the future have enough money to complete that effort. Here, the facts are more compelling. Whatever budgetary issues exist were created by the NRC. The agency had plenty of money in 2010 to continue considering the license application. The NRC chose to stop and did everything in its power to halt further consideration until it could claim that it did not have enough funds to complete the process, and, therefore should shut it down. *See Cherokee Nation v. Leavitt*, 543 U.S. 631, 642 (2005) (government required to pay promised "contract support costs" incurred by Indian Tribes, even though the government argued that it could not pay the costs on grounds of "insufficient appropriations"; Congress had appropriated unrestricted funds for the agency "to carry out" its duties under the relevant statute and even though the agency allocated those funds to another important purpose ("to pay the

costs of inherent federal functions"), it did not relieve the agency of its promise to pay.)

In sum, measured against any rule of reason, the actions by the NRC to halt review of the license application in derogation of its own Board's order are completely unreasonable. The first *TRAC* inquiry weighs in favor of issuing a writ of mandamus.

### (2) The NRC's failure to consider DOE's application directly prejudices interests addressed by the NWPA.

The second general *TRAC* inquiry considers the nature and extent of the interests prejudiced by an agency delay, with any delays impacting human health and welfare considered less tolerable. *TRAC*, 750 F.2d at 80.

The NRC's failure to consider the Yucca Mountain license application is contrary to a statutory scheme intended not only to address one of our nation's most intractable threats to human health and the environment, but also remedy a history of federal agency failure to face the political and logistical challenges that go with addressing that threat. *See Nuclear Energy Inst.,* 373 F.3d at 1257 ("Having the capacity to outlast human civilization as we know it and the potential to devastate public health and the environment, nuclear waste has vexed scientists, Congress, and regulatory agencies for the last half-century."). Once again, the NWPA itself declares that "radioactive waste creates potential risks and requires safe and environmentally acceptable methods of disposal," 42 U.S.C.

§ 10131(a)(1); that "a national problem has been created by the accumulation" of such waste, 42 U.S.C. § 10131(a)(2); that previous federal efforts to devise a permanent solution to the problem "have not been adequate," 42 U.S.C. § 10131(a)(3); and that "appropriate precautions must be taken to ensure that such waste and spent fuel do not adversely affect the public health and safety and the environment for this or future generations." 42 U.S.C. § 10131(a)(7).

The NRC's consideration of DOE's license application is necessary to an NWPA process designed to address these concerns. Because the NRC's withholding of its mandatory consideration affects human health and welfare, the NRC's inaction is less tolerable than delay that affects mere economic regulation. *TRAC*, 750 F.2d at 80. It is an unreasonable delay.

> **(3)    Issuing a writ will not impact the NRC's other duties or competing priorities.**

The final general inquiry under *TRAC* factor considers the impact, if any, of issuing the writ on the agency's other duties or competing priorities. *TRAC*, 750 F.2d at 80.

Competing priorities do not excuse the NRC's failure to consider the license application. *See TRAC*, 750 F.2d at 80. In both 2010 and 2011, the NRC's Office of Inspector General identified oversight of radioactive waste, and specifically the Yucca Mountain license application, as one of the "most serious management and performance challenges facing NRC." *See* Draft App. at 904,

923-24 (Inspector General's Assessment of the Most Serious Management and Performance Challenges Facing NRC, OIG-11-A-01 (Oct. 1, 2010)), 939, 962-63 (Inspector General's Assessment of the Most Serious Management and Performance Challenges Facing NRC, OIG-12-A-01 (Oct. 3, 2011)). The NRC has previously recognized the magnitude of its duty to consider the license application. *See* Draft App. at 718-19 (Memorandum and Order of Commission, *In re U.S. Dep't of Energy*, NRC No. PAPO-00 (Nov. 10, 2004)) ("Review of an application likely will prove an immense undertaking. DOE has generated millions of Yucca Mountain-related documents since Congress charged it with responsibility for the repository [and] Congress has imposed a three-year deadline for the licensing proceeding."); Draft App. at 725 (Memorandum and Order of Commission, *In re U.S. Dep't of Energy*, NRC No. 63-001 (June 30, 2009)) ("the most extensive proceeding in the agency's history"). The agency's Yucca Mountain activities have, until the recent willful termination, constituted a priority program within the agency, with dedicated funding. *See* Draft App. at 693 (Congressional Budget Justification).

"[A]gency recalcitrance . . . in the face of a clear statutory duty" requires that the Court use its "power to order the agency to act to carry out its substantive statutory mandate[]." *Pub. Citizen*, 740 F.2d at 32; *see also In re Bluewater Network*, 234 F.3d 1305 (D.C. Cir. 2000). Under the *TRAC* factors, the NRC has

51

unreasonably refused to comply with its duty to "consider" DOE's license application. A writ of mandamus should thus issue.

2. **The NRC has Violated its Duty to Issue a Final Decision Approving or Disapproving the Yucca Mountain License Application**

In addition to its duty to consider the Yucca Mountain license application, the NWPA imposes a duty on the NRC to issue a *final decision* within a specific timeline. Specifically, the NWPA provides that the Commission *shall* issue a *final decision* approving or disapproving the issuance of a construction authorization not later than the expiration of 3 years after the date of the *submission* of such application . . . . 42 U.S.C. § 10134(d) (emphasis added). As discussed above, the NRC has promulgated regulations recognizing this duty and binding it to a time frame. *See* discussion, *supra* at 7-8. The NRC has failed to comply with this duty.

In July 2011, this Court observed that DOE "submitted" its Yucca Mountain license application in June 2008, and thus "the three year statutory deadline . . . has potentially already come and gone." *In re Aiken Cnty.*, 645 F.3d at 436. The Court also noted that DOE has "suggested that the . . . deadline should toll from September 15, 2008, the date when the application was *docketed*, rather than from when the application was *submitted*." *Id.* n.1 (emphasis added). Regardless of which triggering date is referenced, the three-year deadline has

elapsed with no final decision by the NRC. Further, the NRC did not elect to trigger a one-year statutory extension as allowed under 42 U.S.C. § 10134(d), subject to the requirement that it provide notification to Congress.

As established above, the NRC is not even currently considering DOE's license application. Its actions demonstrate that it *never* intends to issue a decision on the merits of DOE's application. The analysis of *TRAC* factors with respect to the NRC's duty to issue a final decision is identical to the analysis above with respect to the duty to consider. Those arguments, as set forth above, are fully incorporated herein. The NRC's failure to approve or disapprove the application is as clear a violation of a statutory deadline as was DOE's failure to begin accepting spent nuclear fuel waste by January 31, 1998, for which this Court issued mandamus against DOE. *N. States Power Co. v. Dep't of Energy*, 128 F.3d 754, 761 (D.C. Cir. 1997). Both statutory deadlines are clear and unambiguous, and the NRC's failure and delay are not only unreasonable, but inexcusable. The Court should therefore issue a writ of mandamus compelling the NRC to issue a final decision approving or disapproving DOE's application for a construction authorization. *See generally, Ass'n of Am. Railroads v. Costle*, 562 F.2d 1310 (D.C. Cir. 1977) (statue imposing obligation to promulgate rules within a set time period, which agency violated, evidences Congressional concern

that the action be taken expeditiously, which in turn should be reflected in a judicial mandate).

## VIII.  CONCLUSION AND PRAYER FOR RELIEF

Petitioners, for the foregoing reasons, pray that this Court issue its Order:

a.      Determining that the NRC has unreasonably delayed consideration of the license application;

b.      Directing that the NRC resume consideration of the license application within 30 days;

c.      Determining that the NRC has unreasonably delayed approving or disapproving of the license application;

d.      Directing the NRC to approve or disapprove the application within 14 months (reflecting the time lost from the original three-year statutory period) and to provide a proposed schedule containing appropriate milestones to ensure that this timetable is honored;

e.      Directing the NRC to update the Court on the status of the matter every 60 days;

f.      Awarding Petitioners reasonable costs, litigation expenses, and attorney fees associated with this litigation as provided by the Equal Access to Justice Act, 28 U.S.C. § 2412 or other applicable law; and

g.    Granting such other and further relief as this Court deems just and proper.

RESPECTFULLY SUBMITTED this 5th day of December, 2011.

<table>
<tr>
<td>

*s/ Thomas R. Gottshall*
THOMAS R. GOTTSHALL
S. ROSS SHEALY
Haynsworth Sinkler Boyd, P.A.
Post Office Box 11889
Columbia, SC 29211-1889

*Attorneys for Aiken County*

</td>
<td>

*s/ Barry M. Hartman*
BARRY M. HARTMAN
CHRISTOPHER R. NESTOR
JOHN ENGLERT*
K&L Gates LLP
1601 K Street, N.W.
Washington, DC 20005-1600
*not admitted*

*Attorneys for Robert L. Ferguson,
William Lampson, and Gary Petersen*

</td>
</tr>
<tr>
<td>

ALAN WILSON*
Attorney General for the State of
  South Carolina
JOHN W. MCINTOSH*
ROBERT D. COOK*
Post Office Box 11549
Columbia, SC  29211
*not admitted*

*s/ Kenneth Paul Woodington*
WILLIAM HENRY DAVIDSON, II
KENNETH PAUL WOODINGTON
Davidson & Lindemann, P.A.
1611 Devonshire Dr., 2nd Floor
Post Office Box 8568
Columbia, SC 29202-8568

*Attorneys for the State of
South Carolina*

</td>
<td>

ROBERT M. MCKENNA*
Attorney General

*s/ Andrew A. Fitz*
ANDREW A. FITZ
TODD R. BOWERS
State of Washington
Office of the Attorney General
Post Office Box 40117
Olympia, WA  98504-0117
*not admitted*

*Attorneys for State of Washington*

</td>
</tr>
<tr>
<td>

*s/ James Bradford Ramsay*
JAMES BRADFORD RAMSAY
ROBIN J. LUNT
National Assoc. of Regulatory Utility
  Commissioners
1101 Vermont Ave. N.W., Suite 200
Washington, DC 20005

*Attorneys for NARUC*

</td>
<td>

*s/ Robert M. Andersen*
ROBERT M. ANDERSEN
Akerman Senterfitt LLP
750 9th Street, N. W.
Suite 750
Washington DC 20001

*Attorney for Nye County*

</td>
</tr>
</table>

**CERTIFICATE OF COMPLIANCE WITH
TYPE-VOLUME LIMITATION, TYPEFACE
REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) as it contains 11,606 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 pt. and Times New Roman type style.

  s/ *Andrew A. Fitz*
ANDREW A. FITZ
TODD R. BOWERS
State of Washington
Office of the Attorney General
Post Office Box 40117
Olympia, WA 98504-0117

# CERTIFICATE OF SERVICE

I herby certify that on the 5th day of December 2011, a copy of the foregoing was filed using the CM/ECF system which will serve the same on all parties of record as follows:

| | |
|---|---|
| Mullins, Charles | charles.mullins@nrc.gov |
| Nestor, Christopher R. | christopher.nestor@klgates.com, dottie.messimer@klgates.com, klgateseservice@klgates.com |
| Andersen, Robert Michael | robert.andersen@akerman.com |
| Cordes, John F., Jr. | John.Cordes@nrc.gov |
| Ramsay, James Bradford | jramsay@naruc.org |
| Hartman, Barry M. | barry.hartman@klgates.com, klgateseservice@klgates.com |
| Lunt, Robin Kimlin Jensen | rlunt@naruc.org |
| Gottshall, Thomas Rush | tgottshall@hsblawfirm.com, lgantt@hsblawfirm.com, bvaldes@hsblawfirm.com |
| Woodington, Kenneth Paul | kwoodington@dml-law.com, sstafford@dml-law.com, jangus@dml-law.com, nbouknight@dml-law.com |
| Bowers, Todd R. | toddb@atg.wa.gov, TORSeaEF@atg.wa.gov, aaronw@atg.wa.gov, taliaz@atg.wa.gov, jenniferd4@atg.wa.gov |
| Fitz, Andrew Arthur | andyf@atg.wa.gov, ecyolyef@atg.wa.gov, dianam@atg.wa.gov |

Suttenberg, Jeremy          jeremy.suttenberg@nrc.gov

Shealy, Samuel Ross         rshealy@hsblawfirm.com

Cottingham, Anne W.         awc@nei.org

Stouck, Jerry               stouckj@gtlaw.com

Fitzpatrick, Charles J.      cfitzpatrick@nuclearlawyer.com

Lawrence, John W.           jlawrence@nuclearlawyer.com

Malsch, Martin Guilbert     mmalsch@nuclearlawyer.com

DATED this 5th day of December 2011, in Olympia, Washington.


  s/ *Andrew A. Fitz*
ANDREW A. FITZ
Senior Counsel
(360) 586-6752

# ADDENDUM

Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270,

relevant excerpts attached hereto are 42 U.S.C. §§ 10101(31), 10131-10145

Table of Contents.......................................................................................1

§ 10101(31)..............................................................................................3

§ 10131 ....................................................................................................5

§ 10132 ....................................................................................................6

§ 10134 ....................................................................................................9

§ 10136 ..................................................................................................14

§ 10137 ..................................................................................................15

§ 10139 ..................................................................................................18

10 C.F.R. Part 2,

relevant excerpts attached hereto

§ 2.309 ...................................................................................................21

§ 2.1007 .................................................................................................26

Appendix D..............................................................................................27

1991—Subsec. (b). Pub. L. 102–54 substituted ''The Secretary of Veterans Affairs, through the Chief Medical Director of the Department of Veterans Affairs, shall, to the maximum extent feasible consistent with the responsibilities of such Secretary and Chief Medical Director under title 38'' for ''(1) The Administrator of Veterans' Affairs, through the Chief Medical Director of the Veterans' Administration, shall, to the maximum extent feasible consistent with the responsibilities of such Administrator and Chief Medical Director under subtitle 38'', ''over which that Secretary'' for ''over which the Administrator'', and ''Secretary of Veterans Affairs'' for ''Administrator'' wherever else appearing, and struck out pars. (2) and (3) which read as follows:

''(2) Not later than 180 days after standards are promulgated by the Secretary pursuant to this chapter, the Administrator of Veterans' Affairs shall submit to the appropriate committees of Congress a full report with respect to the regulations (including guidelines, policies, and procedures thereunder) prescribed pursuant to paragraph (1) of this subsection. Such report shall include—

''(A) an explanation of any inconsistency between standards made applicable by such regulations and the standards promulgated by the Secretary pursuant to this chapter;

''(B) an account of the extent, substance, and results of consultations with the Secretary respecting the prescription and implementation of regulations by the Administrator; and

''(C) such recommendations for legislation and administrative action as the Administrator determines are necessary and desirable.

''(3) The Administrator of Veterans' Affairs shall publish the report required by paragraph (2) in the Federal Register.''

## CHAPTER 108—NUCLEAR WASTE POLICY

Sec.
10101.    Definitions.
10102.    Separability.
10103.    Territories and possessions.
10104.    Ocean disposal.
10105.    Limitation on spending authority.
10106.    Protection of classified national security information.
10107.    Applicability to atomic energy defense activities.
10108.    Applicability to transportation.

SUBCHAPTER I—DISPOSAL AND STORAGE OF HIGH-LEVEL RADIOACTIVE WASTE, SPENT NUCLEAR FUEL, AND LOW-LEVEL RADIOACTIVE WASTE

10121.    State and affected Indian tribe participation in development of proposed repositories for defense waste.

PART A—REPOSITORIES FOR DISPOSAL OF HIGH-LEVEL RADIOACTIVE WASTE AND SPENT NUCLEAR FUEL

10131.    Findings and purposes.
10132.    Recommendation of candidate sites for site characterization.
10133.    Site characterization.
10134.    Site approval and construction authorization.
10135.    Review of repository site selection.
10136.    Participation of States.
10137.    Consultation with States and affected Indian tribes.
10138.    Participation of Indian tribes.
10139.    Judicial review of agency actions.
10140.    Expedited authorizations.
10141.    Certain standards and criteria.
10142.    Disposal of spent nuclear fuel.
10143.    Title to material.
10144.    Consideration of effect of acquisition of water rights.
10145.    Termination of certain provisions.

Sec.

PART B—INTERIM STORAGE PROGRAM

10151.    Findings and purposes.
10152.    Available capacity for interim storage of spent nuclear fuel.
10153.    Interim at-reactor storage.
10154.    Licensing of facility expansions and transshipments.
10155.    Storage of spent nuclear fuel.
10156.    Interim Storage Fund.
10157.    Transportation.

PART C—MONITORED RETRIEVABLE STORAGE

10161.    Monitored retrievable storage.
10162.    Authorization of monitored retrievable storage.
10163.    Monitored Retrievable Storage Commission.
10164.    Survey.
10165.    Site selection.
10166.    Notice of disapproval.
10167.    Benefits agreement.
10168.    Construction authorization.
10169.    Financial assistance.

