**ORAL ARGUMENT NOT YET SCHEDULED**
**Case No. 11-1271**

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

IN RE: AIKEN COUNTY, ET AL.,

Petitioners,

v.

U.S. NUCLEAR REGULATORY COMMISSION AND
GREGORY JACZKO, CHAIRMAN OF THE NUCLEAR REGULATORY
COMMISSION, IN HIS OFFICIAL CAPACITY,

Respondents.

Petition for Writ of Mandamus (Agency Action Unreasonably Withheld)
Nuclear Regulatory Commission

## BRIEF OF AMICUS CURIAE NUCLEAR ENERGY INSTITUTE, INC.
## IN SUPPORT OF PETITIONERS
## [CORRECTED]

Ellen C. Ginsberg
Anne W. Cottingham
Nuclear Energy Institute, Inc.
1776 I Street, NW, Suite 400
Washington, DC 20006
202-739-8140
202-739-8139
ecg@nei.org
awc@nei.org

Jerry Stouck
Greenberg Traurig LLP
2101 L Street NW
Suite 1000
Washington, DC 20037
202-331-3173
202-331-3101 (fax)
stouckj@gtlaw.com

*Counsel for Amicus Curiae*
*Nuclear Energy Institute, Inc.*

December 15, 2011

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and

Circuit Rule 26.1 of this Court, the Nuclear Energy Institute, Inc. ("NEI") hereby

represents that it is a non-profit corporation exempt from taxation pursuant to

Section 501(c)(6) of the Internal Revenue Code.  NEI functions as a trade

association representing the commercial nuclear energy industry.  Its objective is to

ensure the development of policies that promote the beneficial uses of nuclear

energy and technologies in the United States and around the world.  NEI has no

parent companies, and no publicly held company has a 10% or greater ownership

interest in NEI.

Respectfully submitted,

_____/s/ Jerry Stouck_____

| | |
|---|---|
| Ellen C. Ginsberg | Jerry Stouck |
| Anne W. Cottingham | Greenberg Traurig LLP |
| Nuclear Energy Institute, Inc. | 2101 L Street NW, Suite 1000 |
| 1776 I Street, NW, Suite 400 | Washington, DC 20037 |
| Washington, DC 20006 | 202-331-3173 |
| 202-739-8140 | 202-331-3101 Facsimile |
| 202-739-8139 | stouckj@gtlaw.com |
| ecg@nei.org | |
| awc@nei.org | *Counsel for Amicus Curiae* |

December 15, 2011

# TABLE OF CONTENTS

Table of Authorities ................................................ ii

Statement of Amicus Curiae Identity, Interest, and Source of
Authority to File ...................................................1

Rule 29(c)(5) Statement ............................................5

Introduction and Summary of Argument ...............................6

Argument..........................................................10

   I.   Maintaining the Integrity of Federal Licensing Proceedings Is
      Important to any Entity that Depends on a Federal License,
      and Is of Particular Importance to the Nuclear Industry Given
      NRC's Plenary Licensing Authority Over Nuclear Plants and
      Related Matters..............................................10

   II.  The NRC Has Failed to Comply with the NWPA's Explicit Direction
      to the NRC to "Consider" and "Issue a Final Decision" on DOE's
      License Application for the Yucca Mountain Repository ...........13

   III. The NRC Has Not Complied with its Obligation To Conduct All
      Licensing Proceedings in Accordance with the Particular Law
      Applicable to Such Proceedings..............................14

   IV. The Court Should Enforce the NRC Licensing Board's Correct
      Determination that the NWPA Requires the Yucca Mountain
      Licensing Proceeding to Continue, which Determination Stands
      as the NRC's Final Decision on the Matter ..................17

   V.   Until It Moved to Withdraw the License Application, DOE Had Long
      Participated in the NWPA's Detailed, Prescriptive Repository
      Development Process and Had Advocated for that Process to Continue .....21

   VI. The Requirements for a Writ of Mandamus are Met and the Court
      Should Issue the Writ ......................................24

Conclusion .......................................................28

Certificate Of Compliance ........................................29

i

# TABLE OF AUTHORITIES

**Federal Cases**

*Baltimore Gas and Elec. Co. v. Natural Res. Defense Council, Inc.,*
　　462 U.S. 87 (1983) ........................................................................... 12, 15

*Carstens v. Nuclear Regulatory Comm'n,*
　　742 F.2d 1546 (D.C. Cir. 1984) ................................................................15

*Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.,*
　　467 U.S. 837 (1984) ................................................................................18

*Council of and for the Blind of Delaware Cnty. Valley v. Regan,*
　　709 F.2d 1521 (D.C. Cir. 1983) ................................................................25

*Cox Brothers, Inc. v. Sec'y of Labor,*
　　574 F.2d 465 (9th Cir. 1978) ................................................................18

*Dairyland Power Coop. v. United States,*
　　645 F.3d 1363 (Fed. Cir. 2011) ..................................................................8

*Envirocare of Utah, Inc. v. Nuclear Regulatory Comm'n,*
　　194 F.3d 72 (D.C. Cir. 1999) ...................................................................18

*In re Aiken County,*
　　645 F.3d 428 (D.C. Cir. 2011) ........................................................ 7, 20, 27

*Indiana Michigan Power Co. v. DOE,*
　　88 F.3d 1272 (D.C. Cir. 1996) ...................................................................7

*Lancashire Coal Co. v. Sec'y of Labor,*
　　968 F.2d 388 (9th Cir. 1992) ................................................................18

*Lary v. U.S. Postal Serv.,*
　　472 F.3d 1363 (Fed. Cir. 2006) ................................................................17

*Massachusetts v. EPA,*
　　549 U.S. 497 (2007) ..................................................................................2

Authorities upon which we chiefly rely are marked with an asterisk.