PART D—LOW-LEVEL RADIOACTIVE WASTE

10171.    Financial arrangements for low-level radioactive waste site closure.

PART E—REDIRECTION OF NUCLEAR WASTE PROGRAM

10172.    Selection of Yucca Mountain site.
10172a.    Siting a second repository.

PART F—BENEFITS

10173.    Benefits agreements.
10173a.    Content of agreements.
10173b.    Review Panel.
10173c.    Termination.

PART G—OTHER BENEFITS

10174.    Consideration in siting facilities.
10174a.    Report.

PART H—TRANSPORTATION

10175.    Transportation.

SUBCHAPTER II—RESEARCH, DEVELOPMENT, AND DEMONSTRATION REGARDING DISPOSAL OF HIGH-LEVEL RADIOACTIVE WASTE AND SPENT NUCLEAR FUEL

10191.    Purpose.
10192.    Applicability.
10193.    Identification of sites.
10194.    Siting research and related activities.
10195.    Test and evaluation facility siting review and reports.
10196.    Federal agency actions.
10197.    Research and development on disposal of high-level radioactive waste.
10198.    Research and development on spent nuclear fuel.
10199.    Payments to States and Indian tribes.
10200.    Study of research and development needs for monitored retrievable storage proposal.
10201.    Judicial review.
10202.    Research on alternatives for permanent disposal of high-level radioactive waste.
10203.    Technical assistance to non-nuclear weapon states in field of spent fuel storage and disposal.
10204.    Subseabed disposal.

SUBCHAPTER III—OTHER PROVISIONS RELATING TO RADIOACTIVE WASTE

10221.    Mission plan.
10222.    Nuclear Waste Fund.
10223.    Alternative means of financing.
10224.    Office of Civilian Radioactive Waste Management.

Sec.
10225.    Location of test and evaluation facility.
10226.    Nuclear Regulatory Commission training authorization.

SUBCHAPTER IV—NUCLEAR WASTE NEGOTIATOR

10241.    "State" defined.
10242.    Office of Nuclear Waste Negotiator.
10243.    Duties of Negotiator.
10244.    Environmental assessment of sites.
10245.    Site characterization; licensing.
10246.    Monitored retrievable storage.
10247.    Environmental impact statement.
10248.    Administrative powers of Negotiator.
10249.    Cooperation of other departments and agencies.
10250.    Termination of Office.
10251.    Authorization of appropriations.

SUBCHAPTER V—NUCLEAR WASTE TECHNICAL
REVIEW BOARD

10261.    Definitions.
10262.    Nuclear Waste Technical Review Board.
10263.    Functions.
10264.    Investigatory powers.
10265.    Compensation of members.
10266.    Staff.
10267.    Support services.
10268.    Report.
10269.    Authorization of appropriations.
10270.    Termination of Board.

## § 10101. Definitions

For purposes of this chapter:

(1) The term "Administrator" means the Administrator of the Environmental Protection Agency.

(2) The term "affected Indian tribe" means any Indian tribe—

(A) within whose reservation boundaries a monitored retrievable storage facility, test and evaluation facility, or a repository for high-level radioactive waste or spent fuel is proposed to be located;

(B) whose federally defined possessory or usage rights to other lands outside of the reservation's boundaries arising out of congressionally ratified treaties may be substantially and adversely affected by the locating of such a facility: *Provided*, That the Secretary of the Interior finds, upon the petition of the appropriate governmental officials of the tribe, that such effects are both substantial and adverse to the tribe;[1]

(3) The term "atomic energy defense activity" means any activity of the Secretary performed in whole or in part in carrying out any of the following functions:

(A) naval reactors development;

(B) weapons activities including defense inertial confinement fusion;

(C) verification and control technology;

(D) defense nuclear materials production;

(E) defense nuclear waste and materials by-products management;

(F) defense nuclear materials security and safeguards and security investigations; and

(G) defense research and development.

(4) The term "candidate site" means an area, within a geologic and hydrologic system, that is recommended by the Secretary under

section 10132 of this title for site characterization, approved by the President under section 10132 of this title for site characterization, or undergoing site characterization under section 10133 of this title.

(5) The term "civilian nuclear activity" means any atomic energy activity other than an atomic energy defense activity.

(6) The term "civilian nuclear power reactor" means a civilian nuclear powerplant required to be licensed under section 2133 or 2134(b) of this title.

(7) The term "Commission" means the Nuclear Regulatory Commission.

(8) The term "Department" means the Department of Energy.

(9) The term "disposal" means the emplacement in a repository of high-level radioactive waste, spent nuclear fuel, or other highly radioactive material with no foreseeable intent of recovery, whether or not such emplacement permits the recovery of such waste.

(10) The terms "disposal package" and "package" mean the primary container that holds, and is in contact with, solidified high-level radioactive waste, spent nuclear fuel, or other radioactive materials, and any overpacks that are emplaced at a repository.

(11) The term "engineered barriers" means manmade components of a disposal system designed to prevent the release of radionuclides into the geologic medium involved. Such term includes the high-level radioactive waste form, high-level radioactive waste canisters, and other materials placed over and around such canisters.

(12) The term "high-level radioactive waste" means—

(A) the highly radioactive material resulting from the reprocessing of spent nuclear fuel, including liquid waste produced directly in reprocessing and any solid material derived from such liquid waste that contains fission products in sufficient concentrations; and

(B) other highly radioactive material that the Commission, consistent with existing law, determines by rule requires permanent isolation.

(13) The term "Federal agency" means any Executive agency, as defined in section 105 of title 5.

(14) The term "Governor" means the chief executive officer of a State.

(15) The term "Indian tribe" means any Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided to Indians by the Secretary of the Interior because of their status as Indians, including any Alaska Native village, as defined in section 3(c) of the Alaska Native Claims Settlement Act (43 U.S.C. 1602(c)).

(16) The term "low-level radioactive waste" means radioactive material that—

(A) is not high-level radioactive waste, spent nuclear fuel, transuranic waste, or by-product material as defined in section 2014(e)(2) of this title; and

(B) the Commission, consistent with existing law, classifies as low-level radioactive waste.

_____
[1] So in original. The semicolon probably should be a period.

2

(17) The term ''Office'' means the Office of Civilian Radioactive Waste Management established in section 10224[2] of this title.

(18) The term ''repository'' means any system licensed by the Commission that is intended to be used for, or may be used for, the permanent deep geologic disposal of high-level radioactive waste and spent nuclear fuel, whether or not such system is designed to permit the recovery, for a limited period during initial operation, of any materials placed in such system. Such term includes both surface and subsurface areas at which high-level radioactive waste and spent nuclear fuel handling activities are conducted.

(19) The term ''reservation'' means—

(A) any Indian reservation or dependent Indian community referred to in clause (a) or (b) of section 1151 of title 18; or

(B) any land selected by an Alaska Native village or regional corporation under the provisions of the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.).

(20) The term ''Secretary'' means the Secretary of Energy.

(21) The term ''site characterization'' means—

(A) siting research activities with respect to a test and evaluation facility at a candidate site; and

(B) activities, whether in the laboratory or in the field, undertaken to establish the geologic condition and the ranges of the parameters of a candidate site relevant to the location of a repository, including borings, surface excavations, excavations of exploratory shafts, limited subsurface lateral excavations and borings, and in situ testing needed to evaluate the suitability of a candidate site for the location of a repository, but not including preliminary borings and geophysical testing needed to assess whether site characterization should be undertaken.

(22) The term ''siting research'' means activities, including borings, surface excavations, shaft excavations, subsurface lateral excavations and borings, and in situ testing, to determine the suitability of a site for a test and evaluation facility.

(23) The term ''spent nuclear fuel'' means fuel that has been withdrawn from a nuclear reactor following irradiation, the constituent elements of which have not been separated by reprocessing.

(24) The term ''State'' means each of the several States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, the Northern Mariana Islands, the Trust Territory of the Pacific Islands, and any other territory or possession of the United States.

(25) The term ''storage'' means retention of high-level radioactive waste, spent nuclear fuel, or transuranic waste with the intent to recover such waste or fuel for subsequent use, processing, or disposal.

(26) The term ''Storage Fund'' means the Interim Storage Fund established in section 10156(c)[3] of this title.

(27) The term ''test and evaluation facility'' means an at-depth, prototypic, underground cavity with subsurface lateral excavations extending from a central shaft that is used for research and development purposes, including the development of data and experience for the safe handling and disposal of solidified high-level radioactive waste, transuranic waste, or spent nuclear fuel.

(28) The term ''unit of general local government'' means any borough, city, county, parish, town, township, village, or other general purpose political subdivision of a State.

(29) The term ''Waste Fund'' means the Nuclear Waste Fund established in section 10222(c) of this title.

(30) The term ''Yucca Mountain site'' means the candidate site in the State of Nevada recommended by the Secretary to the President under section 10132(b)(1)(B) of this title on May 27, 1986.

(31) The term ''affected unit of local government'' means the unit of local government with jurisdiction over the site of a repository or a monitored retrievable storage facility. Such term may, at the discretion of the Secretary, include units of local government that are contiguous with such unit.

(32) The term ''Negotiator'' means the Nuclear Waste Negotiator.

(33) As used in subchapter IV of this chapter, the term ''Office'' means the Office of the Nuclear Waste Negotiator established under subchapter IV of this chapter.

(34) The term ''monitored retrievable storage facility'' means the storage facility described in section 10161(b)(1) of this title.

(Pub. L. 97–425, § 2, Jan. 7, 1983, 96 Stat. 2202; Pub. L. 100–202, § 101(d) [title III, § 300], Dec. 22, 1987, 101 Stat. 1329–104, 1329–121; Pub. L. 100–203, title V, § 5002, Dec. 22, 1987, 101 Stat. 1330–227.)

### References in Text

Section 10224 of this title, referred to in par. (17), was in the original a reference to section 305 of Pub. L. 97–425, which is classified to section 10225 of this title, and was translated as section 10224 of this title as the probable intent of Congress, in view of the Office of Civilian Radioactive Waste Management being established by section 10224 of this title.

The Alaska Native Claims Settlement Act, referred to in par. (19)(B), is Pub. L. 92–203, Dec. 18, 1971, 85 Stat. 688, as amended, which is classified generally to chapter 33 (§ 1601 et seq.) of Title 43, Public Lands. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of Title 43 and Tables.

Section 10156(c) of this title, referred to in par. (26), was in the original a reference to section 137(c) of Pub. L. 97–425, which is classified to section 10157(c) of this title, and has been translated as section 10156(c) of this title as the probable intent of Congress, in view of the Interim Storage Fund being established by section 10156(c) of this title.

### Amendments

1987—Pars. (30) to (34). Pub. L. 100–202 and Pub. L. 100–203 amended section identically adding pars. (30) to (34).

### Short Title of 1987 Amendment

Section 101(d) [title III] of Pub. L. 100–202 and section 5001 of title V of Pub. L. 100–203 provided that: ''This

---

[2] See References in Text note below.
[3] See References in Text note below.

subtitle [subtitle A (§§ 5001–5065) of title V, enacting sections 10162, 10163, 10164, 10165, 10166, 10167, 10168, 10169, 10172, 10172a, 10173, 10173a, 10173b, 10173c, 10174, 10174a, 10175, 10204, 10241, 10242, 10243, 10244, 10245, 10246, 10247, 10248, 10249, 10250, 10251, 10261, 10262, 10263, 10264, 10265, 10266, 10267, 10268, 10269, and 10270 of this title, amending this section and sections 10132, 10133, 10134, 10136, 10137, and 10138 of this title and enacting provisions set out as a note under section 5841 of this title] may be cited as the 'Nuclear Waste Policy Amendments Act of 1987'.''

SHORT TITLE

Section 1 of Pub. L. 97–425 provided that: ''This Act [enacting this chapter] may be cited as the 'Nuclear Waste Policy Act of 1982'.''

TERMINATION OF TRUST TERRITORY OF THE PACIFIC ISLANDS

For termination of Trust Territory of the Pacific Islands, see note set out preceding section 1681 of Title 48, Territories and Insular Possessions.

NUCLEAR WASTE MANAGEMENT PLAN; REPORT

Pub. L. 102–486, title VIII, § 803, Oct. 24, 1992, 106 Stat. 2923, provided that:

''(a) PREPARATION AND SUBMISSION OF REPORT.—The Secretary of Energy, in consultation with the Nuclear Regulatory Commission and the Environmental Protection Agency, shall prepare and submit to the Congress a report on whether current programs and plans for management of nuclear waste as mandated by the Nuclear Waste Policy Act of 1982 (42 U.S.C. 10101 et seq.) are adequate for management of any additional volumes or categories of nuclear waste that might be generated by any new nuclear power plants that might be constructed and licensed after the date of the enactment of this Act [Oct. 24, 1992]. The Secretary shall prepare the report for submission to the President and the Congress within 1 year after the date of the enactment of this Act. The report shall examine any new relevant issues related to management of spent nuclear fuel and high-level radioactive waste that might be raised by the addition of new nuclear-generated electric capacity, including anticipated increased volumes of spent nuclear fuel or high-level radioactive waste, any need for additional interim storage capacity prior to final disposal, transportation of additional volumes of waste, and any need for additional repositories for deep geologic disposal.

''(b) OPPORTUNITY FOR PUBLIC COMMENT.—In preparation of the report required under subsection (a), the Secretary of Energy shall offer members of the public an opportunity to provide information and comment and shall solicit the views of the Nuclear Regulatory Commission, the Environmental Protection Agency, and other interested parties.

''(c) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated such sums as may be necessary to carry out this section.''

### § 10102. Separability

If any provision of this chapter, or the application of such provision to any person or circumstance, is held invalid, the remainder of this chapter, or the application of such provision to persons or circumstances other than those as to which it is held invalid, shall not be affected thereby.

(Pub. L. 97–425, § 3, Jan. 7, 1983, 96 Stat. 2205.)

### § 10103. Territories and possessions

Nothing in this chapter shall be deemed to repeal, modify, or amend the provisions of section 1491 of title 48.

(Pub. L. 97–425, § 4, Jan. 7, 1983, 96 Stat. 2205.)

### § 10104. Ocean disposal

Nothing in this chapter shall be deemed to affect the Marine Protection, Research, and Sanctuaries Act of 1972 (33 U.S.C. 1401 et seq.).

(Pub. L. 97–425, § 5, Jan. 7, 1983, 96 Stat. 2205.)

REFERENCES IN TEXT

The Marine Protection, Research, and Sanctuaries Act of 1972, referred to in text, is Pub. L. 92–532, Oct. 23, 1972, 86 Stat. 1052, as amended, which enacted chapters 32 (§ 1431 et seq.) and 32A (§ 1447 et seq.) of Title 16, Conservation, and chapters 27 (§ 1401 et seq.) and 41 (§ 2801 et seq.) of Title 33, Navigation and Navigable Waters. For complete classification of this Act to the Code, see Short Title note set out under section 1401 of Title 33 and Tables.

### § 10105. Limitation on spending authority

The authority under this chapter to incur indebtedness, or enter into contracts, obligating amounts to be expended by the Federal Government shall be effective for any fiscal year only to such extent or in such amounts as are provided in advance by appropriation Acts.

(Pub. L. 97–425, § 6, Jan. 7, 1983, 96 Stat. 2205.)

### § 10106. Protection of classified national security information

Nothing in this chapter shall require the release or disclosure to any person or to the Commission of any classified national security information.

(Pub. L. 97–425, § 7, Jan. 7, 1983, 96 Stat. 2205.)

### § 10107. Applicability to atomic energy defense activities

#### (a) Atomic energy defense activities

Subject to the provisions of subsection (c) of this section, the provisions of this chapter shall not apply with respect to any atomic energy defense activity or to any facility used in connection with any such activity.

#### (b) Evaluation by President

(1) Not later than 2 years after January 7, 1983, the President shall evaluate the use of disposal capacity at one or more repositories to be developed under part A of subchapter I of this chapter for the disposal of high-level radioactive waste resulting from atomic energy defense activities. Such evaluation shall take into consideration factors relating to cost efficiency, health and safety, regulation, transportation, public acceptability, and national security.

(2) Unless the President finds, after conducting the evaluation required in paragraph (1), that the development of a repository for the disposal of high-level radioactive waste resulting from atomic energy defense activities only is required, taking into account all of the factors described in such subsection, the Secretary shall proceed promptly with arrangement for the use of one or more of the repositories to be developed under part A of subchapter I of this chapter for the disposal of such waste. Such arrangements shall include the allocation of costs of developing, constructing, and operating this repository or repositories. The costs resulting from permanent disposal of high-level radioactive

waste from atomic energy defense activities shall be paid by the Federal Government, into the special account established under section 10222 of this title.