*Northern States Power Co. v. DOE,*
    128 F.3d 754 (D.C. Cir. 1997)..................................................................... 7, 8, 25


*Nuclear Energy Inst., Inc. v. EPA,*
    373 F.3 1251 (D.C. Cir. 2004)............................................................ 8, 18, 22, 24

*Nuclear Info. and Res. Serv. v. Nuclear Regulatory Comm'n,*
    509 F.3d 562 (D.C. Cir. 2007)...............................................................................16

*Oystershell Alliance v. Nuclear Regulatory Comm'n,*
    800 F.2d 1201 (D.C. Cir. 1986)............................................................................15

*Seigel v. Atomic Energy Comm'n,*
    400 F.2d 778 (D.C. Cir. 1968)..............................................................................16

*Union of Concerned Scientists v. Nuclear Regulatory Comm'n,*
    735 F.2d 1437 (D.C. Cir. 1984)............................................................................15


**Federal Statutes**

5 U.S.C. § 706(1) .....................................................................................................24

28 U.S.C. § 1295(a)(9) ............................................................................................18

30 U.S.C. § 816(a)(1) ..............................................................................................18

42 U.S.C § 10134(d) ...............................................................................................24

42 U.S.C. § 10134 ............................................................................................. 3, 13

42 U.S.C. § 10134(a) ........................................................................................ 13, 22

* 42 U.S.C. § 10134(b)..............................................................................................13

42 U.S.C. § 10134(c) ...............................................................................................14

42 U.S.C. § 10141(b) ........................................................................................ 13, 14

42 U.S.C. § 10222 ......................................................................................................4

42 U.S.C. § 10222(b) .................................................................................................7

42 U.S.C. § 10222(c) ................................................................7

42 U.S.C. § 2137 ....................................................................11

42 U.S.C. §§ 10135-36 ...........................................................23

42 U.S.C. §§ 10153-10154 .....................................................11

42 U.S.C. §§ 2131-34 .............................................................11

42 U.S.C. §§ 2231-42 .............................................................11

42 U.S.C. § 2073 ....................................................................11

**Federal Rules**

Fed. R. App. P. 29(a) ...............................................................1

**Federal Regulations**

10 C.F.R. Part 2......................................................................12

10 C.F.R. Part 50....................................................................11

10 C.F.R. Part 52....................................................................11

10 C.F.R. Part 54....................................................................11

10 C.F.R. Part 55....................................................................11

10 C.F.R. Part 70....................................................................11

10 C.F.R. Part 72....................................................................11

73 Fed. Reg. 34,348 (June 17, 2008) (corrected in 73 Fed. Reg. 40,883
   (July 16, 2009)..................................................................13

74 Fed. Reg. 20748 (April 11, 2008) ......................................23

**Congressional Materials**

H.R. Rep. No. 97-491(I) (1982)............................................................14

S. Rep. No. 107-159 (June 10, 2002)............................................... 6, 23

*Statement of Kim Cawley, Chief, Natural and Physical Resources Cost
Estimates Unit, Congressional Budget Office, before the Committee
on the Budget, U.S. House of Representatives* 6-7 (July 16, 2009),
*available at* http://www.cbo.gov/doc.cfm?index=10456.......................8

**NRC Rulings and Materials**

*In re U.S. Dep't of Energy* (High-Level Waste Repository),
Docket 63-001-HLW, ASLBP No. 09-892-HLW-CAB04
(April 6, 2010) .........................................................................26

*In re U.S. Dep't of Energy* (High-Level Waste Repository), CLI-11-07,
__NRC__ (Sept. 9, 2011) (slip op.).........................................17

*In re U.S. Dep't of Energy* (High-Level Waste Repository)*, LBP-10-11,
71 NRC 609 (June 29, 2010)................................................. 17, 22, 23

*In re U.S. Dep't of Energy* (High-Level Waste Repository), Docket
63-001-HLW, ASLBP No. 09-892-HLW-CAB04 (Sept. 30, 2010)...................25

NRC's Statement of Policy on the Conduct of Adjudicatory Proceedings,
CLI-98-12, 48 N.R.C. 18 (1998) ...........................................20

Yucca Mountain License Application RAIs, *available at*
http://www.nrc.gov/waste/hlw-disposal/yucca-lic-app-rai.pdf (last
visited Dec. 9, 2011).............................................................26

*Entergy Nuclear Generation Co. & Entergy Nuclear Operations, Inc.*
(Pilgrim Nuclear Power Station), Docket 50-293-LR, Applicant's
Motion for Issuance of Renewed License (Aug. 23, 2011) ...............20

## Other Authorities

*Budget of the U.S. Government*, Fiscal Year 2012, Appendix at 415,
    *available at* http://www.whitehouse.gov/sites/default/files/omb/
    budget/fy2012/assets/doe.pdf (last visited Dec. 8, 2011).......................5

*Secretarial Determination of the Adequacy of the Nuclear Waste Fund
    Fee* (Dep't of Energy Nov. 1, 2010) .....................................................5

*Costs:  Fuel, Operation, and Waste Disposal, available at*
    http://www.nei.org/resourcesandstats/nuclearstatistics/costs................2

EPA, Public Health and Environmental Radiation Protection Standards
    for Yucca Mountain, Nevada, Final Rule, Responses to Comments at
    Appendix A, *available at* http://www.epa.gov/radiation/docs/yucca/
    402-r-01-009.pdf....................................................................................22

July 9, 2004 DOE Press Release, *available at*
    http://www.yuccamountain.org/pdf/doe_press_opinion04.pdf...........................22

NEI's website at: http://www.nei.org/resourcesandstats/documentlibrary/
    reliableandaffordableenergy/brochures/justthefacts...............................2

NEI's website at: http://www.nei.org/resourcesandstats/nuclearstatistics/
    environmentemissionsprevented/carbondioxideemissionsavoided......................2

## STATEMENT OF AMICUS CURIAE IDENTITY, INTEREST, AND SOURCE OF AUTHORITY TO FILE

The Nuclear Energy Institute, Inc. ("NEI") is authorized to file this brief amicus curiae pursuant to Fed. R. App. P. 29(a), which provides for such filing by consent of all parties or by leave of court. All parties consented to NEI's September 23, 2011 motion for leave to file a brief amicus curiae in support of the Petitioners. By Order dated September 28, 2011, this Court granted NEI's motion for leave to participate in this case as amicus curiae. By Order dated November 4, 2011, the Court directed that NEI's brief as amicus curiae be filed by December 12, 2011.

NEI has a clear interest in and unique perspective regarding this proceeding. NEI is the organization responsible for establishing unified industry policy on matters affecting the nuclear energy industry. NEI represents the industry in litigation and on the regulatory aspects of generic operational and technical issues. NEI's members include all companies licensed to operate commercial nuclear power plants in the United States, as well as other types of U.S. Nuclear Regulatory Commission ("NRC") licensees and other organizations involved in the nuclear industry.