(3) Any repository for the disposal of high-level radioactive waste resulting from atomic energy defense activities only shall (A) be subject to licensing under section 5842 of this title; and (B) comply with all requirements of the Commission for the siting, development, construction, and operation of a repository.

**(c) Applicability to certain repositories**

The provisions of this chapter shall apply with respect to any repository not used exclusively for the disposal of high-level radioactive waste or spent nuclear fuel resulting from atomic energy defense activities, research and development activities of the Secretary, or both.

(Pub. L. 97–425, § 8, Jan. 7, 1983, 96 Stat. 2205.)

**§ 10108. Applicability to transportation**

Nothing in this chapter shall be construed to affect Federal, State, or local laws pertaining to the transportation of spent nuclear fuel or high-level radioactive waste.

(Pub. L. 97–425, § 9, Jan. 7, 1983, 96 Stat. 2206.)

SUBCHAPTER I—DISPOSAL AND STORAGE OF HIGH-LEVEL RADIOACTIVE WASTE, SPENT NUCLEAR FUEL, AND LOW-LEVEL RADIOACTIVE WASTE

**§ 10121. State and affected Indian tribe participation in development of proposed repositories for defense waste**

**(a) Notification to States and affected Indian tribes**

Notwithstanding the provisions of section 10107 of this title, upon any decision by the Secretary or the President to develop a repository for the disposal of high-level radioactive waste or spent nuclear fuel resulting exclusively from atomic energy defense activities, research and development activities of the Secretary, or both, and before proceeding with any site-specific investigations with respect to such repository, the Secretary shall notify the Governor and legislature of the State in which such repository is proposed to be located, or the governing body of the affected Indian tribe on whose reservation such repository is proposed to be located, as the case may be, of such decision.

**(b) Participation of States and affected Indian tribes**

Following the receipt of any notification under subsection (a) of this section, the State or Indian tribe involved shall be entitled, with respect to the proposed repository involved, to rights of participation and consultation identical to those provided in sections 10135 through 10138 of this title, except that any financial assistance authorized to be provided to such State or affected Indian tribe under section 10136(c) or 10138(b) of this title shall be made from amounts appropriated to the Secretary for purposes of carrying out this section.

(Pub. L. 97–425, title I, § 101, Jan. 7, 1983, 96 Stat. 2206.)

PART A—REPOSITORIES FOR DISPOSAL OF HIGH-LEVEL RADIOACTIVE WASTE AND SPENT NUCLEAR FUEL

**§ 10131. Findings and purposes**

(a) The Congress finds that—

(1) radioactive waste creates potential risks and requires safe and environmentally acceptable methods of disposal;

(2) a national problem has been created by the accumulation of (A) spent nuclear fuel from nuclear reactors; and (B) radioactive waste from (i) reprocessing of spent nuclear fuel; (ii) activities related to medical research, diagnosis, and treatment; and (iii) other sources;

(3) Federal efforts during the past 30 years to devise a permanent solution to the problems of civilian radioactive waste disposal have not been adequate;

(4) while the Federal Government has the responsibility to provide for the permanent disposal of high-level radioactive waste and such spent nuclear fuel as may be disposed of in order to protect the public health and safety and the environment, the costs of such disposal should be the responsibility of the generators and owners of such waste and spent fuel;

(5) the generators and owners of high-level radioactive waste and spent nuclear fuel have the primary responsibility to provide for, and the responsibility to pay the costs of, the interim storage of such waste and spent fuel until such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this chapter;

(6) State and public participation in the planning and development of repositories is essential in order to promote public confidence in the safety of disposal of such waste and spent fuel; and

(7) high-level radioactive waste and spent nuclear fuel have become major subjects of public concern, and appropriate precautions must be taken to ensure that such waste and spent fuel do not adversely affect the public health and safety and the environment for this or future generations.

(b) The purposes of this part are—

(1) to establish a schedule for the siting, construction, and operation of repositories that will provide a reasonable assurance that the public and the environment will be adequately protected from the hazards posed by high-level radioactive waste and such spent nuclear fuel as may be disposed of in a repository;

(2) to establish the Federal responsibility, and a definite Federal policy, for the disposal of such waste and spent fuel;

(3) to define the relationship between the Federal Government and the State governments with respect to the disposal of such waste and spent fuel; and

(4) to establish a Nuclear Waste Fund, composed of payments made by the generators and owners of such waste and spent fuel, that will ensure that the costs of carrying out activities relating to the disposal of such waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel.

(Pub. L. 97–425, title I, § 111, Jan. 7, 1983, 96 Stat. 2207.)

## § 10132. Recommendation of candidate sites for site characterization

### (a) Guidelines

Not later than 180 days after January 7, 1983, the Secretary, following consultation with the Council on Environmental Quality, the Administrator of the Environmental Protection Agency, the Director of the United States Geological Survey, and interested Governors, and the concurrence of the Commission shall issue general guidelines for the recommendation of sites for repositories. Such guidelines shall specify detailed geologic considerations that shall be primary criteria for the selection of sites in various geologic media. Such guidelines shall specify factors that qualify or disqualify any site from development as a repository, including factors pertaining to the location of valuable natural resources, hydrology, geophysics, seismic activity, and atomic energy defense activities, proximity to water supplies, proximity to populations, the effect upon the rights of users of water, and proximity to components of the National Park System, the National Wildlife Refuge System, the National Wild and Scenic Rivers System, the National Wilderness Preservation System, or National Forest Lands. Such guidelines shall take into consideration the proximity to sites where high-level radioactive waste and spent nuclear fuel is generated or temporarily stored and the transportation and safety factors involved in moving such waste to a repository. Such guidelines shall specify population factors that will disqualify any site from development as a repository if any surface facility of such repository would be located (1) in a highly populated area; or (2) adjacent to an area 1 mile by 1 mile having a population of not less than 1,000 individuals. Such guidelines also shall require the Secretary to consider the cost and impact of transporting to the repository site the solidified high-level radioactive waste and spent fuel to be disposed of in the repository and the advantages of regional distribution in the siting of repositories. Such guidelines shall require the Secretary to consider the various geologic media in which sites for repositories may be located and, to the extent practicable, to recommend sites in different geologic media. The Secretary shall use guidelines established under this subsection in considering candidate sites for recommendation under subsection (b) of this section. The Secretary may revise such guidelines from time to time, consistent with the provisions of this subsection.

### (b) Recommendation by Secretary to President

(1)(A) Following the issuance of guidelines under subsection (a) of this section and consultation with the Governors of affected States, the Secretary shall nominate at least 5 sites that he determines suitable for site characterization for selection of the first repository site.

(B) Subsequent to such nomination, the Secretary shall recommend to the President 3 of the nominated sites not later than January 1, 1985 for characterization as candidate sites.

(C) Such recommendations under subparagraph (B) shall be consistent with the provisions of section 10225 of this title.

(D) Each nomination of a site under this subsection shall be accompanied by an environmental assessment, which shall include a detailed statement of the basis for such recommendation and of the probable impacts of the site characterization activities planned for such site, and a discussion of alternative activities relating to site characterization that may be undertaken to avoid such impacts. Such environmental assessment shall include—

(i) an evaluation by the Secretary as to whether such site is suitable for site characterization under the guidelines established under subsection (a) of this section;

(ii) an evaluation by the Secretary as to whether such site is suitable for development as a repository under each such guideline that does not require site characterization as a prerequisite for application of such guideline;

(iii) an evaluation by the Secretary of the effects of the site characterization activities at such site on the public health and safety and the environment;

(iv) a reasonable comparative evaluation by the Secretary of such site with other sites and locations that have been considered;

(v) a description of the decision process by which such site was recommended; and

(vi) an assessment of the regional and local impacts of locating the proposed repository at such site.

(E)(i)[1] The issuance of any environmental assessment under this paragraph shall be considered to be a final agency action subject to judicial review in accordance with the provisions of chapter 7 of title 5 and section 10139 of this title. Such judicial review shall be limited to the sufficiency of such environmental assessment with respect to the items described in clauses (i) through (vi) of subparagraph (E).[2]

(F) Each environmental assessment prepared under this paragraph shall be made available to the public.

(G) Before nominating a site, the Secretary shall notify the Governor and legislature of the State in which such site is located, or the governing body of the affected Indian tribe where such site is located, as the case may be, of such nomination and the basis for such nomination.

(2) Before nominating any site the Secretary shall hold public hearings in the vicinity of such site to inform the residents of the area in which such site is located of the proposed nomination of such site and to receive their comments. At such hearings, the Secretary shall also solicit and receive any recommendations of such residents with respect to issues that should be addressed in the environmental assessment described in paragraph (1) and the site characterization plan described in section 10133(b)(1) of this title.

(3) In evaluating the sites nominated under this section prior to any decision to recommend a site as a candidate site, the Secretary shall use available geophysical, geologic, geochemical

---

[1] So in original. There is no cl. (ii).
[2] So in original. Probably should be "subparagraph (D)."

and hydrologic, and other information and shall not conduct any preliminary borings or excavations at a site unless (i) such preliminary boring or excavation activities were in progress on January 7, 1983, or (ii) the Secretary certifies that such available information from other sources, in the absence of preliminary borings or excavations, will not be adequate to satisfy applicable requirements of this chapter or any other law: *Provided,* That preliminary borings or excavations under this section shall not exceed a diameter of 6 inches.

**(c) Presidential review of recommended candidate sites**

(1) The President shall review each candidate site recommendation made by the Secretary under subsection (b) of this section. Not later than 60 days after the submission by the Secretary of a recommendation of a candidate site, the President, in his discretion, may either approve or disapprove such candidate site, and shall transmit any such decision to the Secretary and to either the Governor and legislature of the State in which such candidate site is located, or the governing body of the affected Indian tribe where such candidate site is located, as the case may be. If, during such 60-day period, the President fails to approve or disapprove such candidate site, or fails to invoke his authority under paragraph (2) to delay his decision, such candidate site shall be considered to be approved, and the Secretary shall notify such Governor and legislature, or governing body of the affected Indian tribe, of the approval of such candidate site by reason of the inaction of the President.

(2) The President may delay for not more than 6 months his decision under paragraph (1) to approve or disapprove a candidate site, upon determining that the information provided with the recommendation of the Secretary is insufficient to permit a decision within the 60-day period referred to in paragraph (1). The President may invoke his authority under this paragraph by submitting written notice to the Congress, within such 60-day period, of his intent to invoke such authority. If the President invokes such authority, but fails to approve or disapprove the candidate site involved by the end of such 6-month period, such candidate site shall be considered to be approved, and the Secretary shall notify such Governor and legislature, or governing body of the affected Indian tribe, of the approval of such candidate site by reason of the inaction of the President.

**(d) Preliminary activities**

Except as otherwise provided in this section, each activity of the President or the Secretary under this section shall be considered to be a preliminary decisionmaking activity. No such activity shall require the preparation of an environmental impact statement under section 102(2)(C) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(2)(C)), or to require any environmental review under subparagraph (E) or (F) of section 102(2) of such Act.

(Pub. L. 97–425, title I, § 112, Jan. 7, 1983, 96 Stat. 2208; Pub. L. 100–202, § 101(d) [title III, § 300], Dec. 22, 1987, 101 Stat. 1329–104, 1329–121; Pub. L.

100–203, title V, § 5011(b)–(d), Dec. 22, 1987, 101 Stat. 1330–228; Pub. L. 102–154, title I, Nov. 13, 1991, 105 Stat. 1000.)

AMENDMENTS

1987—Subsec. (b)(1)(C) to (H). Pub. L. 100–202 and Pub. L. 100–203, § 5011(b), amended par. (1) identically, redesignating subpars. (D) to (H) as (C) to (G), respectively, in subpar. (C) substituting "subparagraph (B)" for "subparagraphs (B) and (C)", and striking out former subpar. (C) which read as follows: 'Not later than July 1, 1989, the Secretary shall nominate 5 sites, which shall include at least 3 additional sites not nominated under subparagraph (A), and recommend by such date to the President from such 5 nominated sites 3 candidate sites the Secretary determines suitable for site characterization for selection of the second repository. The Secretary may not nominate any site previously nominated under subparagraph (A), that was not recommended as a candidate site under subparagraph (B).''

Subsec. (d). Pub. L. 100–202 and Pub. L. 100–203, § 5011(c), amended section identically, redesignating subsec. (e) as (d) and striking out former subsec (d) which read as follows: "After the required recommendation of candidate sites under subsection (b) of this section, the Secretary may continue, as he determines necessary, to identify and study other sites to determine their suitability for recommendation for site characterization, in accordance with the procedures described in this section.'

Subsec. (e). Pub. L. 100–202 and Pub. L. 100–203, § 5011(d), which contained identical amendments directing that subsec. (f) be struck out and all subsequent subsections be redesignated accordingly, was executed by striking out subsec. (e) as the probable intent of Congress because of the redesignation of former subsec. (f) as (e) by Pub. L. 100–202 and Pub. L. 100–203, § 5011(c), and the absence of any subsections subsequent to former subsec. (f). Subsec. (e) read as follows: "Nothing in this section may be construed as prohibiting the Secretary from continuing ongoing or presently planned site characterization at any site on Department of Energy land for which the location of the principal borehole has been approved by the Secretary by August 1, 1982, except that (1) the environmental assessment described in subsection (b)(1) of this section shall be prepared and made available to the public before proceeding to sink shafts at any such site; and (2) the Secretary shall not continue site characterization at any such site unless such site is among the candidate sites recommended by the Secretary under the first sentence of subsection (b) of this section for site characterization and approved by the President under subsection (c) of this section; and (3) the Secretary shall conduct public hearings under section 10133(b)(2) of this title and comply with requirements under section 10137 of this title within one year of January 7, 1983.''

Pub. L. 100–202 and Pub. L. 100–203, § 5011(c), amended section identically, redesignating subsec. (f) as (e). Former subsec. (e) redesignated (d).

Subsec. (f). Pub. L. 100–202 and Pub. L. 100–203, § 5011(c), amended section identically, redesignating subsec. (f) as (e).

CHANGE OF NAME

"United States Geological Survey" substituted for "Geological Survey" in subsec. (a) pursuant to provision of title I of Pub. L. 102–154, set out as a note under section 31 of Title 43, Public Lands.

DELEGATION OF NOTIFICATION FUNCTION

Letter of the President of the United States, dated May 28, 1986, 51 F.R. 19531, provided:

Letter to the Honorable John S. Herrington, Secretary of Energy
*Dear Mr. Secretary:*
You are hereby authorized to perform the notification function vested in the President pursuant to Sec-

tion 112(c)(1) of the Nuclear Waste Policy Act of 1982, 42 U.S.C. § 10132(c)(1).

This document shall be published in the Federal Register.

Sincerely,

RONALD REAGAN.

## § 10133. Site characterization

### (a) In general

The Secretary shall carry out, in accordance with the provisions of this section, appropriate site characterization activities at the Yucca Mountain site. The Secretary shall consider fully the comments received under subsection (b)(2) and section 10132(b)(2) of this title and shall, to the maximum extent practicable and in consultation with the Governor of the State of Nevada, conduct site characterization activities in a manner that minimizes any significant adverse environmental impacts identified in such comments or in the environmental assessment submitted under subsection (b)(1).[1]

### (b) Commission and States

(1) Before proceeding to sink shafts at the Yucca Mountain site, the Secretary shall submit for such candidate site to the Commission and to the Governor or legislature of the State of Nevada, for their review and comment—

(A) a general plan for site characterization activities to be conducted at such candidate site, which plan shall include—

(i) a description of such candidate site;

(ii) a description of such site characterization activities, including the following: the extent of planned excavations, plans for any onsite testing with radioactive or nonradioactive material, plans for any investigation activities that may affect the capability of such candidate site to isolate high-level radioactive waste and spent nuclear fuel, and plans to control any adverse, safety-related impacts from such site characterization activities;

(iii) plans for the decontamination and decommissioning of such candidate site, and for the mitigation of any significant adverse environmental impacts caused by site characterization activities if it is determined unsuitable for application for a construction authorization for a repository;

(iv) criteria to be used to determine the suitability of such candidate site for the location of a repository, developed pursuant to section 10132(a) of this title; and

(v) any other information required by the Commission;

(B) a description of the possible form or packaging for the high-level radioactive waste and spent nuclear fuel to be emplaced in such repository, a description, to the extent practicable, of the relationship between such waste form or packaging and the geologic medium of such site, and a description of the activities being conducted by the Secretary with respect to such possible waste form or packaging or such relationship; and

(C) a conceptual repository design that takes into account likely site-specific requirements.