NEI member companies operate the 104 U.S. nuclear power plants that currently generate approximately 20% of the nation's electricity. These facilities form an integral part of the nation's energy production infrastructure because of

their cost, stability, and output reliability.  The cost and the supply of nuclear

power do not fluctuate significantly because of weather, climate conditions, fuel

costs, or the availability of imported energy supplies.  Nuclear plants are capable of

operating without interruption for extended periods – up to 24 months at a time –

without shutting down.  As a result, nuclear power is an extremely important

source of the "baseload" electric power generation that is necessary for the national

electric power grid to function.  Nuclear energy is also comparatively inexpensive:

nuclear plants are currently estimated to be the lowest-cost producers of baseload

electricity.[1]

Finally, nuclear power has important environmental advantages over other

forms of electricity production, including the fact that nuclear power plants emit no

greenhouse gases.  This is a particularly important attribute as the world is

confronted with serious threats from climate change.[2]  Today, nuclear plants

generate approximately 70% of all carbon-free electricity in the U.S.[3]

---

[1]    *See Costs: Fuel, Operation, and Waste Disposal*, *available at*
http://www.nei.org/resourcesandstats/nuclearstatistics/costs/.

[2]    *See, e.g., Massachusetts v. EPA*, 549 U.S. 497, 521-23 (2007).

[3]    *See* NEI's website at: http://www.nei.org/resourcesandstats/document
library/reliableandaffordableenergy/brochures/justthefacts, and (2)
http://www.nei.org/resourcesandstats/nuclearstatistics/environmentemissionspreve
nted/carbondioxideemissionsavoided.

Notwithstanding the operational, economic, and environmental benefits of nuclear power, however, ultimate disposal of used or spent nuclear fuel (or "SNF") generated by nuclear plants depends upon the availability of a geologic repository. This is true whether SNF is disposed of directly, reprocessed, or otherwise recycled. Under the Nuclear Waste Policy Act ("NWPA"), once Congress designated Yucca Mountain, Nevada, as the site of the nation's geologic repository, the U.S. Department of Energy ("DOE") was required to submit to the NRC an application for authorization to construct and operate a repository at that site; and the NRC was required to consider the application, conduct a licensing hearing, and issue a decision approving or disapproving that application. *See generally* 42 U.S.C. § 10134. The Yucca Mountain repository was intended for the disposal of spent fuel from all commercial nuclear power plants in the country. NRC has now suspended and stymied the only process available for licensing the repository.

Thus, the significance of the Yucca Mountain repository project to NEI members operating U.S. nuclear power plants cannot be overstated. At a minimum, abandonment of Yucca Mountain project will significantly delay the availability of a repository, probably for decades. Such delay will not only unnecessarily complicate used fuel management, but will likely result in increased costs to taxpayers as damages accrue based on the federal government's failure to

meet its long-established legal and contractual obligation to remove SNF from nuclear power plant sites.  *See* pp. 7-8 & n. 6, *infra* (discussing the federal government's legal and contractual obligation to remove spent fuel from commercial reactor sites).

This case is also of compelling interest to NEI because NEI members pay more than $700 million per year in fees into the Nuclear Waste Fund established under NWPA to cover all costs associated with used nuclear fuel disposal.  *See* 42 U.S.C. § 10222 (c) & (d).  Thus far, more than $35 billion, including interest, has been or is committed to be paid into the Fund.[4]  Despite the staggering sums spent by industry to support disposal of spent nuclear fuel (fees that DOE continues to collect), NRC and DOE inaction on Yucca Mountain threatens to deprive the industry of any near-term solution to the SNF disposal issue, which solution is already decades past due.[5]

---

[4]     *See* Congressional Budget Office Statement for the Record for the House Committee on the Budget, *The Federal Government's Responsibilities and Liabilities under the Nuclear Waste Policy Act* (July 27, 2010).  In that Statement, CBO estimated that $31 billion was credited to the NWF from 1983 until the end of FY 2009, with a projected $2 billion per year in payments and interest going forward.  Note this figure is conservative because it does not include outstanding one-time fee payments from reactor licensees (totaling approximately $3.5 billion).

[5]     The Nuclear Waste Fund fee continues to be collected from ratepayers and utilities.  On November 1, 2010, the Secretary of Energy issued his most recent determination on the adequacy of that fee, finding that there was "no reasonable basis at this time to conclude that either excess or insufficient funds are being collected."  Accordingly, the DOE proposed no adjustment to the NWF fee.

## RULE 29(C)(5) STATEMENT

No party's counsel authored this brief in whole or in part, and no person other than NEI contributed money that was intended to fund preparing or submitting this brief.

---

*Secretarial Determination of the Adequacy of the Nuclear Waste Fund Fee* (Dep't of Energy Nov. 1, 2010) at 1.  DOE expects to collect approximately $778 million in fees during Fiscal Year 2012 from ratepayers and utilities.  *See Budget of the U.S. Government*, Fiscal Year 2012, Appendix at 415, *available at* http://www.whitehouse.gov/sites/default/files/omb/budget/fy2012/assets/doe.pdf (last visited Dec. 8, 2011).

## INTRODUCTION AND SUMMARY OF ARGUMENT

NEI concurs with the statement of issues, statement of the case, and statement of facts set forth in the December 5, 2011, Brief of Petitioners Aiken County, South Carolina; Robert L. Ferguson; William Lampson; Gary Petersen; State of South Carolina; State of Washington; National Association of Regulatory Utility Commissioners; and Nye County, Nevada ("Petitioners' Br."). As have the Petitioners, we urge the Court to issue a writ of mandamus because the NRC has unlawfully withheld and unreasonably delayed, and is now ignoring entirely, its statutory obligation both to consider the Yucca Mountain license application and to approve or disapprove that application within the 3-year time period mandated by Congress. *See* Petitioners' Br. at 37. The prejudice to the Petitioners and to NEI's members resulting from this delay is profound and serious.

As amicus curiae, NEI wishes to emphasize several points:

Continued progress toward development of a suitable repository for disposal of used nuclear fuel is a matter of great importance to the nuclear power industry. To date, the Nation's 104 commercial nuclear have produced about 50,000 metric tons of radioactive spent nuclear fuel, and they continue to produce each year about 2,000 additional tons of SNF. *See* S. Rep. No. 107-159 (June 10, 2002) at 2. Because the federal government has not fulfilled its longstanding legal and contractual obligation to provide for disposal of this used fuel, NRC reactor

licensees have continued to store spent fuel on site, at very substantial cost to the

utilities and consumers of the electricity they produce. That cost for on-site used

fuel storage is *in addition to* the more than $700 million per year in fees that

nuclear utilities pay into the Nuclear Waste Fund, which the Nuclear Waste Policy

Act ("NWPA") established to cover all costs associated with used fuel disposal.