(2) Before proceeding to sink shafts at the Yucca Mountain site, the Secretary shall (A) make available to the public the site characterization plan described in paragraph (1); and (B) hold public hearings in the vicinity of such candidate site to inform the residents of the area in which such candidate site is located of such plan, and to receive their comments.

(3) During the conduct of site characterization activities at the Yucca Mountain site, the Secretary shall report not less than once every 6 months to the Commission and to the Governor and legislature of the State of Nevada, on the nature and extent of such activities and the information developed from such activities.

### (c) Restrictions

(1) The Secretary may conduct at the Yucca Mountain site only such site characterization activities as the Secretary considers necessary to provide the data required for evaluation of the suitability of such site for an application to be submitted to the Commission for a construction authorization for a repository at such site, and for compliance with the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

(2) In conducting site characterization activities—

(A) the Secretary may not use any radioactive material at a site unless the Commission concurs that such use is necessary to provide data for the preparation of the required environmental reports and an application for a construction authorization for a repository at such site; and

(B) if any radioactive material is used at a site—

(i) the Secretary shall use the minimum quantity necessary to determine the suitability of such site for a repository, but in no event more than the curie equivalent of 10 metric tons of spent nuclear fuel; and

(ii) such radioactive material shall be fully retrievable.

(3) If the Secretary at any time determines the Yucca Mountain site to be unsuitable for development as a repository, the Secretary shall—

(A) terminate all site characterization activities at such site;

(B) notify the Congress, the[2] Governor and legislature of Nevada of such termination and the reasons for such termination;

(C) remove any high-level radioactive waste, spent nuclear fuel, or other radioactive materials at or in such site as promptly as practicable;

(D) take reasonable and necessary steps to reclaim the site and to mitigate any significant adverse environmental impacts caused by site characterization activities at such site;

(E) suspend all future benefits payments under part F of this subchapter with respect to such site; and

(F) report to Congress not later than 6 months after such determination the Secretary's recommendations for further action to assure the safe, permanent disposal of spent nuclear fuel and high-level radioactive waste, including the need for new legislative authority.

---

[1] See References in Text note below.

[2] So in original. Probably should read ''Congress and the''.

**(d) Preliminary activities**

Each activity of the Secretary under this section that is in compliance with the provisions of subsection (c) shall be considered a preliminary decisionmaking activity. No such activity shall require the preparation of an environmental impact statement under section 102(2)(C) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(2)(C)), or to [3] require any environmental review under subparagraph (E) or (F) of section 102(2) of such Act.

(Pub. L. 97–425, title I, §113, Jan. 7, 1983, 96 Stat. 2211; Pub. L. 100–202, §101(d) [title III, §300], Dec. 22, 1987, 101 Stat. 1329–104, 1329–121; Pub. L. 100–203, title V, §5011(e)–(g), Dec. 22, 1987, 101 Stat. 1330–228.)

REFERENCES IN TEXT

Subsection (b)(1), referred to in subsec. (a), probably means subsec. (b)(1) of section 10132 of this title, which relates to nomination of repository sites for radioactive waste and submission of environmental assessments for those sites.

The National Environmental Policy Act of 1969, referred to in subsec. (c)(1), is Pub. L. 91–190, Jan. 1, 1970, 83 Stat. 852, as amended, which is classified generally to chapter 55 (§4321 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 4321 of this title and Tables.

AMENDMENTS

1987—Subsec. (a). Pub. L. 100–202 and Pub. L. 100–203, §5011(e)(2), which contained identical amendments directing that "at the Yucca Mountain site" be substituted for "beginning" and all that follows through "geological media", were executed by substituting "at the Yucca Mountain site" for "beginning with the candidate sites that have been approved under section 10132 of this title and are located in various geologic media" as the probable intent of Congress.

Pub. L. 100–202 and Pub. L. 100–203, §5011(e)(1), amended subsec. (a) identically, substituting "State of Nevada" for "State involved or the governing body of the affected Indian tribe involved".

Subsec. (b)(1). Pub. L. 100–202 and Pub. L. 100–203, §5011(f)(1), amended par. (1) identically, substituting "the Yucca Mountain site" for "any candidate site" and "the Governor or legislature of the State of Nevada" for "either the Governor and legislature of the State in which such candidate site is located, or the governing body of the affected Indian tribe on whose reservation such candidate site is located, as the case may be".

Subsec. (b)(2). Pub. L. 100–202 and Pub. L. 100–203, §5011(f)(2), amended par. (2) identically, substituting "the Yucca Mountain site" for "any candidate site".

Subsec. (b)(3). Pub. L. 100–202 and Pub. L. 100–203, §5011(f)(3), amended par. (3) identically, substituting "the Yucca Mountain site" for "a candidate site", striking "either" before "the Governor", and substituting "the State of Nevada" for "the State in which such candidate site is located, or the governing body of the affected Indian tribe where such candidate site is located, as the case may be".

Subsec. (c)(1). Pub. L. 100–202 and Pub. L. 100–203, §5011(g)(1), amended par. (1) identically, substituting "the Yucca Mountain site" for "any candidate site", "suitability of such site" for "suitability of such candidate site", and "repository at such site" for "repository at such candidate site".

Subsec. (c)(2). Pub. L. 100–202 and Pub. L. 100–203, §5011(g)(2), amended par. (2) identically, striking out "candidate" before "site" in two places in subpar. (A) and in two places in subpar. (B).

Subsec. (c)(3), (4). Pub. L. 100–202 and Pub. L. 100–203, §5011(g)(3), amended subsec. (c) identically, adding par. (3) and striking out former pars. (3) and (4) which read as follows:

"(3) If site characterization activities are terminated at a candidate site for any reason, the Secretary shall (A) notify the Congress, the Governors and legislatures of all States in which candidate sites are located, and the governing bodies of all affected Indian tribes where candidate sites are located, of such termination and the reasons for such termination; and (B) remove any high-level radioactive waste, spent nuclear fuel, or other radioactive materials at or in such candidate site as promptly as practicable.

"(4) If a site is determined to be unsuitable for application for a construction authorization for a repository, the Secretary shall take reasonable and necessary steps to reclaim the site and to mitigate any significant adverse environmental impacts caused by site characterization activities."

**§ 10134. Site approval and construction authorization**

**(a) Hearings and Presidential recommendation**

(1) The Secretary shall hold public hearings in the vicinity of the Yucca Mountain site, for the purposes of informing the residents of the area of such consideration and receiving their comments regarding the possible recommendation of such site. If, upon completion of such hearings and completion of site characterization activities at the Yucca Mountain site, under section 10133 of this title, the Secretary decides to recommend approval of such site to the President, the Secretary shall notify the Governor and legislature of the State of Nevada, of such decision. No sooner than the expiration of the 30-day period following such notification, the Secretary shall submit to the President a recommendation that the President approve such site for the development of a repository. Any such recommendation by the Secretary shall be based on the record of information developed by the Secretary under section 10133 of this title and this section, including the information described in subparagraph (A) through subparagraph (G). Together with any recommendation of a site under this paragraph, the Secretary shall make available to the public, and submit to the President, a comprehensive statement of the basis of such recommendation, including the following:

(A) a description of the proposed repository, including preliminary engineering specifications for the facility;

(B) a description of the waste form or packaging proposed for use at such repository, and an explanation of the relationship between such waste form or packaging and the geologic medium of such site;

(C) a discussion of data, obtained in site characterization activities, relating to the safety of such site;

(D) a final environmental impact statement prepared for the Yucca Mountain site pursuant to subsection (f) of this section and the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), together with comments made concerning such environmental impact statement by the Secretary of the Interior, the Council on Environmental Quality, the Administrator, and the Commission, except that the Secretary shall not be required in any such environmental impact statement to con-

[3] So in original. The word "to" probably should not appear.

9

sider the need for a repository, the alternatives to geological disposal, or alternative sites to the Yucca Mountain site;

(E) preliminary comments of the Commission concerning the extent to which the at-depth site characterization analysis and the waste form proposal for such site seem to be sufficient for inclusion in any application to be submitted by the Secretary for licensing of such site as a repository;

(F) the views and comments of the Governor and legislature of any State, or the governing body of any affected Indian tribe, as determined by the Secretary, together with the response of the Secretary to such views;

(G) such other information as the Secretary considers appropriate; and

(H) any impact report submitted under section 10136(c)(2)(B) of this title by the State of Nevada.

(2)(A) If, after recommendation by the Secretary, the President considers the Yucca Mountain site qualified for application for a construction authorization for a repository, the President shall submit a recommendation of such site to Congress.

(B) The President shall submit with such recommendation a copy of the statement for such site prepared by the Secretary under paragraph (1).

(3)(A) The President may not recommend the approval of the Yucca Mountain site unless the Secretary has recommended to the President under paragraph (1) approval of such site and has submitted to the President a statement for such site as required under such paragraph.

(B) No recommendation of a site by the President under this subsection shall require the preparation of an environmental impact statement under section 102(2)(C) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(2)(C)), or to[1] require any environmental review under subparagraph (E) or (F) of section 102(2) of such Act.

**(b) Submission of application**

If the President recommends to the Congress the Yucca Mountain site under subsection (a) of this section and the site designation is permitted to take effect under section 10135 of this title, the Secretary shall submit to the Commission an application for a construction authorization for a repository at such site not later than 90 days after the date on which the recommendation of the site designation is effective under such section and shall provide to the Governor and legislature of the State of Nevada a copy of such application.

**(c) Status report on application**

Not later than 1 year after the date on which an application for a construction authorization is submitted under subsection (b) of this section, and annually thereafter until the date on which such authorization is granted, the Commission shall submit a report to the Congress describing the proceedings undertaken through the date of such report with regard to such application, including a description of—

(1) any major unresolved safety issues, and the explanation of the Secretary with respect to design and operation plans for resolving such issues;

(2) any matters of contention regarding such application; and

(3) any Commission actions regarding the granting or denial of such authorization.

**(d) Commission action**

The Commission shall consider an application for a construction authorization for all or part of a repository in accordance with the laws applicable to such applications, except that the Commission shall issue a final decision approving or disapproving the issuance of a construction authorization not later than the expiration of 3 years after the date of the submission of such application, except that the Commission may extend such deadline by not more than 12 months if, not less than 30 days before such deadline, the Commission complies with the reporting requirements established in subsection (e)(2) of this section. The Commission decision approving the first such application shall prohibit the emplacement in the first repository of a quantity of spent fuel containing in excess of 70,000 metric tons of heavy metal or a quantity of solidified high-level radioactive waste resulting from the reprocessing of such a quantity of spent fuel until such time as a second repository is in operation. In the event that a monitored retrievable storage facility, approved pursuant to part C of this subchapter, shall be located, or is planned to be located, within 50 miles of the first repository, then the Commission decision approving the first such application shall prohibit the emplacement of a quantity of spent fuel containing in excess of 70,000 metric tons of heavy metal or a quantity of solidified high-level radioactive waste resulting from the reprocessing of spent fuel in both the repository and monitored retrievable storage facility until such time as a second repository is in operation.

**(e) Project decision schedule**

(1) The Secretary shall prepare and update, as appropriate, in cooperation with all affected Federal agencies, a project decision schedule that portrays the optimum way to attain the operation of the repository, within the time periods specified in this part. Such schedule shall include a description of objectives and a sequence of deadlines for all Federal agencies required to take action, including an identification of the activities in which a delay in the start, or completion, of such activities will cause a delay in beginning repository operation.

(2) Any Federal agency that determines that it cannot comply with any deadline in the project decision schedule, or fails to so comply, shall submit to the Secretary and to the Congress a written report explaining the reason for its failure or expected failure to meet such deadline, the reason why such agency could not reach an agreement with the Secretary, the estimated time for completion of the activity or activities involved, the associated effect on its other deadlines in the project decision schedule, and any recommendations it may have or actions it intends to take regarding any improvements in its operation or organization, or changes to its stat-

[1] So in original. The word ''to'' probably should not appear.

utory directives or authority, so that it will be able to mitigate the delay involved. The Secretary, within 30 days after receiving any such report, shall file with the Congress his response to such report, including the reasons why the Secretary could not amend the project decision schedule to accommodate the Federal agency involved.

**(f) Environmental impact statement**

(1) Any recommendation made by the Secretary under this section shall be considered a major Federal action significantly affecting the quality of the human environment for purposes of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.). A final environmental impact statement prepared by the Secretary under such Act shall accompany any recommendation to the President to approve a site for a repository.

(2) With respect to the requirements imposed by the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), compliance with the procedures and requirements of this chapter shall be deemed adequate consideration of the need for a repository, the time of the initial availability of a repository, and all alternatives to the isolation of high-level radioactive waste and spent nuclear fuel in a repository.

(3) For purposes of complying with the requirements of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) and this section, the Secretary need not consider alternate sites to the Yucca Mountain site for the repository to be developed under this part.

(4) Any environmental impact statement prepared in connection with a repository proposed to be constructed by the Secretary under this part shall, to the extent practicable, be adopted by the Commission in connection with the issuance by the Commission of a construction authorization and license for such repository. To the extent such statement is adopted by the Commission, such adoption shall be deemed to also satisfy the responsibilities of the Commission under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) and no further consideration shall be required, except that nothing in this subsection shall affect any independent responsibilities of the Commission to protect the public health and safety under the Atomic Energy Act of 1954 (42 U.S.C. 2011 et seq.).

(5) Nothing in this chapter shall be construed to amend or otherwise detract from the licensing requirements of the Nuclear Regulatory Commission established in title II of the Energy Reorganization Act of 1974 (42 U.S.C. 5841 et seq.).

(6) In any such statement prepared with respect to the repository to be constructed under this part, the Nuclear Regulatory Commission need not consider the need for a repository, the time of the initial availability of a repository, alternate sites to the Yucca Mountain site, or nongeologic alternatives to such site.

(Pub. L. 97–425, title I, §114, Jan. 7, 1983, 96 Stat. 2213; Pub. L. 100–202, §101(d) [title III, §300], Dec. 22, 1987, 101 Stat. 1329–104, 1329–121; Pub. L. 100–203, title V, §5011(h)–(*l*), Dec. 22, 1987, 101 Stat. 1330–229, 1330–230.)

REFERENCES IN TEXT

The National Environmental Policy Act of 1969, referred to in subsecs. (a)(1)(D) and (f), is Pub. L. 91–190, Jan. 1, 1970, 83 Stat. 852, as amended, which is classified generally to chapter 55 (§4321 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 4321 of this title and Tables.

The Atomic Energy Act of 1954, referred to in subsec. (f)(4), is act Aug. 1, 1946, ch. 724, as added by act Aug. 30, 1954, ch. 1073, §1, 68 Stat. 921, and amended, which is classified generally to chapter 23 (§2011 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 2011 of this title and Tables.

The Energy Reorganization Act of 1974, referred to in subsec. (f)(5), is Pub. L. 93–438, Oct. 11, 1974, 88 Stat. 1233, as amended. Title II of the Energy Reorganization Act of 1974 is classified generally to subchapter II (§5841 et seq.) of chapter 73 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 5801 of this title and Tables.

AMENDMENTS

1987—Subsec. (a)(1). Pub. L. 100–202 and Pub. L. 100–203, §5011(h)(1)(A)–(E), amended par. (1) identically, in introductory provisions substituting "vicinity of the Yucca Mountain site" for "vicinity of each site under consideration for recommendation to the President under this paragraph as a site for the development of a repository", striking out "in which such site is located" after "residents of the area", substituting "activities at the Yucca Mountain site" for "activities at not less than 3 candidate sites for the first proposed repository, or from all of the characterized sites for the development of subsequent respositories" [sic] and "of Nevada" for "in which such site is located, or the governing body of the affected Indian tribe where such site is located, as the case may be", and struck out before last sentence "In making site recommendations and approvals subsequent to the first site recommendation, the Secretary and the President, respectively, shall also consider the need for regional distribution of repositories and the need to minimize, to the extent practicable, the impacts and cost of transporting spent fuel and solidified high-level radioactive waste."

Subsec. (a)(1)(D). Pub. L. 100–202 and Pub. L. 100–203, §5011(h)(1)(F), generally amended subpar. (D) identically. Prior to amendment, subpar. (D) read as follows: "a final environmental impact statement prepared pursuant to subsection (f) of this section and the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), including an analysis of the consideration given by the Secretary to not less than 3 candidate sites for the first proposed respository [sic] or to all of the characterized sites for the development of subsequent repositories, with respect to which site characterization is completed under section 10133 of this title, together with comments made concerning such environmental impact statement by the Secretary of the Interior, the Council on Environmental Quality, the Administrator, and the Commission, except that any such environmental impact statement concerning the first repository to be developed under this chapter shall not be required to consider the need for a repository or the alternatives to geologic disposal;".