*See* 42 U.S.C. § 10222(b) and (c); *see also* n. 5, *supra.*

Also important to NEI and its members is the availability of appropriate

judicial relief to enforce the requirements of the Nuclear Waste Policy Act. As this

Court has recognized, the NWPA imposed on the federal government an

"unconditional obligation" to dispose of used nuclear fuel beginning not later than

January 31, 1998. *See Northern States Power Co. v. DOE,* 128 F.3d 754, 755

(D.C. Cir. 1997). To ensure that the government fulfills its obligation, "Congress .

. . include[ed] specific statutory procedures regarding the siting and development

of a repository in the NWPA." *Indiana Michigan Power Co. v. DOE*, 88 F.3d

1272, 1277 (D.C. Cir. 1996); *see In re Aiken County*, 645 F.3d 428, 437 (D.C. Cir.

2011) ("*Aiken I*") ("The NWPA set forth a process and schedule for the siting,

construction, and operation of a federal repository"). Notwithstanding the detailed

prescriptive requirements of the NWPA, however, the government has repeatedly

defaulted on its unconditional obligation. Those defaults have forced NEI and its

members repeatedly to obtain judicial assistance to enforce the statute's

requirements and the NWPA-based contracts that DOE was required to enter with utilities to carry out the NWPA program.  *See, e.g., Nuclear Energy Inst., Inc. v. EPA,* 373 F.3 1251, 1285-109 (D.C. Cir. 2004) (enforcing NWPA requirements and upholding NRC actions under that statute); *Dairyland Power Coop. v. United States*, 645 F.3d 1363, 1366 n.1 (Fed. Cir. 2011) (listing numerous spent fuel contract damages decisions).  Indeed, this case is not the first time this Court has been called upon to issue mandamus relief to require the government to adhere to the NWPA.  *See Northern States Power Co.,* 128 F.3d at 758-61 (granting partial writ of mandamus).[6]

NEI submits this amicus brief not only to underscore the importance of this case to its members, and the importance of judicial oversight to enforce the NWPA, but also to emphasize three long-settled legal points that should inform the Court's consideration of this case:

First, the NRC's duty in a licensing proceeding – like the duty of any federal licensing agency – is to follow the particular statutory provisions and regulations that govern the licensing proceeding, and not succumb to extraneous political

---

[6]     According to the Congressional Budget Office, as of 2009 companies had been awarded $1.3 billion in damages as compensation for DOE's breach of its spent fuel contracts with utilities, and DOE estimated that liabilities to utilities would total more than $12 billion assuming that the Department begins accepting SNF by 2020.  *See Statement of Kim Cawley, Chief, Natural and Physical Resources Cost Estimates Unit, Congressional Budget Office, before the Committee on the Budget, U.S. House of Representatives* 6-7 (July 16, 2009), *available at* http://www.cbo.gov/doc.cfm?index=10456.

influence or other extra-legal considerations.  Yet that is exactly what the NRC has done by suspending the Yucca Mountain licensing proceeding, contrary to the mandatory requirements of the NWPA that the NRC is required to follow.

Second, the role of the courts in reviewing NRC licensing proceedings is to enforce NRC's obligation to follow the laws that apply to the particular proceeding.  We urge this Court to do so here, by compelling NRC to carry out the NWPA's explicit mandate to "consider" DOE's license application for Yucca Mountain, and "issue a final decision approving or disapproving the issuance of  a construction authorization."

Third, because the applicable provisions of the NWPA are clear and unequivocal, the NRC Atomic Safety and Licensing Board's construction and application of those provisions to forbid DOE from withdrawing its Yucca Mountain license application should be upheld under *Chevron* "Step One" principles.  Because the Commission has let stand the decision of its licensing board denying DOE's motion to withdraw as contrary to the NWPA, the Court should require the NRC to adhere to that now-final decision and continue the licensing proceeding to conclusion.

The NRC's outright suspension of its proceedings on DOE's repository license application clearly violates explicit terms of the NWPA and the bedrock principles of administrative law set out above.  The requirements to issue a writ of

9

mandamus are therefore met, and the Court should issue the mandamus relief that

Petitioners request.  Indeed, mandamus is particularly appropriate here because the

NRC has already conducted a technical review of DOE's Yucca Mountain license

application and initiated licensing hearings.  Petitioners ask only that the Court

direct NRC to finish the job and issue a final decision, as the NWPA explicitly

requires, not to initiate and pursue some complex new administrative proceeding

from scratch.  Mandamus should issue in these circumstances, given that the

federal government has already expended billions of dollars and decades of effort

preparing and evaluating the repository license application.  *See* n. 11, *infra.*

## ARGUMENT

**I.      Maintaining the Integrity of Federal Licensing Proceedings Is Important to any Entity that Depends on a Federal License, and Is of Particular Importance to the Nuclear Industry Given NRC's Plenary Licensing Authority Over Nuclear Plants and Related Matters.**

That federal agencies are required to conduct licensing proceedings in

accordance with the laws and regulations that apply in such proceedings is a truism

of administrative law.  Ensuring that the NRC does so is particularly important to

NEI's members because the commercial nuclear power industry is one of the most

heavily regulated industries in the country, and the NRC's licensing authority is at

the heart of the regulatory scheme that governs the industry.  The NRC licenses not

only construction and operation of nuclear power plants, but many other matters

bearing on the operation of such plants and the handling, storage and disposal of nuclear materials.

The NRC has broad authority under the Atomic Energy Act of 1954 ("AEA") to license commercial nuclear power plants. *See* 42 U.S.C. §§ 2131-34. Requirements for nuclear plant license applications, and for NRC proceedings to address such applications, are also set forth in the AEA. *See* 42 U.S.C. §§ 2231-42. Additional substantive and procedural NRC requirements govern the review of separate NRC licenses for construction and operation of nuclear power plants, *see* 10 C.F.R. Part 50, as well as "combined" construction and operating licenses for nuclear power plants, *see* 10 C.F.R. Part 52. Other detailed regulations, *see* 10 C.F.R. Part 54, govern the NRC's consideration of applications for renewal of nuclear plant operating licenses beyond the initial 40-year license term.