Subsec. (a)(1)(H). Pub. L. 100–202 and Pub. L. 100–203, §5011(h)(1)(G), amended subpar. (H) identically, substituting "the State of Nevada" for "the State in which such site is located, or under section 10138(b)(3)(B) of this title by the affected Indian tribe where such site is located, as the case may be".

Subsec. (a)(2). Pub. L. 100–202 and Pub. L. 100–203, §5011(h)(2), amended subsec. (a) identically, adding par. (2) and striking out former par. (2) which required submission of recommendation of one site for repository not later than Mar. 31, 1987, and recommendation of second site not later than Mar. 31, 1990, and permitted subsequent recommendations for other sites and extension of deadlines.

Subsec. (a)(3), (4). Pub. L. 100–202 and Pub. L. 100–203, §5011(h)(2), (3), amended subsec. (a) identically, redesignating par. (4) as (3), in subpar. (A), substituting "the Yucca Mountain site" for "any site under this subsection" and "statement" for "report", and striking out former par. (3) which read as follows: "If approval of any such site recommendation does not take effect as a result of a disapproval by the Governor or legislature of a State under section 10136 of this title or the governing body of an affected Indian tribe under section 10138 of this title, the President shall submit to the Congress, not later than 1 year after the disapproval of such recommendation, a recommendation of another site for the first or subsequent repository."

Subsec. (b). Pub. L. 100–202 and Pub. L. 100–203, §5011(i), amended subsec. (b) identically, substituting "the Yucca Mountain site" for "a site for a repository" and "State of Nevada" for "State in which such site is located, or the governing body of the affected Indian tribe where such site is located, as the case may be,".

Subsec. (d). Pub. L. 100–202 and Pub. L. 100–203, §5011(j), amended subsec. (d) identically, substituting "than the expiration" for "than— (1) January 1, 1989, for the first such application, and January 1, 1992 for the second such application; or (2) the expiration" and "subsection (e)(2) of this section" for "subsection (e)(2) of this section; whichever occurs later".

Subsec. (e)(1). Pub. L. 100–202 and Pub. L. 100–203, §5011(k), amended par. (1) identically, substituting "operation of the repository" for "operation of the repository involved".

Subsec. (f). Pub. L. 100–202 and Pub. L. 100–203, §5011(l), generally amended subsec. (f) identically, substituting provisions consisting of pars. (1) to (6) for former provisions consisting of single unnumbered par.

TERMINATION OF REPORTING REQUIREMENTS

For termination, effective May 15, 2000, of provisions of law requiring submittal to Congress of any annual, semiannual, or other regular periodic report listed in House Document No. 103–7 (in which a report required under subsec. (c) of this section is listed as the 17th item on page 186), see section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance.

VIABILITY ASSESSMENT OF YUCCA MOUNTAIN SITE

Pub. L. 104–206, title III, Sept. 30, 1996, 110 Stat. 2995, provided in part: "That no later than September 30, 1998, the Secretary shall provide to the President and to the Congress a viability assessment of the Yucca Mountain site. The viability assessment shall include:

"(1) the preliminary design concept for the critical elements for the repository and waste package;

"(2) a total system performance assessment, based upon the design concept and the scientific data and analysis available by September 30, 1998, describing the probable behavior of the repository in the Yucca Mountain geological setting relative to the overall system performance standards;

"(3) a plan and cost estimate for the remaining work required to complete a license application; and

"(4) an estimate of the costs to construct and operate the repository in accordance with the design concept."

## § 10135. Review of repository site selection

### (a) "Resolution of repository siting approval" defined

For purposes of this section, the term "resolution of repository siting approval" means a joint resolution of the Congress, the matter after the resolving clause of which is as follows: "That there hereby is approved the site at .......... for a repository, with respect to which a notice of disapproval was submitted by .......... on ............". The first blank space in such resolution shall be filled with the name of the geographic location of the proposed site of the repository to which such resolution pertains; the second blank space in such resolution shall be filled with the designation of the State Governor and legislature or Indian tribe governing body submitting the notice of disapproval to which such resolution pertains; and the last blank space in such resolution shall be filled with the date of such submission.

### (b) State or Indian tribe petitions

The designation of a site as suitable for application for a construction authorization for a repository shall be effective at the end of the 60-day period beginning on the date that the President recommends such site to the Congress under section 10134 of this title, unless the Governor and legislature of the State in which such site is located, or the governing body of an Indian tribe on whose reservation such site is located, as the case may be, has submitted to the Congress a notice of disapproval under section 10136 or 10138 of this title. If any such notice of disapproval has been submitted, the designation of such site shall not be effective except as provided under subsection (c) of this section.

### (c) Congressional review of petitions

If any notice of disapproval of a repository site designation has been submitted to the Congress under section 10136 or 10138 of this title after a recommendation for approval of such site is made by the President under section 10134 of this title, such site shall be disapproved unless, during the first period of 90 calendar days of continuous session of the Congress after the date of the receipt by the Congress of such notice of disapproval, the Congress passes a resolution of repository siting approval in accordance with this subsection approving such site, and such resolution thereafter becomes law.

### (d) Procedures applicable to Senate

(1) The provisions of this subsection are enacted by the Congress—

(A) as an exercise of the rulemaking power of the Senate, and as such they are deemed a part of the rules of the Senate, but applicable only with respect to the procedure to be followed in the Senate in the case of resolutions of repository siting approval, and such provisions supersede other rules of the Senate only to the extent that they are inconsistent with such other rules; and

(B) with full recognition of the constitutional right of the Senate to change the rules (so far as relating to the procedure of the Senate) at any time, in the same manner and to the same extent as in the case of any other rule of the Senate.

(2)(A) Not later than the first day of session following the day on which any notice of disapproval of a repository site selection is submitted to the Congress under section 10136 or 10138 of this title, a resolution of repository siting approval shall be introduced (by request) in the Senate by the chairman of the committee to which such notice of disapproval is referred, or by a Member or Members of the Senate designated by such chairman.

(B) Upon introduction, a resolution of repository siting approval shall be referred to the ap-

propriate committee or committees of the Senate by the President of the Senate, and all such resolutions with respect to the same repository site shall be referred to the same committee or committees. Upon the expiration of 60 calendar days of continuous session after the introduction of the first resolution of repository siting approval with respect to any site, each committee to which such resolution was referred shall make its recommendations to the Senate.

(3) If any committee to which is referred a resolution of siting approval introduced under paragraph (2)(A), or, in the absence of such a resolution, any other resolution of siting approval introduced with respect to the site involved, has not reported such resolution at the end of 60 days of continuous session of Congress after introduction of such resolution, such committee shall be deemed to be discharged from further consideration of such resolution, and such resolution shall be placed on the appropriate calendar of the Senate.

(4)(A) When each committee to which a resolution of siting approval has been referred has reported, or has been deemed to be discharged from further consideration of, a resolution described in paragraph (3), it shall at any time thereafter be in order (even though a previous motion to the same effect has been disagreed to) for any Member of the Senate to move to proceed to the consideration of such resolution. Such motion shall be highly privileged and shall not be debatable. Such motion shall not be subject to amendment, to a motion to postpone, or to a motion to proceed to the consideration of other business. A motion to reconsider the vote by which such motion is agreed to or disagreed to shall not be in order. If a motion to proceed to the consideration of such resolution is agreed to, such resolution shall remain the unfinished business of the Senate until disposed of.

(B) Debate on a resolution of siting approval, and on all debatable motions and appeals in connection with such resolution, shall be limited to not more than 10 hours, which shall be divided equally between Members favoring and Members opposing such resolution. A motion further to limit debate shall be in order and shall not be debatable. Such motion shall not be subject to amendment, to a motion to postpone, or to a motion to proceed to the consideration of other business, and a motion to recommit such resolution shall not be in order. A motion to reconsider the vote by which such resolution is agreed to or disagreed to shall not be in order.

(C) Immediately following the conclusion of the debate on a resolution of siting approval, and a single quorum call at the conclusion of such debate if requested in accordance with the rules of the Senate, the vote on final approval of such resolution shall occur.

(D) Appeals from the decisions of the Chair relating to the application of the rules of the Senate to the procedure relating to a resolution of siting approval shall be decided without debate.

(5) If the Senate receives from the House a resolution of repository siting approval with respect to any site, then the following procedure shall apply:

(A) The resolution of the House with respect to such site shall not be referred to a committee.

(B) With respect to the resolution of the Senate with respect to such site—

(i) the procedure with respect to that or other resolutions of the Senate with respect to such site shall be the same as if no resolution from the House with respect to such site had been received; but

(ii) on any vote on final passage of a resolution of the Senate with respect to such site, a resolution from the House with respect to such site where the text is identical shall be automatically substituted for the resolution of the Senate.

**(e) Procedures applicable to House of Representatives**

(1) The provisions of this section[1] are enacted by the Congress—

(A) as an exercise of the rulemaking power of the House of Representatives, and as such they are deemed a part of the rules of the House, but applicable only with respect to the procedure to be followed in the House in the case of resolutions of repository siting approval, and such provisions supersede other rules of the House only to the extent that they are inconsistent with such other rules; and

(B) with full recognition of the constitutional right of the House to change the rules (so far as relating to the procedure of the House) at any time, in the same manner and to the same extent as in the case of any other rule of the House.

(2) Resolutions of repository siting approval shall upon introduction, be immediately referred by the Speaker of the House to the appropriate committee or committees of the House. Any such resolution received from the Senate shall be held at the Speaker's table.

(3) Upon the expiration of 60 days of continuous session after the introduction of the first resolution of repository siting approval with respect to any site, each committee to which such resolution was referred shall be discharged from further consideration of such resolution, and such resolution shall be referred to the appropriate calendar, unless such resolution or an identical resolution was previously reported by each committee to which it was referred.

(4) It shall be in order for the Speaker to recognize a Member favoring a resolution to call up a resolution of repository siting approval after it has been on the appropriate calendar for 5 legislative days. When any such resolution is called up, the House shall proceed to its immediate consideration and the Speaker shall recognize the Member calling up such resolution and a Member opposed to such resolution for 2 hours of debate in the House, to be equally divided and controlled by such Members. When such time has expired, the previous question shall be considered as ordered on the resolution to adoption without intervening motion. No amendment to any such resolution shall be in order, nor shall it be in order to move to reconsider the vote by which such resolution is agreed to or disagreed to.

(5) If the House receives from the Senate a resolution of repository siting approval with re-

---

[1] So in original. Probably should be "subsection".

spect to any site, then the following procedure shall apply:

(A) The resolution of the Senate with respect to such site shall not be referred to a committee.

(B) With respect to the resolution of the House with respect to such site—

(i) the procedure with respect to that or other resolutions of the House with respect to such site shall be the same as if no resolution from the Senate with respect to such site had been received; but

(ii) on any vote on final passage of a resolution of the House with respect to such site, a resolution from the Senate with respect to such site where the text is identical shall be automatically substituted for the resolution of the House.

**(f) Computation of days**

For purposes of this section—

(1) continuity of session of Congress is broken only by an adjournment sine die; and

(2) the days on which either House is not in session because of an adjournment of more than 3 days to a day certain are excluded in the computation of the 90-day period referred to in subsection (c) of this section and the 60-day period referred to in subsections (d) and (e) of this section.

**(g) Information provided to Congress**

In considering any notice of disapproval submitted to the Congress under section 10136 or 10138 of this title, the Congress may obtain any comments of the Commission with respect to such notice of disapproval. The provision of such comments by the Commission shall not be construed as binding the Commission with respect to any licensing or authorization action concerning the repository involved.

(Pub. L. 97–425, title I, §115, Jan. 7, 1983, 96 Stat. 2217.)

YUCCA MOUNTAIN, NEVADA REPOSITORY SITE

Pub. L. 107–200, July 23, 2002, 116 Stat. 735, provided: "That there hereby is approved the site at Yucca Mountain, Nevada, for a repository, with respect to which a notice of disapproval was submitted by the Governor of the State of Nevada on April 8, 2002."

## § 10136. Participation of States

**(a) Notification of States and affected tribes**

The Secretary shall identify the States with one or more potentially acceptable sites for a repository within 90 days after January 7, 1983. Within 90 days of such identification, the Secretary shall notify the Governor, the State legislature, and the tribal council of any affected Indian tribe in any State of the potentially acceptable sites within such State. For the purposes of this subchapter, the term "potentially acceptable site" means any site at which, after geologic studies and field mapping but before detailed geologic data gathering, the Department undertakes preliminary drilling and geophysical testing for the definition of site location.

**(b) State participation in repository siting decisions**

(1) Unless otherwise provided by State law, the Governor or legislature of each State shall have

authority to submit a notice of disapproval to the Congress under paragraph (2). In any case in which State law provides for submission of any such notice of disapproval by any other person or entity, any reference in this part to the Governor or legislature of such State shall be considered to refer instead to such other person or entity.

(2) Upon the submission by the President to the Congress of a recommendation of a site for a repository, the Governor or legislature of the State in which such site is located may disapprove the site designation and submit to the Congress a notice of disapproval. Such Governor or legislature may submit such a notice of disapproval to the Congress not later than the 60 days after the date that the President recommends such site to the Congress under section 10134 of this title. A notice of disapproval shall be considered to be submitted to the Congress on the date of the transmittal of such notice of disapproval to the Speaker of the House and the President pro tempore of the Senate. Such notice of disapproval shall be accompanied by a statement of reasons explaining why such Governor or legislature disapproved the recommended repository site involved.

(3) The authority of the Governor or legislature of each State under this subsection shall not be applicable with respect to any site located on a reservation.

**(c) Financial assistance**

(1)(A) The Secretary shall make grants to the State of Nevada and any affected unit of local government for the purpose of participating in activities required by this section and section 10137 of this title or authorized by written agreement entered into pursuant to section 10137(c) of this title. Any salary or travel expense that would ordinarily be incurred by such State or affected unit of local government, may not be considered eligible for funding under this paragraph.

(B) The Secretary shall make grants to the State of Nevada and any affected unit of local government for purposes of enabling such State or affected unit of local government—

(i) to review activities taken under this part with respect to the Yucca Mountain site for purposes of determining any potential economic, social, public health and safety, and environmental impacts of a repository on such State, or affected unit of local government and its residents;

(ii) to develop a request for impact assistance under paragraph (2);

(iii) to engage in any monitoring, testing, or evaluation activities with respect to site characterization programs with regard to such site;

(iv) to provide information to Nevada residents regarding any activities of such State, the Secretary, or the Commission with respect to such site; and

(v) to request information from, and make comments and recommendations to, the Secretary regarding any activities taken under this part with respect to such site.

(C) Any salary or travel expense that would ordinarily be incurred by the State of Nevada or

any affected unit of local government may not be considered eligible for funding under this paragraph.

(2)(A)(i) The Secretary shall provide financial and technical assistance to the State of Nevada, and any affected unit of local government requesting such assistance.

(ii) Such assistance shall be designed to mitigate the impact on such State or affected unit of local government of the development of such repository and the characterization of such site.

(iii) Such assistance to such State or affected unit of local government of such State shall commence upon the initiation of site characterization activities.

(B) The State of Nevada and any affected unit of local government may request assistance under this subsection by preparing and submitting to the Secretary a report on the economic, social, public health and safety, and environmental impacts that are likely to result from site characterization activities at the Yucca Mountain site. Such report shall be submitted to the Secretary after the Secretary has submitted to the State a general plan for site characterization activities under section 10133(b) of this title.

(C) As soon as practicable after the Secretary has submitted such site characterization plan, the Secretary shall seek to enter into a binding agreement with the State of Nevada setting forth—

(i) the amount of assistance to be provided under this subsection to such State or affected unit of local government; and

(ii) the procedures to be followed in providing such assistance.

(3)(A) In addition to financial assistance provided under paragraphs (1) and (2), the Secretary shall grant to the State of Nevada and any affected unit of local government an amount each fiscal year equal to the amount such State or affected unit of local government, respectively, would receive if authorized to tax site characterization activities at such site, and the development and operation of such repository, as such State or affected unit of local government taxes the non-Federal real property and industrial activities occurring within such State or affected unit of local government.

(B) Such grants shall continue until such time as all such activities, development, and operation are terminated at such site.

(4)(A) The State of Nevada or any affected unit of local government may not receive any grant under paragraph (1) after the expiration of the 1-year period following—

(i) the date on which the Secretary notifies the Governor and legislature of the State of Nevada of the termination of site characterization activities at the site in such State;

(ii) the date on which the Yucca Mountain site is disapproved under section 10135 of this title; or

(iii) the date on which the Commission disapproves an application for a construction authorization for a repository at such site;

whichever occurs first.