In addition to licensing of nuclear power plants, the NRC has authority to license nuclear power plant operators, *see* 42 U.S.C. § 2137; 10 C.F.R. Part 55, and the on-site interim storage facilities for used nuclear fuel made necessary by the delays in developing the Yucca Mountain repository, *see* 42 U.S.C. §§ 10153-10154; 10 C.F.R. Part 72. The NRC also has licensing authority over other matters, including the handling of nuclear materials, that affect both nuclear utilities and other entities that make use of such materials. *See, e.g.,* 42 U.S.C. § 2073; 10 C.F.R. Part 70. The NRC has promulgated detailed procedural

regulations applicable to the licensing proceedings it conducts.  *See* 10 C.F.R. Part 2.

Given the pervasiveness of the NRC's licensing authority, and the importance of licensing proceedings in the regulatory framework governing the nuclear power industry, enforcement of the legal requirements governing the NRC's conduct of such proceedings is essential.  Issues that arise in NRC licensing proceedings are often both complex and controversial, with technical, legal and policy implications.  This makes it all the more important that the NRC's conduct of such proceedings be guided by the applicable legal requirements and not influenced by national or local politics or other non-legal considerations.  *See Baltimore Gas and Elec. Co. v. Natural Res. Defense Council, Inc.,* 462 U.S. 87, 97 (1983) ("We are acutely aware that the extent to which this Nation should rely on nuclear power as a source of energy is an important and sensitive issue. . . . Congress has assigned the courts only the limited, albeit important task of reviewing agency action to determine whether the agency conformed with controlling statutes.").  Indeed, such agency compliance with the controlling statutes is of paramount importance not only to the nuclear industry but also more broadly in any federal licensing proceeding.

## II.     The NRC Has Failed to Comply with the NWPA's Explicit Direction to the NRC to "Consider" and "Issue a Final Decision" on DOE's License Application for the Yucca Mountain Repository.

Mindful of the NRC's broad licensing authority, and its unique experience in diverse licensing proceedings, Congress in the NWPA authorized and directed the NRC to conduct proceedings on the Yucca Mountain repository construction authorization.  *See* 42 U.S.C. §§ 10134, 10141(b).  Under the 1987 amendments to the NWPA, once the President recommends the Yucca Mountain site to Congress and that recommendation becomes effective under 42 U.S.C. § 10134(a), the statute directs that DOE "shall submit" to the NRC an application for construction authorization at Yucca Mountain.  42 U.S.C. § 10134(b).  DOE did so on June 3, 2008.  *See* 73 Fed. Reg. 34,348 (June 17, 2008) (corrected in 73 Fed. Reg. 40,883 (July 16, 2009)).

The NWPA further directs that:

> *The Commission shall consider an application* for a construction authorization for all or part of a repository *in accordance with the laws applicable to such applications*, . . . [and] *the Commission shall issue a final decision* approving or disapproving the issuance of construction authorization not later than the expiration of 3 years after the date of the submission of such application, except that the Commission may extend such deadline by not more than 12 months if [certain requirements are met.]

42 U.S.C. § 10134(b) (emphasis added).  Congress underscored its intent that the NRC adhere to this explicit requirement by also mandating that after DOE submits its application for construction authorization, the NRC shall annually "submit a

13

report to the Congress describing the proceedings undertaken through the date of such report with regard to such application, including a description of – (1) any unresolved safety issues, and the explanation of the Secretary [of DOE] with respect to . . . plans for resolving such issues; (2) any matters of contention regarding such application; and (3) any [NRC] actions regarding the granting or denial of such authorization."  42 U.S.C. § 10134(c).  *See also* 42 U.S.C. § 10141(b) (directing NRC to promulgate, by rule, technical requirements and criteria for approving or disapproving, *inter alia*, applications for repository construction authorization).  There could hardly be a clearer case for requiring an administrative agency to adhere to the strict and explicit requirements of the applicable statutory provisions.  *See also* H.R. Rep. No. 97-491(I) (1982) (A "legislated schedule for Federal decisions and actions for repository development" is an "essential element" of the NWPA program).

## III.    The NRC Has Not Complied with its Obligation To Conduct All Licensing Proceedings in Accordance with the Particular Law Applicable to Such Proceedings.

In reviewing a wide variety of licensing proceedings, courts – including the Supreme Court and this Court – have held that the NRC's role in such proceedings is to adhere to the applicable statutes and regulations, while the courts' role is to ensure that the NRC does so.  In the present case, the NRC must again be held to these black letter principles of administrative law.  The following examples are

illustrative of the many cases applying these principles to NRC actions in (or relating to) licensing proceedings.

In *Union of Concerned Scientists v. Nuclear Regulatory Comm'n,* 735 F.2d 1437 (D.C. Cir. 1984), this Court invalidated an NRC rule excluding certain issues from nuclear power plant licensing proceedings, holding that the rule contravened the AEA because it "denie[d] statutorily prescribed hearing rights." *Id.* at 1442. Conversely, in *Carstens v. Nuclear Regulatory Comm'n*, 742 F.2d 1546 (D.C. Cir. 1984), the Court upheld an NRC decision granting a nuclear plant operating license because "the Commission has fully complied with the procedures mandated in the applicable statutes and regulations." *Id.* at 1549. Similarly, in *Oystershell Alliance v. Nuclear Regulatory Comm'n*, 800 F.2d 1201 (D.C. Cir. 1986) (per curiam), the Court held that the NRC's decision to authorize full-power operation of a nuclear power plant, notwithstanding the pendency of motions to reopen the licensing proceeding, "was fully consistent with the statutory and regulatory requirements under which the Commission operates." *Id*. at 1203.

In *Baltimore Gas and Elec. Co.*, 462 U.S. 87, the Supreme Court upheld, as consistent with the National Environmental Policy Act (NEPA), an NRC rule requiring licensing boards to assume in nuclear power plant licensing proceedings that no significant environmental impact would result from extended storage of nuclear wastes on site. The Court found that in promulgating the rule, the NRC

15

"ha[d] made the careful consideration and disclosure required by NEPA." *Id.* at

979.  And in *Nuclear Info. and Res. Serv. v. Nuclear Regulatory Comm'n,* 509 F.3d

562 (D.C. Cir. 2007), this Court rejected a challenge to an NRC license for a

uranium enrichment facility, finding that although the required Environmental

Impact Statement was supplemented during the license proceeding, "the agency

still 'prepared' an EIS before the hearing was completed, which is all that th[e

applicable] provision of the Atomic Energy Act requires." *Id.* at 568-59.