(B) The State of Nevada or any affected unit of local government may not receive any further assistance under paragraph (2) with respect to a site if repository construction activities or site characterization activities at such site are terminated by the Secretary or if such activities are permanently enjoined by any court.

(C) At the end of the 2-year period beginning on the effective date of any license to receive and possess for a repository in a State, no Federal funds, shall be made available to such State or affected unit of local government under paragraph (1) or (2), except for—

(i) such funds as may be necessary to support activities related to any other repository located in, or proposed to be located in, such State, and for which a license to receive and possess has not been in effect for more than 1 year;

(ii) such funds as may be necessary to support State activities pursuant to agreements or contracts for impact assistance entered into, under paragraph (2), by such State with the Secretary during such 2-year period; and

(iii) such funds as may be provided under an agreement entered into under subchapter IV of this chapter.

(5) Financial assistance authorized in this subsection shall be made out of amounts held in the Waste Fund.

(6) No State, other than the State of Nevada, may receive financial assistance under this subsection after December 22, 1987.

**(d) Additional notification and consultation**

Whenever the Secretary is required under any provision of this chapter to notify or consult with the governing body of an affected Indian tribe where a site is located, the Secretary shall also notify or consult with, as the case may be, the Governor of the State in which such reservation is located.

(Pub. L. 97–425, title I, §116, Jan. 7, 1983, 96 Stat. 2220; Pub. L. 100–202, §101(d) [title III, §300], Dec. 22, 1987, 101 Stat. 1329–104, 1329–121; Pub. L. 100–203, title V, §5032(a), Dec. 22, 1987, 101 Stat. 1330–241.)

AMENDMENTS

1987—Subsec. (c). Pub. L. 100–202 and Pub. L. 100–203 generally amended subsec. (c) identically, substituting provisions consisting of pars. (1) to (6) for former provisions consisting of pars. (1) to (5).

**§ 10137. Consultation with States and affected Indian tribes**

**(a) Provision of information**

(1) The Secretary, the Commission, and other agencies involved in the construction, operation, or regulation of any aspect of a repository in a State shall provide to the Governor and legislature of such State, and to the governing body of any affected Indian tribe, timely and complete information regarding determinations or plans made with respect to the site characterization siting, development, design, licensing, construction, operation, regulation, or decommissioning of such repository.

(2) Upon written request for such information by the Governor or legislature of such State, or by the governing body of any affected Indian tribe, as the case may be, the Secretary shall

provide a written response to such request within 30 days of the receipt of such request. Such response shall provide the information requested or, in the alternative, the reasons why the information cannot be so provided. If the Secretary fails to so respond within such 30 days, the Governor or legislature of such State, or the governing body of any affected Indian tribe, as the case may be, may transmit a formal written objection to such failure to respond to the President. If the President or Secretary fails to respond to such written request within 30 days of the receipt by the President of such formal written objection, the Secretary shall immediately suspend all activities in such State authorized by this part, and shall not renew such activities until the Governor or legislature of such State, or the governing body of any affected Indian tribe, as the case may be, has received the written response to such written request required by this subsection.

**(b) Consultation and cooperation**

In performing any study of an area within a State for the purpose of determining the suitability of such area for a repository pursuant to section 10132(c) of this title, and in subsequently developing and loading[1] any repository within such State, the Secretary shall consult and cooperate with the Governor and legislature of such State and the governing body of any affected Indian tribe in an effort to resolve the concerns of such State and any affected Indian tribe regarding the public health and safety, environmental, and economic impacts of any such repository. In carrying out his duties under this part, the Secretary shall take such concerns into account to the maximum extent feasible and as specified in written agreements entered into under subsection (c) of this section.

**(c) Written agreement**

Not later than 60 days after (1) the approval of a site for site characterization for such a repository under section 10132(c) of this title, or (2) the written request of the State or Indian tribe in any affected State notified under section 10136(a) of this title to the Secretary, whichever,[2] first occurs, the Secretary shall seek to enter into a binding written agreement, and shall begin negotiations, with such State and, where appropriate, to enter into a separate binding agreement with the governing body of any affected Indian tribe, setting forth (but not limited to) the procedures under which the requirements of subsections (a) and (b) of this section, and the provisions of such written agreement, shall be carried out. Any such written agreement shall not affect the authority of the Commission under existing law. Each such written agreement shall, to the maximum extent feasible, be completed not later than 6 months after such notification. Such written agreement shall specify procedures—

(1) by which such State or governing body of an affected Indian tribe, as the case may be, may study, determine, comment on, and make recommendations with regard to the possible public health and safety, environmental, so-

cial, and economic impacts of any such repository;

(2) by which the Secretary shall consider and respond to comments and recommendations made by such State or governing body of an affected Indian tribe, including the period in which the Secretary shall so respond;

(3) by which the Secretary and such State or governing body of an affected Indian tribe may review or modify the agreement periodically;

(4) by which such State or governing body of an affected Indian tribe is to submit an impact report and request for impact assistance under section 10136(c) of this title or section 10138(b) of this title, as the case may be;

(5) by which the Secretary shall assist such State, and the units of general local government in the vicinity of the repository site, in resolving the offsite concerns of such State and units of general local government, including, but not limited to, questions of State liability arising from accidents, necessary road upgrading and access to the site, ongoing emergency preparedness and emergency response, monitoring of transportation of high-level radioactive waste and spent nuclear fuel through such State, conduct of baseline health studies of inhabitants in neighboring communities near the repository site and reasonable periodic monitoring thereafter, and monitoring of the repository site upon any decommissioning and decontamination;

(6) by which the Secretary shall consult and cooperate with such State on a regular, ongoing basis and provide for an orderly process and timely schedule for State review and evaluation, including identification in the agreement of key events, milestones, and decision points in the activities of the Secretary at the potential repository site;

(7) by which the Secretary shall notify such State prior to the transportation of any high-level radioactive waste and spent nuclear fuel into such State for disposal at the repository site;

(8) by which such State may conduct reasonable independent monitoring and testing of activities on the repository site, except that such monitoring and testing shall not unreasonably interfere with or delay onsite activities;

(9) for sharing, in accordance with applicable law, of all technical and licensing information, the utilization of available expertise, the facilitating of permit procedures, joint project review, and the formulation of joint surveillance and monitoring arrangements to carry out applicable Federal and State laws;

(10) for public notification of the procedures specified under the preceding paragraphs; and

(11) for resolving objections of a State and affected Indian tribes at any stage of the planning, siting, development, construction, operation, or closure of such a facility within such State through negotiation, arbitration, or other appropriate mechanisms.

**(d) On-site representative**

The Secretary shall offer to any State, Indian tribe or unit of local government within whose jurisdiction a site for a repository or monitored

---

[1] So in original. Probably should be "locating".

[2] So in original. The comma probably should not appear.

retrievable storage facility is located under this subchapter an opportunity to designate a representative to conduct on-site oversight activities at such site. Reasonable expenses of such representatives shall be paid out of the Waste Fund.

(Pub. L. 97–425, title I, §117, Jan. 7, 1983, 96 Stat. 2222; Pub. L. 100–202, §101(d) [title III, §300], Dec. 22, 1987, 101 Stat. 1329–104, 1329–121; Pub. L. 100–203, title V, §5011(m), Dec. 22, 1987, 101 Stat. 1330–231; Pub. L. 104–66, title I, §1051(i), Dec. 21, 1995, 109 Stat. 716.)

### AMENDMENTS

1995—Subsec. (c). Pub. L. 104–66 struck out after third sentence "If such written agreement is not completed within such period, the Secretary shall report to the Congress in writing within 30 days on the status of negotiations to develop such agreement and the reasons why such agreement has not been completed. Prior to submission of such report to the Congress, the Secretary shall transmit such report to the Governor of such State or the governing body of such affected Indian tribe, as the case may be, for their review and comments. Such comments shall be included in such report prior to submission to the Congress.''

1987—Subsec. (d). Pub. L. 100–202 and Pub. L. 100–203 amended section identically, adding subsec. (d).

### § 10138. Participation of Indian tribes

#### (a) Participation of Indian tribes in repository siting decisions

Upon the submission by the President to the Congress of a recommendation of a site for a repository located on the reservation of an affected Indian tribe, the governing body of such Indian tribe may disapprove the site designation and submit to the Congress a notice of disapproval. The governing body of such Indian tribe may submit such a notice of disapproval to the Congress not later than the 60 days after the date that the President recommends such site to the Congress under section 10134 of this title. A notice of disapproval shall be considered to be submitted to the Congress on the date of the transmittal of such notice of disapproval to the Speaker of the House and the President pro tempore of the Senate. Such notice of disapproval shall be accompanied by a statement of reasons explaining why the governing body of such Indian tribe disapproved the recommended repository site involved.

#### (b) Financial assistance

(1) The Secretary shall make grants to each affected tribe notified under section 10136(a) of this title for the purpose of participating in activities required by section 10137 of this title or authorized by written agreement entered into pursuant to section 10137(c) of this title. Any salary or travel expense that would ordinarily be incurred by such tribe, may not be considered eligible for funding under this paragraph.

(2)(A) The Secretary shall make grants to each affected Indian tribe where a candidate site for a repository is approved under section 10132(c) of this title. Such grants may be made to each such Indian tribe only for purposes of enabling such Indian tribe—

(i) to review activities taken under this part with respect to such site for purposes of determining any potential economic, social, public

health and safety, and environmental impacts of such repository on the reservation and its residents;

(ii) to develop a request for impact assistance under paragraph (2);

(iii) to engage in any monitoring, testing, or evaluation activities with respect to site characterization programs with regard to such site;

(iv) to provide information to the residents of its reservation regarding any activities of such Indian tribe, the Secretary, or the Commission with respect to such site; and

(v) to request information from, and make comments and recommendations to, the Secretary regarding any activities taken under this part with respect to such site.

(B) The amount of funds provided to any affected Indian tribe under this paragraph in any fiscal year may not exceed 100 percent of the costs incurred by such Indian tribe with respect to the activities described in clauses (i) through (v) of subparagraph (A). Any salary or travel expense that would ordinarily be incurred by such Indian tribe may not be considered eligible for funding under this paragraph.

(3)(A) The Secretary shall provide financial and technical assistance to any affected Indian tribe requesting such assistance and where there is a site with respect to which the Commission has authorized construction of a repository. Such assistance shall be designed to mitigate the impact on such Indian tribe of the development of such repository. Such assistance to such Indian tribe shall commence within 6 months following the granting by the Commission of a construction authorization for such repository and following the initiation of construction activities at such site.

(B) Any affected Indian tribe desiring assistance under this paragraph shall prepare and submit to the Secretary a report on any economic, social, public health and safety, and environmental impacts that are likely as a result of the development of a repository at a site on the reservation of such Indian tribe. Such report shall be submitted to the Secretary following the completion of site characterization activities at such site and before the recommendation of such site to the President by the Secretary for application for a construction authorization for a repository. As soon as practicable following the granting of a construction authorization for such repository, the Secretary shall seek to enter into a binding agreement with the Indian tribe involved setting forth the amount of assistance to be provided to such Indian tribe under this paragraph and the procedures to be followed in providing such assistance.

(4) The Secretary shall grant to each affected Indian tribe where a site for a repository is approved under section 10132(c) of this title an amount each fiscal year equal to the amount such Indian tribe would receive were it authorized to tax site characterization activities at such site, and the development and operation of such repository, as such Indian tribe taxes the other commercial activities occurring on such reservation. Such grants shall continue until such time as all such activities, development, and operation are terminated at such site.

(5)[1] An affected Indian tribe may not receive any grant under paragraph (1) after the expiration of the 1-year period following—

(i) the date on which the Secretary notifies such Indian tribe of the termination of site characterization activities at the candidate site involved on the reservation of such Indian tribe;

(ii) the date on which such site is disapproved under section 10135 of this title;

(iii) the date on which the Commission disapproves an application for a construction authorization for a repository at such site;[2]

(iv) December 22, 1987;

whichever occurs first, unless there is another candidate site on the reservation of such Indian tribe that is approved under section 10132(c) of this title and with respect to which the actions described in clauses (i), (ii), and (iii) have not been taken.

(B) An affected Indian tribe may not receive any further assistance under paragraph (2) with respect to a site if repository construction activities at such site are terminated by the Secretary or if such activities are permanently enjoined by any court.

(C) At the end of the 2-year period beginning on the effective date of any license to receive and possess for a repository at a site on the reservation of an affected Indian tribe, no Federal funds shall be made available under paragraph (1) or (2) to such Indian tribe, except for—

(i) such funds as may be necessary to support activities of such Indian tribe related to any other repository where a license to receive and possess has not been in effect for more than 1 year; and

(ii) such funds as may be necessary to support activities of such Indian tribe pursuant to agreements or contracts for impact assistance entered into, under paragraph (2), by such Indian tribe with the Secretary during such 2-year period.

(6) Financial assistance authorized in this subsection shall be made out of amounts held in the Nuclear Waste Fund established in section 10222 of this title.

(Pub. L. 97–425, title I, §118, Jan. 7, 1983, 96 Stat. 2225; Pub. L. 100–202, §101(d) [title III, §300], Dec. 22, 1987, 101 Stat. 1329–104, 1329–121; Pub. L. 100–203, title V, §5033, Dec. 22, 1987, 101 Stat. 1330–243.)

#### AMENDMENTS

1987—Subsec. (b)(5)(iv). Pub. L. 100–202 and Pub. L. 100–203 amended par. (5) identically, adding cl. (iv).

### § 10139. Judicial review of agency actions

#### (a) Jurisdiction of United States courts of appeals

(1) Except for review in the Supreme Court of the United States, the United States courts of appeals shall have original and exclusive jurisdiction over any civil action—

(A) for review of any final decision or action of the Secretary, the President, or the Commission under this part;

(B) alleging the failure of the Secretary, the President, or the Commission to make any decision, or take any action, required under this part;

(C) challenging the constitutionality of any decision made, or action taken, under any provision of this part;

(D) for review of any environmental impact statement prepared pursuant to the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) with respect to any action under this part, or as required under section 10155(c)(1) of this title, or alleging a failure to prepare such statement with respect to any such action;

(E) for review of any environmental assessment prepared under section 10132(b)(1) or 10155(c)(2) of this title; or

(F) for review of any research and development activity under subchapter II of this chapter.

(2) The venue of any proceeding under this section shall be in the judicial circuit in which the petitioner involved resides or has its principal office, or in the United States Court of Appeals for the District of Columbia.

#### (c)[1] Deadline for commencing action

A civil action for judicial review described under subsection (a)(1) of this section may be brought not later than the 180th day after the date of the decision or action or failure to act involved, as the case may be, except that if a party shows that he did not know of the decision or action complained of (or of the failure to act), and that a reasonable person acting under the circumstances would not have known, such party may bring a civil action not later than the 180th day after the date such party acquired actual or constructive knowledge of such decision, action, or failure to act.

(Pub. L. 97–425, title I, §119, Jan. 7, 1983, 96 Stat. 2227.)

#### REFERENCES IN TEXT

The National Environmental Policy Act of 1969, referred to in subsec. (a)(1)(D), is Pub. L. 91–190, Jan. 1, 1970, 83 Stat. 852, as amended, which is classified generally to chapter 55 (§4321 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 4321 of this title and Tables.

### § 10140. Expedited authorizations

#### (a) Issuance of authorizations

(1) To the extent that the taking of any action related to the site characterization of a site or the construction or initial operation of a repository under this part requires a certificate, right-of-way, permit, lease, or other authorization from a Federal agency or officer, such agency or officer shall issue or grant any such authorization at the earliest practicable date, to the extent permitted by the applicable provisions of law administered by such agency or officer. All actions of a Federal agency or officer with respect to consideration of applications or requests for the issuance or grant of any such au-

---

[1] So in original. Probably should be designated "(5)(A)".
[2] So in original. Probably should be followed by "or".

[1] So in original. No subsec. (b) has been enacted.

thorization shall be expedited, and any such application or request shall take precedence over any similar applications or requests not related to such repositories.

(2) The provisions of paragraph (1) shall not apply to any certificate, right-of-way, permit, lease, or other authorization issued or granted by, or requested from, the Commission.

**(b) Terms of authorizations**

Any authorization issued or granted pursuant to subsection (a) of this section shall include such terms and conditions as may be required by law, and may include terms and conditions permitted by law.

(Pub. L. 97–425, title I, § 120, Jan. 7, 1983, 96 Stat. 2227.)

## § 10141. Certain standards and criteria

**(a) Environmental Protection Agency standards**

Not later than 1 year after January 7, 1983, the Administrator, pursuant to authority under other provisions of law, shall, by rule, promulgate generally applicable standards for protection of the general environment from offsite releases from radioactive material in repositories.