    Notably, many previous nuclear licensing cases have involved statutory

provisions that conferred on the NRC (and before it the Atomic Energy

Commission) significant discretion to formulate appropriate licensing rules and

reach appropriate licensing decisions.  As this Court explained in *Seigel v. Atomic

Energy Comm'n,* 400 F.2d 778, 783 (D.C. Cir. 1968), in the AEA Congress

"enact[ed] a regulatory scheme which is virtually unique in the degree to which

broad responsibility is reposed in the administrative agency, free of close

prescription in its charter as to how it shall proceed in achieving the statutory

objectives."

    In sharp contrast, in the NWPA Congress prescribed specific, mandatory

requirements for the NRC to follow in addressing the licensing of spent fuel and

high level waste repositories, including now the repository at Yucca Mountain that

Congress focused on in the 1987 NWPA amendments.  Regardless of the varying

16

legislative approaches to different licensing proceedings, however, the governing

legal principles as applied in previous NRC licensing cases are the same:  the NRC

must comply with the applicable statutes and regulations, and courts will require

the NRC to do so.  Those principles should apply with special force in this case

precisely because the NWPA provisions that apply here impose prescriptive and

mandatory obligations on the NRC.

**IV.    The Court Should Enforce the NRC Licensing Board's Correct
        Determination that the NWPA Requires the Yucca Mountain Licensing
        Proceeding to Continue, which Determination Stands as the NRC's
        Final Decision on the Matter.**

        In this case, the requirement that the NRC must follow the mandatory

NWPA provisions is all the more clear because the NRC's own licensing board has

determined that the NWPA does not allow DOE to withdraw its license

application, but instead requires the Yucca Mountain repository licensing

proceeding to continue to completion.  *In re U.S. Dep't of Energy* (High-Level

Waste Repository)*, LBP-10-11, 71 NRC 609 (June 29, 2010) ("6/29/10 Lic. Bd.

Opin.").  That licensing board decision stands as the NRC's final decision on the

matter in light of the 2-2 vote of the NRC Commissioners on review of the

licensing board's ruling.  *In re U.S. Dep't of Energy* (High-Level Waste

Repository), CLI-11-07, __NRC__ (Sept. 9, 2011) (slip op.) ("9/9/11 NRC Order")

at 1; *see Lary v. U.S. Postal Serv.,* 472 F.3d 1363, 1368 (Fed. Cir. 2006) (Merit

Systems Protection Board ALJ decision "affirmed" by an equally divided Board

17

gave court jurisdiction under 28 U.S.C. § 1295(a)(9) (2000), which confers

jurisdiction over "an appeal from a final order or final decision of the [MSPB]");

*Lancashire Coal Co. v. Sec'y of Labor,* 968 F.2d 388 (9th Cir. 1992) ("[D]ecision

of Federal Mine Safety and Health Review Commission affirming [an ALJ ruling]

by an equally divided vote" was a "final decision by the Review Commission"

conferring jurisdiction on court under 30 U.S.C. § 816(a)(1), which provides that

persons "aggrieved by an order of the Commission . . . may obtain [federal

appellate] review of such an order"); *cf. Cox Brothers, Inc. v. Sec'y of Labor,* 574

F.2d 465 (9th Cir. 1978) (Equally divided, 1-1 vote of federal commission was "no

official action at all" where applicable statute imposed two member quorum

requirement and provided that "official action can be taken only on the affirmative

vote of at least two members.").

 As the NRC's final decision on DOE's motion to withdraw, the licensing

board's opinion must be given effect under *Chevron* "Step One" principles.  *See*

*Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842-43

(1984); *see also Nuclear Energy Inst., Inc.,* 373 F.3d at 1289 ("We defer to NRC's

interpretation of the NWPA under *Chevron*"); *Envirocare of Utah, Inc. v. Nuclear*

*Regulatory Comm'n*, 194 F.3d 72, 77-78 (D.C. Cir. 1999) (upholding as reasonable

NRC's interpretation of AEA to preclude intervention by competitor who alleged

only economic injury).

In its extensive and thoughtful opinion, the NRC licensing board correctly concluded that "the NWPA does not give the Secretary [of DOE] the discretion to substitute his policy for the one established by Congress in the NWPA that, at this point, mandates progress toward a merits decision by the [NRC] on the construction permit."  6/29/10 Lic. Bd. Opin. at 617; *see id.* at 618 ("[W]e conclude that Congress directed both that DOE file the Application (as DOE concedes) and that the NRC consider the Application and issue a final, merits-based decision approving or disapproving the construction authorization application"); *id*. at 619 ("[T]he NWPA set out a detailed, specific procedure for site selection and review by the Secretary of Energy, the President, and the Congress, followed by submission of the Application for a construction permit, review, and final decision thereon by the NRC."); *id*. at 620 ("Given the stated purposes of the NWPA and the detailed structure of that legislation, it would be illogical to allow DOE to withdraw the Application without any examination of the merits."); *id*. at 622 ("[T]he pertinent policy – that DOE's Yucca Mountain Application should be decided on the merits by the NRC– is footed on controlling provisions of the Nuclear Waste Policy Act that DOE lacks authority to override. Regardless of whether DOE thinks the congressional scheme is wise, it is beyond dispute that DOE and NRC are each bound to follow it."); *id*. at 623 ("[T]he language, structure and legislative history of the NWPA all contravene the notion

19

that Congress intended to allow DOE to terminate the NRC's consideration of the

Application"); *id.* at 626-27 ("Once DOE has applied for a construction

authorization, the NRC – not DOE – is charged with granting or denying the

construction permit application under the sequential process prescribed by the

NWPA.").[7]

     This Court can and should read the applicable NWPA provisions in exactly

the same way as the NRC licensing board, because those provisions are clear and

unambiguous: "shall consider" and "shall issue a final decision." There is no need

and no occasion for the Court to interpret these explicit statutory directives.

Although the outcome would unquestionably be the same, that exercise is

unnecessary given the NRC's now-final and authoritative application of the

governing NWPA provisions. *See also Aiken I,* 645 F.3d at 435-36 ("As we noted

above, the NWPA requires the Commission to 'issue a final decision approving or

disapproving the issuance of a construction authorization.'"); *id.* at 434-35 ("At

this stage of the administrative process . . . the Secretary of the Commission and

---

[7]    Notably, in addition to the clear and explicit NWPA provisions that the
licensing board applied, the NRC's Statement of Policy on the Conduct of
Adjudicatory Proceedings, CLI-98-12, 48 N.R.C. 18 (1998) recognizes that
"applicants for a license are . . . entitled to a prompt resolution of disputes
concerning their applications." *Id. at 19; see also Entergy Nuclear Generation Co.
& Entergy Nuclear Operations, Inc.* (Pilgrim Nuclear Power Station), Docket 50-
293-LR, Applicant's Motion for Issuance of Renewed License (Aug. 23, 2011).
This unusual motion before the Commission cited the above policy statement in
urging the NRC to issue a renewal license for the Pilgrim plant after an unusually
lengthy six-year license renewal proceeding.

the NRC Licensing Board . . . *still ha[ve] the responsibility and authority to review the merits of the Yucca Mountain application*.") (emphasis added).