**(b) Commission requirements and criteria**

(1)(A) Not later than January 1, 1984, the Commission, pursuant to authority under other provisions of law, shall, by rule, promulgate technical requirements and criteria that it will apply, under the Atomic Energy Act of 1954 (42 U.S.C. 2011 et seq.) and the Energy Reorganization Act of 1974 (42 U.S.C. 5801 et seq.), in approving or disapproving—

(i) applications for authorization to construct repositories;

(ii) applications for licenses to receive and possess spent nuclear fuel and high-level radioactive waste in such repositories; and

(iii) applications for authorization for closure and decommissioning of such repositories.

(B) Such criteria shall provide for the use of a system of multiple barriers in the design of the repository and shall include such restrictions on the retrievability of the solidified high-level radioactive waste and spent fuel emplaced in the repository as the Commission deems appropriate.

(C) Such requirements and criteria shall not be inconsistent with any comparable standards promulgated by the Administrator under subsection (a) of this section.

(2) For purposes of this chapter, nothing in this section shall be construed to prohibit the Commission from promulgating requirements and criteria under paragraph (1) before the Administrator promulgates standards under subsection (a) of this section. If the Administrator promulgates standards under subsection (a) of this section after requirements and criteria are promulgated by the Commission under paragraph (1), such requirements and criteria shall be revised by the Commission if necessary to comply with paragraph (1)(C).

**(c) Environmental impact statement**

The promulgation of standards or criteria in accordance with the provisions of this section shall not require the preparation of an environmental impact statement under section 102(2)(C) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(2)(C)), or to require any environmental review under subparagraph (E) or (F) of section 102(2) of such Act.

(Pub. L. 97–425, title I, § 121, Jan. 7, 1983, 96 Stat. 2228.)

### References in Text

The Atomic Energy Act of 1954, referred to in subsec. (b)(1)(A), is act Aug. 1, 1946, ch. 724, as added by act Aug. 30, 1954, ch. 1073, § 1, 68 Stat. 921, and amended, which is classified generally to chapter 23 (§ 2011 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 2011 of this title and Tables.

The Energy Reorganization Act of 1974, referred to in subsec. (b)(1)(A), is Pub. L. 93–438, Oct. 11, 1974, 88 Stat. 1233, as amended, which is classified principally to chapter 73 (§ 5801 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 5801 of this title and Tables.

### Nuclear Waste Storage and Disposal at Yucca Mountain Site

Pub. L. 102–486, title VIII, § 801, Oct. 24, 1992, 106 Stat. 2921, provided that:

"(a) Environmental Protection Agency Standards.—

"(1) Promulgation.—Notwithstanding the provisions of section 121(a) of the Nuclear Waste Policy Act of 1982 (42 U.S.C. 10141(a)), section 161 b. of the Atomic Energy Act of 1954 (42 U.S.C. 2201(b)), and any other authority of the Administrator of the Environmental Protection Agency to set generally applicable standards for the Yucca Mountain site, the Administrator shall, based upon and consistent with the findings and recommendations of the National Academy of Sciences, promulgate, by rule, public health and safety standards for protection of the public from releases from radioactive materials stored or disposed of in the repository at the Yucca Mountain site. Such standards shall prescribe the maximum annual effective dose equivalent to individual members of the public from releases to the accessible environment from radioactive materials stored or disposed of in the repository. The standards shall be promulgated not later than 1 year after the Administrator receives the findings and recommendations of the National Academy of Sciences under paragraph (2) and shall be the only such standards applicable to the Yucca Mountain site.

"(2) Study by National Academy of Sciences.— Within 90 days after the date of the enactment of this Act [Oct. 24, 1992], the Administrator shall contract with the National Academy of Sciences to conduct a study to provide, by not later than December 31, 1993, findings and recommendations on reasonable standards for protection of the public health and safety, including—

"(A) whether a health-based standard based upon doses to individual members of the public from releases to the accessible environment (as that term is defined in the regulations contained in subpart B of part 191 of title 40, Code of Federal Regulations, as in effect on November 18, 1985) will provide a reasonable standard for protection of the health and safety of the general public;

"(B) whether it is reasonable to assume that a system for post-closure oversight of the repository can be developed, based upon active institutional controls, that will prevent an unreasonable risk of breaching the repository's engineered or geologic barriers or increasing the exposure of individual members of the public to radiation beyond allowable limits; and

"(C) whether it is possible to make scientifically supportable predictions of the probability that the

repository's engineered or geologic barriers will be breached as a result of human intrusion over a period of 10,000 years.

"(3) APPLICABILITY.—The provisions of this section shall apply to the Yucca Mountain site, rather than any other authority of the Administrator to set generally applicable standards for radiation protection.

"(b) NUCLEAR REGULATORY COMMISSION REQUIREMENTS AND CRITERIA.—

"(1) MODIFICATIONS.—Not later than 1 year after the Administrator promulgates standards under subsection (a), the Nuclear Regulatory Commission shall, by rule, modify its technical requirements and criteria under section 121(b) of the Nuclear Waste Policy Act of 1982 (42 U.S.C. 10141(b)), as necessary, to be consistent with the Administrator's standards promulgated under subsection (a).

"(2) REQUIRED ASSUMPTIONS.—The Commission's requirements and criteria shall assume, to the extent consistent with the findings and recommendations of the National Academy of Sciences, that, following repository closure, the inclusion of engineered barriers and the Secretary's post-closure oversight of the Yucca Mountain site, in accordance with subsection (c), shall be sufficient to—

"(A) prevent any activity at the site that poses an unreasonable risk of breaching the repository's engineered or geologic barriers; and

"(B) prevent any increase in the exposure of individual members of the public to radiation beyond allowable limits.

"(c) POST-CLOSURE OVERSIGHT.—Following repository closure, the Secretary of Energy shall continue to oversee the Yucca Mountain site to prevent any activity at the site that poses an unreasonable risk of—

"(1) breaching the repository's engineered or geologic barriers; or

"(2) increasing the exposure of individual members of the public to radiation beyond allowable limits."

### § 10142. Disposal of spent nuclear fuel

Notwithstanding any other provision of this part, any repository constructed on a site approved under this part shall be designed and constructed to permit the retrieval of any spent nuclear fuel placed in such repository, during an appropriate period of operation of the facility, for any reason pertaining to the public health and safety, or the environment, or for the purpose of permitting the recovery of the economically valuable contents of such spent fuel. The Secretary shall specify the appropriate period of retrievability with respect to any repository at the time of design of such repository, and such aspect of such repository shall be subject to approval or disapproval by the Commission as part of the construction authorization process under subsections (b) through (d) of section 10134 of this title.

(Pub. L. 97–425, title I, § 122, Jan. 7, 1983, 96 Stat. 2228.)

### § 10143. Title to material

Delivery, and acceptance by the Secretary, of any high-level radioactive waste or spent nuclear fuel for a repository constructed under this part shall constitute a transfer to the Secretary of title to such waste or spent fuel.

(Pub. L. 97–425, title I, § 123, Jan. 7, 1983, 96 Stat. 2229.)

### § 10144. Consideration of effect of acquisition of water rights

The Secretary shall give full consideration to whether the development, construction, and op-

eration of a repository may require any purchase or other acquisition of water rights that will have a significant adverse effect on the present or future development of the area in which such repository is located. The Secretary shall mitigate any such adverse effects to the maximum extent practicable.

(Pub. L. 97–425, title I, § 124, Jan. 7, 1983, 96 Stat. 2229.)

### § 10145. Termination of certain provisions

Sections 10139 and 10140 of this title shall cease to have effect at such time as a repository developed under this part is licensed to receive and possess high-level radioactive waste and spent nuclear fuel.

(Pub. L. 97–425, title I, § 125, Jan. 7, 1983, 96 Stat. 2229.)

PART B—INTERIM STORAGE PROGRAM

### § 10151. Findings and purposes

(a) The Congress finds that—

(1) the persons owning and operating civilian nuclear power reactors have the primary responsibility for providing interim storage of spent nuclear fuel from such reactors, by maximizing, to the extent practical, the effective use of existing storage facilities at the site of each civilian nuclear power reactor, and by adding new onsite storage capacity in a timely manner where practical;

(2) the Federal Government has the responsibility to encourage and expedite the effective use of existing storage facilities and the addition of needed new storage capacity at the site of each civilian nuclear power reactor; and

(3) the Federal Government has the responsibility to provide, in accordance with the provisions of this part, not more than 1,900 metric tons of capacity for interim storage of spent nuclear fuel for civilian nuclear power reactors that cannot reasonably provide adequate storage capacity at the sites of such reactors when needed to assure the continued, orderly operation of such reactors.

(b) The purposes of this part are—

(1) to provide for the utilization of available spent nuclear fuel pools at the site of each civilian nuclear power reactor to the extent practical and the addition of new spent nuclear fuel storage capacity where practical at the site of such reactor; and

(2) to provide, in accordance with the provisions of this part, for the establishment of a federally owned and operated system for the interim storage of spent nuclear fuel at one or more facilities owned by the Federal Government with not more than 1,900 metric tons of capacity to prevent disruptions in the orderly operation of any civilian nuclear power reactor that cannot reasonably provide adequate spent nuclear fuel storage capacity at the site of such reactor when needed.

(Pub. L. 97–425, title I, § 131, Jan. 7, 1983, 96 Stat. 2229.)

the service method used to deliver the entire document, excluding courtesy copies, to all of the other participants in the proceeding. The presiding officer may determine the calculation of additional days when a participant is not entitled to receive an entire filing served by multiple methods.

(4) In mixed service proceedings when all participants are not using the same filing and service method, the number of days for service will be determined by the presiding officer based on considerations of fairness and efficiency.

(c) To be considered timely, a document must be served:

(1) By 5 p.m. Eastern Time for a document served in person or by expedited service; and

(2) By 11:59 p.m. Eastern Time for a document served by the E-Filing system.

[72 FR 49151, Aug. 28, 2007]

**§ 2.307  Extension and reduction of time limits; delegated authority to order use of procedures for access by potential parties to certain sensitive unclassified information.**

(a) Except as otherwise provided by law, the time fixed or the period of time prescribed for an act that is required or allowed to be done at or within a specified time, may be extended or shortened either by the Commission or the presiding officer for good cause, or by stipulation approved by the Commission or the presiding officer.

(b) If this part does not prescribe a time limit for an action to be taken in the proceeding, the Commission or the presiding officer may set a time limit for the action.

(c) In circumstances where, in order to meet Commission requirements for intervention, potential parties may deem it necessary to obtain access to safeguards information (as defined in § 73.2 of this chapter) or to sensitive unclassified non-safeguards information, the Secretary is delegated authority to issue orders establishing procedures and timelines for submitting and resolving requests for this information.

[69 FR 2236, Jan. 14, 2004, as amended at 73 FR 10980, Feb. 29, 2008]

**§ 2.308  Treatment of requests for hearing or petitions for leave to intervene by the Secretary.**

Upon receipt of a request for hearing or a petition to intervene, the Secretary will forward the request or petition and/or proffered contentions and any answers and replies either to the Commission for a ruling on the request/petition and/or proffered contentions or to the Chief Administrative Judge of the Atomic Safety and Licensing Board Panel for the designation of a presiding officer under § 2.313(a) to rule on the matter.

**§ 2.309  Hearing requests, petitions to intervene, requirements for standing, and contentions.**

(a) *General requirements.* Any person whose interest may be affected by a proceeding and who desires to participate as a party must file a written request for hearing and a specification of the contentions which the person seeks to have litigated in the hearing. In a proceeding under 10 CFR 52.103, the Commission, acting as the presiding officer, will grant the request if it determines that the requestor has standing under the provisions of paragraph (d) of this section and has proposed at least one admissible contention that meets the requirements of paragraph (f) of this section. For all other proceedings, except as provided in paragraph (e) of this section, the Commission, presiding officer, or the Atomic Safety and Licensing Board designated to rule on the request for hearing and/or petition for leave to intervene, will grant the request/petition if it determines that the requestor/petitioner has standing under the provisions of paragraph (d) of this section and has proposed at least one admissible contention that meets the requirements of paragraph (f) of this section. In ruling on the request for hearing/petition to intervene submitted by petitioners seeking to intervene in the proceeding on the HLW repository, the Commission, the presiding officer, or the Atomic Safety and Licensing Board shall also consider any failure of the petitioner to participate as a potential party in the pre-license application phase under subpart J of this part in addition to the factors

in paragraph (d) of this section. If a request for hearing or petition to intervene is filed in response to any notice of hearing or opportunity for hearing, the applicant/licensee shall be deemed to be a party.

(b) *Timing.* Unless otherwise provided by the Commission, the request and/or petition and the list of contentions must be filed as follows:

(1) In proceedings for the direct or indirect transfer of control of an NRC license when the transfer requires prior approval of the NRC under the Commission's regulations, governing statute, or pursuant to a license condition, twenty (20) days from the date of publication of the notice in the FEDERAL REGISTER.

(2) In proceedings for the initial authorization to construct a high-level radioactive waste geologic repository, and the initial licensee to receive and process high level radioactive waste at a geological repository operations area, thirty (30) days from the date of publication of the notice in the FEDERAL REGISTER.

(3) In proceedings for which a FEDERAL REGISTER notice of agency action is published (other than a proceeding covered by paragraphs (b)(1) or (b)(2) of this section), not later than:

(i) The time specified in any notice of hearing or notice of proposed action or as provided by the presiding officer or the Atomic Safety and Licensing Board designated to rule on the request and/or petition, which may not be less than sixty (60) days from the date of publication of the notice in the FEDERAL REGISTER; or

(ii) If no period is specified, sixty (60) days from the date of publication of the notice.

(4) In proceedings for which a FEDERAL REGISTER notice of agency action is not published, not later than the latest of:

(i) Sixty (60) days after publication of notice on the NRC Web site at *http://www.nrc.gov/public-involve/major-actions.html*, or

(ii) Sixty (60) days after the requestor receives actual notice of a pending application, but not more than sixty (60) days after agency action on the application.

(5) For orders issued under §2.202 the time period provided therein.

(c) *Nontimely filings.* (1) Nontimely requests and/or petitions and contentions will not be entertained absent a determination by the Commission, the presiding officer or the Atomic Safety and Licensing Board designated to rule on the request and/or petition and contentions that the request and/or petition should be granted and/or the contentions should be admitted based upon a balancing of the following factors to the extent that they apply to the particular nontimely filing:

(i) Good cause, if any, for the failure to file on time;

(ii) The nature of the requestor's/petitioner's right under the Act to be made a party to the proceeding;

(iii) The nature and extent of the requestor's/petitioner's property, financial or other interest in the proceeding;

(iv) The possible effect of any order that may be entered in the proceeding on the requestor's/petitioner's interest;

(v) The availability of other means whereby the requestor's/petitioner's interest will be protected;

(vi) The extent to which the requestor's/petitioner's interests will be represented by existing parties;

(vii) The extent to which the requestor's/petitioner's participation will broaden the issues or delay the proceeding; and

(viii) The extent to which the requestor's/petitioner's participation may reasonably be expected to assist in developing a sound record.

(2) The requestor/petitioner shall address the factors in paragraphs (c)(1)(i) through (c)(1)(viii) of this section in its nontimely filing.

(d) *Standing.* (1) General requirements. A request for hearing or petition for leave to intervene must state:

(i) The name, address and telephone number of the requestor or petitioner;

(ii) The nature of the requestor's/petitioner's right under the Act to be made a party to the proceeding;

(iii) The nature and extent of the requestor's/petitioner's property, financial or other interest in the proceeding; and

(iv) The possible effect of any decision or order that may be issued in the

51

proceeding on the requestor's/petitioner's interest.

(2) State, local governmental body, and affected, Federally-recognized Indian Tribe. (i) A State, local governmental body (county, municipality or other subdivision), and any affected Federally-recognized Indian Tribe that desires to participate as a party in the proceeding shall submit a request for hearing/petition to intervene. The request/petition must meet the requirements of this section (including the contention requirements in paragraph (f) of this section), except that a State, local governmental body or affected Federally-recognized Indian Tribe that wishes to be a party in a proceeding for a facility located within its boundaries need not address the standing requirements under this paragraph. The State, local governmental body, and affected Federally-recognized Indian Tribe shall, in its request/petition, each designate a single representative for the hearing.

(ii) The Commission, the presiding officer or the Atomic Safety and Licensing Board designated to rule on requests for hearings or petitions for leave to intervene will admit as a party to a proceeding a single designated representative of the State, a single designated representative for each local governmental body (county, municipality or other subdivision), and a single designated representative for each affected Federally-recognized Indian Tribe. In determining the request/petition of a State, local governmental body, and any affected Federally-recognized Indian Tribe that wishes to be a party in a proceeding for a facility located within its boundaries, the Commission, the presiding officer or the Atomic Safety and Licensing Board designated to rule on requests for hearings or petitions for leave to intervene shall not require a further demonstration of standing.