As Petitioners demonstrate, *see* Petitioners' Br. at 44-48, the NRC Chairman's assertions that lack of funding justified the abandonment of the DOE licensing proceeding, contrary to the explicit requirements of the NWPA, is both factually and legally wrong. Those assertions are also disingenuous, because as Petitioners also observe, *id.* at 48-49, to the extent any funding problem may have existed, it was created by NRC personnel who expended the appropriated funds on activities to shut down the licensing proceedings, contrary to the NWPA requirements. The diversion of available funds and the associated activities to shut down the licensing proceeding also were contrary to the now-final NRC determination that the NWPA forbids DOE from withdrawing its license application. To credit the conduct of NRC personnel in diverting available funds away from actively pursuing consideration of the DOE license application would invite every administrative agency to disregard mandatory statutory requirements by merely administratively reprogramming appropriated funds to other uses.

## V. Until It Moved to Withdraw the License Application, DOE Had Long Participated in the NWPA's Detailed, Prescriptive Repository Development Process and Had Advocated for that Process to Continue.

As noted above, deference is owed to the NRC's interpretation of the NWPA licensing provisions it administers – although here the clear and explicit NWPA

21

terms involved must be enforced under *Chevron* "Step One."  In contrast, no

deference is owed to DOE's astonishing assertion that it was entitled to withdraw

the repository license application.  *Cf.* 6/29/10 Lic. Bd. Opin. at 626 ("[A]s DOE's

counsel appeared to concede at argument, the NRC does not owe deference to

DOE's understanding of the NRC's own responsibilities under section 114(a)[, 42

U.S.C. § 10134(a)]").  It is nonetheless instructive that DOE's motion to withdraw

is contrary to DOE's own previous longstanding position regarding the NWPA

requirements.  That position has been reflected in DOE's participation for many

years in the repository development process set out in the NWPA, including

participation in:  1) NRC and EPA rulemakings and other proceedings that

established or elaborated the substantive and procedural rules that would govern

the Yucca Mountain licensing proceeding,[8] 2) litigation where DOE advocated

upholding the applicable NRC and EPA rules and generally for continued progress

in the Yucca Mountain licensing proceeding,[9] 3) applying for federal and state

---

[8]    *See, e.g.*, EPA, Public Health and Environmental Radiation Protection
Standards for Yucca Mountain, Nevada, Final Rule, Responses to Comments at
Appendix A, *available at* http://www.epa.gov/radiation/docs/yucca/402-r-01-
009.pdf (listing DOE as a commentator to 400 C.F.R. Part 197).

[9]    *See, e.g.,* July 9, 2004 DOE Press Release, *available at*
http://www.yuccamountain.org/pdf/doe_press_opinion04.pdf, quoting the DOE
Secretary as stating: "I am pleased with today's decisions handed down by the
Court [referring to *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251 (D.C. Cir.
2004)].  The Court dismissed all challenges to the site selection of Yucca

licenses, permits, and approvals necessary to develop or construct the Yucca
Mountain repository or related infrastructure,[10] and 4) the Yucca Mountain
licensing proceeding itself.

Prior to its March 3, 2010, motion to withdraw, DOE had been working for
more than two decades on the Yucca Mountain license application.  *See* 6/29/10
Lic. Bd. Opin. at 616 (Noting the "17-volume, 8600-page construction
authorization application (Application) . . . over two decades in the making and
undergirded by millions of pages of studies, reports, and related materials at a
reported cost of over 10 billion dollars").  In 2002, at congressional hearings on
whether to approve a resolution overriding Nevada's "notice of disapproval" of the
President's recommendation of the Yucca Mountain repository site, under the
NWPA's procedures, *see* 42 U.S.C. §§ 10135-36, "the Secretary of Energy
testified in support of the [override] resolution and the President's
recommendation."  *See* S. Rep. No. 107-159 at 5.  And as recently as last year, in
proceedings before the NRC licensing board, "DOE also acknowledge[d] . . . that it
cannot withdraw the Application if that would be contrary to the statutes passed by
Congress").  6/29/10 Lic. Bd. Opin. at 618.

Mountain.  Our scientific basis for the Yucca Mountain Project is sound.  The
project will protect the public health and safety."

[10]     *See, e.g.,* 74 Fed. Reg. 20748 (April 11, 2008) (announcing DOE's
application to the Surface and Transportation Board seeking authority to construct
and operate a rail line to Yucca Mountain).

In short, DOE also knows what the NWPA's repository development procedures require, and it knows that the statutory requirements must be followed. *See id.* at 628-629 ("The Board is confident that DOE can and will prosecute the Application before the NRC in good faith, as we believe the NWPA requires.").

## VI.  The Requirements for a Writ of Mandamus are Met and the Court Should Issue the Writ.

The requirements for a writ of mandamus are met in this case.  Under the judicial review provisions of the NWPA, the Court applies to NRC action the familiar standards of the Administrative Procedure Act ("APA").  *See Nuclear Energy Inst.,* 373 F.3d at 1289.  Here, in accordance with 5 U.S.C. § 706(1), "The reviewing court shall – (1) compel agency action unlawfully withheld or unreasonably denied."  As explained above, there can be no question that NRC's failure to "consider" and "issue a final decision approving or disapproving" the DOE license application is contrary to the requirements of the NWPA, and thus is agency action "unlawfully withheld."  It is also both 1) agency action *unreasonably* withheld, as Petitioners demonstrate, *see* Petitioners' Br. at 37-52, and 2) agency action "unreasonably delayed" within the APA's meaning, given the NWPA's explicit, now-expired three year timeframe for an NRC decision on the license application, *see* 42 U.S.C § 10134(d)), as Petitioners likewise explain, *see* Petitioners' Br. at 35-36, 52-53.