(iii) In any proceeding on an application for a construction authorization for a high-level radioactive waste repository at a geologic repository operations area under parts 60 or 63 of this chapter, or an application for a license to receive and possess high-level radioactive waste at a geologic repository operations area under parts 60 or 63 of this chapter, the Commission shall permit intervention by the State and local governmental body (county, municipality or other subdivision) in which such an area is located and by any affected Federally-recognized Indian Tribe as defined in parts 60 or 63 of this chapter if the requirements of paragraph (f) of this section are satisfied with respect to at least one contention. All other petitions for intervention in any such proceeding must be reviewed under the provisions of paragraphs (a) through (f) of this section.

(3) The Commission, the presiding officer, or the Atomic Safety and Licensing Board designated to rule on requests for hearing and/or petitions for leave to intervene will determine whether the petitioner has an interest affected by the proceeding considering the factors enumerated in § 2.309(d)(1)–(2), among other things. In enforcement proceedings, the licensee or other person against whom the action is taken shall have standing.

(e) *Discretionary Intervention.* The presiding officer may consider a request for discretionary intervention when at least one requestor/petitioner has established standing and at least one admissible contention has been admitted so that a hearing will be held. A requestor/petitioner may request that his or her petition be granted as a matter of discretion in the event that the petitioner is determined to lack standing to intervene as a matter of right under paragraph (d)(1) of this section. Accordingly, in addition to addressing the factors in paragraph (d)(1) of this section, a petitioner who wishes to seek intervention as a matter of discretion in the event it is determined that standing as a matter of right is not demonstrated shall address the following factors in his/her initial petition, which the Commission, the presiding officer or the Atomic Safety and Licensing Board will consider and balance:

(1) Factors weighing in favor of allowing intervention—

(i) The extent to which the requestor's/petitioner's participation may reasonably be expected to assist in developing a sound record;

(ii) The nature and extent of the requestor's/petitioner's property, financial or other interests in the proceeding; and

(iii) The possible effect of any decision or order that may be issued in the proceeding on the requestor's/petitioner's interest;

(2) Factors weighing against allowing intervention—

(i) The availability of other means whereby the requestor's/petitioner's interest will be protected;

(ii) The extent to which the requestor's/petitioner's interest will be represented by existing parties; and

(iii) The extent to which the requestor's/petitioner's participation will inappropriately broaden the issues or delay the proceeding.

(f) *Contentions.* (1) A request for hearing or petition for leave to intervene must set forth with particularity the contentions sought to be raised. For each contention, the request or petition must:

(i) Provide a specific statement of the issue of law or fact to be raised or controverted, *provided further,* that the issue of law or fact to be raised in a request for hearing under 10 CFR 52.103(b) must be directed at demonstrating that one or more of the acceptance criteria in the combined license have not been, or will not be met, and that the specific operational consequences of nonconformance would be contrary to providing reasonable assurance of adequate protection of the public health and safety;

(ii) Provide a brief explanation of the basis for the contention;

(iii) Demonstrate that the issue raised in the contention is within the scope of the proceeding;

(iv) Demonstrate that the issue raised in the contention is material to the findings the NRC must make to support the action that is involved in the proceeding;

(v) Provide a concise statement of the alleged facts or expert opinions which support the requestor's/petitioner's position on the issue and on which the petitioner intends to rely at hearing, together with references to the specific sources and documents on which the requestor/petitioner intends to rely to support its position on the issue;

(vi) In a proceeding other than one under 10 CFR 52.103, provide sufficient information to show that a genuine dispute exists with the applicant/licensee on a material issue of law or fact. This information must include references to specific portions of the application (including the applicant's environmental report and safety report) that the petitioner disputes and the supporting reasons for each dispute, or, if the petitioner believes that the application fails to contain information on a relevant matter as required by law, the identification of each failure and the supporting reasons for the petitioner's belief; and

(vii) In a proceeding under 10 CFR 52.103(b), the information must be sufficient, and include supporting information showing, *prima facie,* that one or more of the acceptance criteria in the combined license have not been, or will not be met, and that the specific operational consequences of nonconformance would be contrary to providing reasonable assurance of adequate protection of the public health and safety. This information must include the specific portion of the report required by 10 CFR 52.99(c) which the requestor believes is inaccurate, incorrect, and/or incomplete (i.e., fails to contain the necessary information required by §52.99(c)). If the requestor identifies a specific portion of the §52.99(c) report as incomplete and the requestor contends that the incomplete portion prevents the requestor from making the necessary *prima facie* showing, then the requestor must explain why this deficiency prevents the requestor from making the *prima facie* showing.

(2) Contentions must be based on documents or other information available at the time the petition is to be filed, such as the application, supporting safety analysis report, environmental report or other supporting document filed by an applicant or licensee, or otherwise available to a petitioner. On issues arising under the National Environmental Policy Act, the petitioner shall file contentions based on the applicant's environmental report. The petitioner may amend those contentions or file new contentions if there are

data or conclusions in the NRC draft or final environmental impact statement, environmental assessment, or any supplements relating thereto, that differ significantly from the data or conclusions in the applicant's documents. Otherwise, contentions may be amended or new contentions filed after the initial filing only with leave of the presiding officer upon a showing that—

(i) The information upon which the amended or new contention is based was not previously available;

(ii) The information upon which the amended or new contention is based is materially different than information previously available; and

(iii) The amended or new contention has been submitted in a timely fashion based on the availability of the subsequent information.

(3) If two or more requestors/petitioners seek to co-sponsor a contention, the requestors/petitioners shall jointly designate a representative who shall have the authority to act for the requestors/petitioners with respect to that contention. If a requestor/petitioner seeks to adopt the contention of another sponsoring requestor/petitioner, the requestor/petitioner who seeks to adopt the contention must either agree that the sponsoring requestor/petitioner shall act as the representative with respect to that contention, or jointly designate with the sponsoring requestor/petitioner a representative who shall have the authority to act for the requestors/petitioners with respect to that contention.

(g) *Selection of hearing procedures.* A request for hearing and/or petition for leave to intervene may, except in a proceeding under 10 CFR 52.103, also address the selection of hearing procedures, taking into account the provisions of § 2.310. If a request/petition relies upon § 2.310(d), the request/petition must demonstrate, by reference to the contention and the bases provided and the specific procedures in subpart G of this part, that resolution of the contention necessitates resolution of material issues of fact which may be best determined through the use of the identified procedures.

(h) *Answers to requests for hearing and petitions to intervene.* Unless otherwise specified by the Commission, the presiding officer, or the Atomic Safety and Licensing Board designated to rule on requests for hearings or petitions for leave to intervene—

(1) The applicant/licensee, the NRC staff, and any other party to a proceeding may file an answer to a request for a hearing, a petition to intervene and/or proffered contentions within twenty-five (25) days after service of the request for hearing, petition and/or contentions. Answers should address, at a minimum, the factors set forth in paragraphs (a) through (g) of this section insofar as these sections apply to the filing that is the subject of the answer.

(2) Except in a proceeding under 10 CFR 52.103, the requestor/petitioner may file a reply to any answer. The reply must be filed within 7 days after service of that answer.

(3) No other written answers or replies will be entertained.

(i) *Decision on request/petition.* In all proceedings other than a proceeding under 10 CFR 52.103, the presiding officer shall, within 45 days after the filing of answers and replies under paragraph (h) of this section, issue a decision on each request for hearing/petition to intervene, absent an extension from the Commission. The Commission, acting as the presiding officer, shall expeditiously grant or deny the request for hearing in a proceeding under 10 CFR 52.103. The Commission's decision may not be the subject of any appeal under 10 CFR 2.311.

[69 FR 2236, Jan. 14, 2004, as amended at 72 FR 49474, Aug. 28, 2007; 73 FR 44620, July 31, 2008]

§ 2.310  Selection of hearing procedures.

Upon a determination that a request for hearing/petition to intervene should be granted and a hearing held, the Commission, the presiding officer, or the Atomic Safety and Licensing Board designated to rule on the request/petition will determine and identify the specific hearing procedures to be used for the proceeding as follows—

(a) Except as determined through the application of paragraphs (b) through (h) of this section, proceedings for the grant, renewal, licensee-initiated amendment, or termination of licenses

(d) Press clippings and press releases;

(e) Junk mail;

(f) References cited in contractor reports that are readily available;

(g) Classified material subject to subpart I of this part;

(h) Readily available references, such as journal articles and proceedings, which may be subject to copyright.

(i) Correspondence between a potential party, interested governmental participant, or party and the Congress of the United States.

[63 FR 71738, Dec. 30, 1998, as amended at 69 FR 32848, June 14, 2004]

**§2.1006 Privilege.**

(a) Subject to the requirements in §2.1003(a)(4), the traditional discovery privileges recognized in NRC adjudicatory proceedings and the exceptions from disclosure in §2.390 may be asserted by potential parties, interested States, local governmental bodies, Federally-recognized Indian Tribes, and parties. In addition to Federal agencies, the deliberative process privilege may also be asserted by States, local governmental bodies, and Federally-recognized Indian Tribes.

(b) Any document for which a claim of privilege is asserted, but is denied in whole or in part by the Pre-License Application Presiding Officer or the Presiding Officer, must be provided in electronic form by the party, interested governmental participant, or potential party that asserted the claim to—

(1) The other participants; or

(2) To the Pre-License Application Presiding Officer or to the Presiding Officer, for entry into a Protective Order file, if the Pre-License Application Presiding Officer or the Presiding Officer so directs under §§2.1010(b) or 2.1018(c).

(c) Notwithstanding any availability of the deliberative process privilege under paragraph (a) of this section, circulated drafts not otherwise privileged shall be provided for electronic access pursuant to §2.1003(a).

[63 FR 71738, Dec. 30, 1998; 64 FR 15920, Apr. 2, 1999, as amended at 69 FR 2265, Jan. 14, 2004]

**§2.1007 Access.**

(a)(1) A system to provide electronic access to the Licensing Support Network shall be provided at the headquarters of DOE, and at all DOE Local Public Document Rooms established in the vicinity of the likely candidate site for a geologic repository, beginning in the pre-license application phase.

(2) A system to provide electronic access to the Licensing Support Network shall be provided at the NRC Web site, *http://www.nrc.gov*, and/or at the NRC Public Document Room beginning in the pre-license application phase.

(3) [Reserved]

(b) Public availability of paper and electronic copies of the records of NRC and DOE, as well as duplication fees, and fee waiver for those records, is governed by the regulations of the respective agencies.

[63 FR 71738, Dec. 30, 1998, as amended at 64 FR 48949, Sept. 9, 1999]

**§2.1008 [Reserved]**

**§2.1009 Procedures.**

(a) Each potential party, interested governmental participant, or party shall—

(1) Designate an official who will be responsible for administration of its responsibility to provide electronic files of documentary material ;

(2) Establish procedures to implement the requirements in §2.1003;

(3) Provide training to its staff on the procedures for implementation of the responsibility to provide electronic files of documentary material;

(4) Ensure that all documents carry the submitter's unique identification number;

(5) Cooperate with the advisory review process established by the NRC under §2.1011(d).

(b) The responsible official designated under paragraph (a)(1) of this section shall certify to the Pre-License Application Presiding Officer that the procedures specified in paragraph (a)(2) of this section have been implemented, and that to the best of his or her knowledge, the documentary material specified in §2.1003 has been identified and made electronically available. The initial certification must be made at the time the participant is required to

reflect electronic filing and service in accordance with 10 CFR 2.305. The only discovery provided is the mandatory disclosure made by each party pursuant to 10 CFR 2.336.

MODEL MILESTONES

[10 CFR Part 2, Subpart N]

| | |
|---|---|
| • Within 20 of date of enforcement order: | Person subject to order files answer; if order immediately effective, motion to set aside immediate effectiveness due; requests for hearing due, including joint motion to use Subpart N procedures. |
| • Within 50 days of date of enforcement order: | Presiding officer decision on requests for hearing and confirms use of Subpart N procedures (note: if presiding officer concludes that Subpart N procedures should not be used, the Model Milestone for Enforcement Actions under Subpart G are applicable). |
| • Within 30 days of presiding officer decision granting hearing: | Mandatory disclosures complete. |
| • Within 40 days of presiding officer decision granting hearing: | Prehearing conference to specify issues for hearing and set schedules for remaining course of proceeding. |
| • Within 60 days of presiding officer decision granting hearing: | Evidentiary hearing begins. |
| • Within 30 days of end of evidentiary hearing and closing of record: | Presiding officer issues initial decision. |

[70 FR 20462, Apr. 20, 2005]

APPENDIX C TO PART 2 [RESERVED]

APPENDIX D TO PART 2—SCHEDULE FOR THE PROCEEDING ON CONSIDERATION OF CONSTRUCTION AUTHORIZATION FOR A HIGH-LEVEL WASTE GEOLOGIC REPOSITORY.

| Day | Regulation (10 CFR) | Action |
|---|---|---|
| 0 | 2.101(f)(8), 2.105(a)(5). | FEDERAL REGISTER Notice of Hearing. |
| 30 | 2.309(b)(2) ...... | Petition to intervene/request for hearing, w/contentions. |
| 30 | 2.309(b)(2) ...... | Petition for status as interested government participant. |
| 55 | 2.315(c) .......... | Answers to intervention & interested government participant Petitions. |
| 62 | 2.309(h)(1) ...... | Petitioner's response to answers. |
| 70 | 2.1021 ............. | First Prehearing conference. |
| 100 | 2.309(h)(2) ...... | First Prehearing Conference Order identifying participants in proceeding, admitted contentions, and setting discovery and other schedules. |
| 110 | 2.1021 ............. | Appeals from First Prehearing Conference Order. |
| 120 | ....................... | Briefs in opposition to appeals. |

| Day | Regulation (10 CFR) | Action |
|---|---|---|
| 150 | 2.1021, 2.329 | Commission ruling on appeals for First Prehearing Conference Order. |
| 548 | ....................... | NRC Staff issues SER. |
| 578 | 2.1022 ............. | Second Prehearing Conference. |
| 608 | 2.1021, 2.1022 | Discovery complete; Second Prehearing Conference Order finalizes issues for hearing and sets schedule for prefiled testimony and hearing. |
| 618 | 2.1015(b) ........ | Appeals from Second Prehearing Conference Order. |
| 628 | 2.1015(b), c.f. 2.710(a). | Briefs in opposition to appeals; last date for filing motions for summary disposition. |
| 648 | c.f. 2.710(a) .... | Last date for responses to summary disposition motions. |
| 658 | 2.710(a) .......... | Commission ruling on appeals from Second Prehearing Conference Order; last date for party opposing summary disposition motion to file response to new facts and arguments in any response supporting summary disposition motion. |
| 698 | 2.1015(b) ........ | Decision on summary disposition motions (may be determination to dismiss or to hold in abeyance). |
| 720 | c.f. 2.710(a) .... | Evidentiary hearing begins. |
| 810 | ....................... | Evidentiary hearing ends. |
| 840 | 2.712(a)(1) ...... | Applicant's proposed findings. |
| 850 | 2.712(a)(2) ...... | Other parties' proposed findings. |
| 855 | 2.712(a)(3) ...... | Applicant's reply to other parties' proposed findings. |
| 955 | 2.713 .............. | Initial decision. |
| 965 | 2.342(a), 2.345(a), 2.1015(c)(1). | Stay motion. Petition for reconsideration, notice of appeal. |
| 975 | 2.342(d), 2.345(b). | Other parties' responses to stay motion and Petitions for reconsideration. |
| 985 | ....................... | Commission ruling on stay motion. |
| 995 | 2.1015(c)(2) ..... | Appellant's briefs. |
| 1015 | 2.1015(c)(3) ..... | Appellee's briefs. |
| 1055 | 2.1023 Supp. Info. | Completion of NMSS and Commission supervisory review; issuance of construction authorization; NWPA 3-year period tolled. |
| 1125 | ....................... | Commission decision. |

[69 FR 2275, Jan. 14, 2004; 69 FR 25997, May 11, 2004]

# PART 4—NONDISCRIMINATION IN FEDERALLY ASSISTED PROGRAMS OR ACTIVITIES RECEIVING FEDERAL FINANCIAL ASSISTANCE FROM THE COMMISSION

GENERAL PROVISIONS

Sec.
4.1 Purpose and scope.
4.2 Subparts.
4.3 Application of this part.
4.4 Definitions.
4.5 Communications and reports.
4.6 Maintenance of records.