24

In previously issuing a partial writ of mandamus requiring DOE to adhere to an NWPA provision, this Court noted that "[m]andamus is proper only if '(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff.'" *Northern States Power,* 128 F.3d at 758 (quoting *Council of and for the Blind of Delaware Cnty. Valley v. Regan,* 709 F.2d 1521, 1533 (D.C. Cir. 1983)) (*en banc*). These requirements are amply met here. The explicit NWPA requirements that Petitioners seek to enforce are clear and unequivocal, making the NRC's duty to act equally clear. The NRC has nonetheless failed to do what the NWPA requires it to do. In fact, the NRC's current inaction is directly contrary to the statutory requirements. Purportedly in the "exercise [of its] inherent supervisory authority," the NRC "direct[ed] the Board to, by the close of the current fiscal year, complete all necessary and appropriate case management activities." *See* 9/9/11 NRC Order at 1-2. That direction left the licensing board no choice, "consistent with" that NRC Order, but to declare that the proceeding on the DOE application for construction authorization "is suspended." *In re U.S. Dep't of Energy* (High-Level Waste Repository), Docket 63-001-HLW, ASLBP No. 09-892-HLW-CAB04 (Sept. 30, 2010) at 3. In these circumstances, where the NRC has purposely failed to comply with the statutory requirement that it "shall consider" and "shall issue a final decision" on DOE's license application, there is no adequate remedy available to

25

Petitioners other than a writ of mandamus from this Court directing the NRC to do what the NWPA requires.

Although mandamus is an extraordinary remedy, directing the NRC to comply with the NWPA's explicit commands in this case requires only that the NRC complete a proceeding in which substantial progress has already been made, after decades of planning and preparation.[11]  The Court is not being asked to order the agency to initiate some new, complex, uncharted and unstudied administrative proceeding *from scratch*.  This circumstance counsels in favor of issuing the writ.

---

[11]      As the NRC licensing board observed, *see* 6/29/10 Lic. Bd. Opin. at 615-617, DOE worked for more than two decades preparing the construction authorization application for the Yucca Mountain repository which DOE submitted to the NRC in June 2008.  That application contained 8600 pages comprising 17 volumes, was "undergirded by millions of pages of studies, reports and related materials," and DOE estimated the cost of preparing the application to be over 10 billion dollars.  *Id.* at 616.  The broad scope of technical subject issues DOE addressed in the application (at least 40 disciplines, many with sub-topics) triggered about 600 additional questions (Requests for Additional Information) from the NRC staff.  *See* Yucca Mountain License Application RAIs, *available at* http://www.nrc.gov/waste/hlw-disposal/yucca-lic-app-rai.pdf (last visited Dec. 9, 2011).  NRC devoted considerable manpower (more than 100 NRC staff and contractors) to the review of this first-of-a-kind application.  *See* Petitioners' Br. at p. 6.  NRC staff review of the application began in 2008 when the application was filed and continued into 2010.  *Id.* at pp. 8, 13.  As of April 2010, NRC staff informed the licensing board that the staff expected to complete 2 of 5 volumes of the NRC Safety Evaluation by November 2010.  *See In re U.S. Dep't of Energy* (High-Level Waste Repository), Docket 63-001-HLW, ASLBP No. 09-892-HLW-CAB04 (April 6, 2010) at 3. With respect to the licensing hearing on the application, approximately 318 proposed contentions were filed by 12 entities seeking to intervene and participate as parties; the licensing board ultimately admitted 11 parties and allowed most of their contentions for litigation.  *Id*. at 1-2.

The many billions of dollars that NEI members have paid and continue to pay into the Nuclear Waste Fund also counsel in favor of requiring NRC to *complete* the DOE license proceedings, as the NWPA requires.

Finally, strong action by this Court to enforce the requirements of the NWPA is appropriate and necessary here because the Executive Branch, if not entirely disabled from ensuring that the NRC faithfully executes the requirements of the NWPA, *see Aiken I,* 645 F.3d at 438-448 (Kavanaugh, J, concurring) (discussing NRC's independent agency status), has shown a clear and complete unwillingness to do so.  The responsibility therefore rests upon the Court to enforce the statutory requirements by issuing the writ of mandamus that Petitioners request.

# CONCLUSION

For these reasons, and those set forth in the Petition for Mandamus and in the Brief of Petitioners, the Court should issue the writ of mandamus.

Respectfully submitted,

_____/s/ Jerry Stouck_____

Ellen C. Ginsberg                    Jerry Stouck
Anne W. Cottingham                   Greenberg Traurig LLP
Nuclear Energy Institute, Inc.       2101 L Street NW, Suite 1000
1776 I Street, NW, Suite 400         Washington, DC 20037
Washington, DC 20006                 202-331-3173
202-739-8140                         202-331-3101 Facsimile
202-739-8139                         stouckj@gtlaw.com
ecg@nei.org
awc@nei.org                          *Counsel for Amicus Curaie*

CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,375 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2003 in 14 pt. Times New Roman font.

December 15, 2011                         /s/ Jerry Stouck
                                         Jerry Stouck

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of December, 2011, a copy of the

foregoing was filed using the CM/ECF system which will serve the same on all

parties of record as follows:

| | |
|---|---|
| Mullins, Charles | charles.mullins@nrc.gov |
| Nestor, Christopher R. | christopher.nestor@klgates.com |
| Andersen, Robert Michael | robert.andersen@akerman.com |
| Cordes, John F., Jr. | John.Cordes@nrc.gov |
| Ramsay, James Bradford | jramsay@naruc.org |
| Hartman, Barry M. | barry.hartman@klgages.com |
| | klgatesservice@klgates.com |
| Lunt, Robert Kimlin Jensen | rlunt@naruc.org |
| Gottshall, Thomas Rush | tgottshall@hsblawfirm.com |
| Woodington, Kenneth Paul | kwoodington@dml-law.com |
| Bowers, Todd R. | toddb@atg.wa.gov |
| Fits, Andrew Arthur | andyf@atg.wa.gov |
| Suttenbuerg, Jeremy | jeremy.suttenberg@nrc.gov |
| Shealy, Samuel Ross | rshealy@hsblawfirm.com |
| Cottingham, Anne W. | awc@nei.org |
| Stouck, Jerry | stouckj@gtlaw.com |
| Fitzpatrick, Charles J. | cfitzpatrick@nuclearlawyer.com |
| Lawrence, John W. | jlawrence@nuclearlawyer.com |
| Malsch, Martin Guilbert | mmalsch@nuclearlawyer.com |

DATED this 15th day of December 2011.

_____/s/ Jerry Stouck_____

Jerry Stouck